# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI

BONNIE GEORGE, ED MCKINZIE,  )
TIM WORSTELL, CEDAR DERAPS,  )
CASEY WASSER TAMMY VOLKART,  )
JAMES REHM, RON METZGAR,  )
BOBBIE LEE, BRIAN IMMEKUS, AND  )
AMAZING GRACE COMMUNITY CHURCH,  )
on behalf of themselves and all others similarly  )
situated,  )
       )
     Plaintiffs,  )
       )     Case No. 6:17-cv-03114MDH
     v.  )
       )
OMEGA FLEX, INC.,  )
WARD MANUFACTURING, LLC,  )
AND TITEFLEX CORPORATION,  )
       )
     Defendants.  )

## PLAINTIFFS' SECOND AMENDED COMPLAINT

COMES NOW plaintiffs, BONNIE GEORGE, ED MCKINZIE, TIM WORSTELL, CEDAR DERAPS, CASEY WASSER, TAMMY VOLKART, JAMES REHM, RON METZGAR, BOBBIE LEE, BRIAN IMMEKUS, and AMAZING GRACE COMMUNITY CHURCH ("plaintiffs"), on their own behalf and as Class Representatives on behalf of all similarly situated persons, and submits the following Second Amended Complaint against defendants OMEGA FLEX, INC. ("Omega Flex"), WARD MFG., LLC ("Ward"), and TITEFLEX CORPORATION ("Titeflex") ("defendants").

## NATURE OF THE ACTION

1.     Plaintiffs bring this action on their own behalf and, with respect to Counts I and II, as representatives of a class of persons consisting of all persons that purchased for personal, family or household purposes yellow CSST or a structure with yellow CSST (corrugated

1

stainless steel tubing) in the State of Missouri between January 1, 2007 and the date of class certification ("Missouri Class") and, with respect to Counts III and IV, a class consisting of all persons in the United States who purchased, for personal, family or household purposes, yellow CSST or a structure with yellow CSST between January 1, 2007 and the date of class certification ("Nationwide Class").

2.     Plaintiffs bring this action individually and as class representatives for defendants' violations of the Missouri Merchandising Practices Act, § 407.010, *et seq.*, to recover economic damages caused by those MMPA violations and to obtain injunctive relief against defendants, who are companies that sell, market, and distribute yellow CSST in the State of Missouri and throughout the United States to supply fuel gas to and within residential structures.  Plaintiffs also allege a conspiracy among defendants and that defendants were unjustly enriched.

3.     Numerous product liability actions have been brought against defendants in connection with yellow CSST, but this action is not based on any theory of product liability.  The Missouri Class claims are based on the MMPA, Missouri's consumer protection statute, because although defendants claim that "properly installed" yellow CSST will transport fuel gas safely, without risk of harming consumers or their residences, those claims were and are not true. Plaintiffs and class members have been damaged economically, as alleged herein, because they each have yellow CSST in their home.  The Nationwide class claims are based on a theory of unjust enrichment and defendants' conspiracy to deceive the public into believing the dangers inherent in yellow CSST can be eliminated through "bonding and grounding", including making that claim without any testing to back it up, then retroactively attempting to validate that claim through a false and inaccurate report in 2013, concealing research demonstrating yellow CSST is

susceptible to failure at energy levels found in common household currents as well as direct and indirect lightning strikes, and jointly developing and participating in a misleading "safety campaign" to promote the sale and installation of yellow CSST.

## <u>PARTIES</u>

4.      Plaintiff and homeowner Bonnie George is a post-2006 consumer of Titeflex's GasTite yellow-jacketed CSST, and is a citizen and resident of California, Moniteau County in the State of Missouri. Ms. George purchased GasTite in connection with building her home in 2011.

5.      Plaintiff and homeowner Ed McKinzie is a post-2006 consumer of Ward's Wardflex yellow-jacketed CSST, and is a citizen and resident of Columbia, Boone County in the State of Missouri. Mr. McKinzie purchased Wardflex in connection with building his home in 2011.

6.      Plaintiff and homeowner Tim Worstell is a post-2006 consumer of Ward's Wardflex yellow-jacketed CSST, and is a citizen and resident of Columbia, Boone County in the State of Missouri. Mr. Worstell purchased Wardflex in connection with building his home in 2015.

7.      Plaintiff and homeowner Cedar Deraps is a post-2006 consumer of Titeflex's GasTite yellow-jacketed CSST, and is a citizen and resident of Jamestown, Moniteau County in the State of Missouri. Mr. Deraps purchased GasTite in connection with remodeling his house in 2007, which he did himself and not through a contractor.

8.      Plaintiff and homeowner Casey Wasser is a post-2006 consumer of Titeflex's GasTite yellow-jacketed CSST, and is a citizen and resident of California, Moniteau County in

Case 6:17-cv-03114-MDH   Document 173   Filed 01/31/19   Page 3 of 43

the State of Missouri.  Mr. Wasser purchased GasTite in connection with building his house in late 2014 through early 2015.

9.      Plaintiff and homeowner Tammy Volkart is a post-2006 consumer of Omega Flex's TracPipe yellow-jacketed CSST, and is a citizen and resident of California, Moniteau County in the State of Missouri.  Ms. Volkart bought TracPipe in connection with the purchase of her just constructed house in September 2007.

10.     Plaintiff and homeowner James Rehm is a post-2006 consumer of Omega Flex's TracPipe yellow-jacketed CSST, and is a citizen and resident of Pulaski County in the State of Missouri.  Mr. Rehm purchased TracPipe in connection with building his house in 2011.

11.     Plaintiff and homeowner Ron Metzgar is a post-2006 consumer of Omega Flex's TracPipe yellow-jacketed CSST, and is a citizen and resident of Pulaski County in the State of Missouri.   Mr. Metzgar purchased TracPipe in connection with building his house in 2009.

12.     Plaintiff and homeowner Bobbie Lee is a post-2006 consumer of Omega Flex's TracPipe yellow-jacketed CSST, and is a citizen and resident of St. Charles County in the State of Missouri who previously resided in Franklin County in the State of Missouri. Ms. Lee purchased TracPipe in connection with building her house in 2009 in Franklin County in the State of Missouri.

13.     Plaintiff and homeowner Brian Immekus is a post-2006 consumer of Omega Flex's TracPipe yellow-jacketed CSST, and is a citizen and resident of Franklin County in the State of Missouri.  Mr. Immekus purchased TracPipe in connection with building his house in 2011 through 2012.

14.     Plaintiff Amazing Grace Community Church is a post-2006 consumer of Ward's Wardflex yellow-jacketed CSST in Crawford County in the State of Missouri.  Amazing Grace

Community Church purchased Wardflex in connection with building the church in approximately 2008-2009.

15. Defendant Omega Flex, Inc. ("Omega Flex") is a company that develops, sells, markets or distributes yellow CSST in the State of Missouri, but is incorporated and with its principal place of business in the Commonwealth of Pennsylvania.

16. Defendant Ward Manufacturing, LLC. ("Ward") is a is a company that develops, sells, markets or distributes yellow CSST in the State of Missouri, but is a Pennsylvania corporation.

17. Defendant Titeflex Corporation ("Titeflex") is a company that develops, sells, markets or distributes yellow CSST in the State of Missouri, but is incorporated and with its principal place of business in the State of Connecticut.

## JURISDICTION AND VENUE

18. This is a Class Action lawsuit seeking monetary damages and injunctive relief pursuant to Federal Rule of Civil Procedure 23.

19. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000 and the parties are citizens of different states. Furthermore, jurisdiction is conferred upon this Court pursuant to the Class Action Fairness Act in that damages exceed more than $5,000,000 in the aggregate, and the parties are citizens of different states. 28 U.S.C. § 1332(d)(2).

20. This Court has personal jurisdiction because defendants' contacts with the forum are continuous and substantial and because the claims of plaintiffs and the Class arise out of defendants' contact with the forum. Furthermore, defendants have availed themselves of the privilege of conducting business in Missouri and this forum, and, as explained elsewhere in this Complaint, defendants have committed affirmative tortious acts within the State of Missouri and

5

this forum, and have violated Missouri's Merchandising Practices Act. Service can be had upon the named defendants through application of the Missouri long-arm statute and as outlined above.

21.     Plaintiffs are all citizens of the State of Missouri and residents of this judicial district.

22.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b) because defendants engage in continuous and systematic activities within the State of Missouri and in this forum. Specifically, as provided by 28 U.S.C. §1391(c), defendants are companies that are deemed to reside in this District. Moreover, a substantial part of the events and omissions giving rise to the claims alleged herein occurred in this District.

23.     Service has been properly effected, and this Court has *in-personam* jurisdiction over the defendants under the applicable federal statutes and state long-arm statutes.

## FACTUAL BACKGROUND

### A.     Yellow CSST

24.     Since the early 1990s, the defendants have been selling a flexible gas piping system in the United States, including Missouri, known as Corrugated Stainless Steel Tubing ("CSST"). CSST is vastly thinner than traditional black iron pipe gas delivery systems that have been used by plumbers across the United States for more than 100 years.

25.     Yellow CSST consists of continuous, flexible stainless-steel pipe encased in a polymer outer (yellow) jacket. This jacket is not required by the CSST manufacturing specification, ANSI LC-1, but defendants sell and sold it with this jacket. The jacket serves two purposes: 1) the yellow color identifies the line as a fuel gas line; and 2) by "filling in" the external corrugations, it makes the CSST easier to pull over rough or sharp edges during installation. As readily acknowledged by defendants, today there are hundreds of millions of feet

6

of this product in more than 10 million homes across the country.

26. Since 1998, the CSST defendants have known that the yellow-jacketed CSST products they each design, manufacture, and sell to the public, are prone to catastrophic failure when exposed to electrical energy. All yellow CSST, including that purchased by class members and plaintiffs, is susceptible to failure in several ways: (1) electrical arcing from household appliances and the home's electrical circuitry; (2) indirect lightning strike; (3) lightning strike to one of the utility services supplying the house; and (4) direct lightning strike to the house. Yet defendants have sold yellow CSST as a product that safely transports fuel gas without inherent defects that create risk of fire or explosion, which is the purpose of the product.

27. Traditional black iron pipe has a wall thickness of .12 inches, while CSST has a wall thickness of .008 inches. Lightning damage to black iron pipe is usually so small that it is only visible with microscopic analysis, and the limited, small pit does not leak gas which would be subject to ignition. There are no reported instances of black iron pipe utilized to transport fuel gas failing from lightning.

28. In contrast, when electricity contacts CSST, the product fails due to its design and physical properties. The CSST tubing is so thin it is highly susceptible to perforation when exposed to even moderate voltage. Any electrical energy source sufficient to cause an "arc" between the CSST and any nearby conductive material – e.g., metal wiring, metal fasteners, metal bolts, etc. – which concentrates the voltage at a point may puncture or melt a hole in the thin tubing. The yellow jacket itself actually focuses electrical energy onto the surface of the CSST, exacerbating the problem.

29. The minimal amount of energy emitted that is required to generate the "arc" is the same as one would find in ordinary household electric current and can emanate from an ordinary

7

household appliance.

30.     The insulative yellow jacketing is unnecessary and heightens the danger so much that expert testing has concluded that *unjacketed* CSST would be better than having the yellow CSST.   Indeed, unjacketed CSST is as much as 25 times more resistant to puncture from exposure to electrical energy than yellow-jacketed CSST.

31.     Furthermore, experts have noted that installation practices render the jacketing a poor mechanism for insulating the metal tubing and preventing leaks and fires.   Defendants admit that the yellow jacketing is easily torn, punctured and ripped during installation when, for example, it may be dragged through the attic in a home.

**B.     Defendants Were Aware of the Danger of Yellow CSST**

32.     Defendants have long been aware of the dangers described herein associated with all yellow CSST and were aware of the dangers before January 1, 2007 and before plaintiffs herein purchased yellow CSST.   Defendants have, for example, manifested their knowledge as follows:

a.     In 2004, Defendant Omega Flex submitted a patent application for "Conductive Jacket for Tubing," in which it stated with regard to the existing tubing (i.e. the yellow jacketed CSST) "the jacket is made from an insulative material.   In the event that the piping is introduced to an electrical charge (e.g., from direct or indirect lightning), charge accumulates on the jacket and can burn through the jacket to the tubing resulting in a breach of the tubing."

b.     In 2009, Defendant Titleflex submitted a patent application for "Energy Dissipative Tubes" to "fix" yellow CSST.   In that application, Titeflex stated:   "Oftentimes, electrical currents will occur from inside the structure….This can result in an electrical flashover or arc between the adjacent systems."   Titeflex acknowledged that "[i]t is possible that a flash like this can cause enough heat generation to melt a hole in the CSST, allowing fuel gas to

8

escape. *This scenario is worsened by the dielectric jacket that often surrounds the CSST.* This jacket only typically breaks down in a very small area, creating a pinhole as a result of the flashover. This phenomenon focuses the flash and concentrates the heating of the stainless steel inside. The result is a reduced capability of the CSST to resist puncture from flashover compared to un-jacketed pipe."

c.      In their Yellow CSST Safety Campaign bulletin developed in early 2007, defendants acknowledged that "if lightning strikes on or near a structure" the electrical current "can travel through the structure's gas piping system and cause a leak, and in some cases a fire."

d.      Robert Torbin, the Director of Codes & Standards for Omega Flex and the self-proclaimed "Godfather of CSST" prepared a guide for the design and installation of CSST, published in September 2008, in which he referenced yellow CSST dangers from electrical fault, and lightning strikes, but clarified that "[bonding and grounding] guidelines are intended to reduce the risk of damage to the CSST system based on indirect lightning strikes only." *See* Exhibit E: ELECTRICAL BONDING OF CSST SYSTEMS, attached hereto and incorporated herein.

e.      In a National Fire Protection Association (NFPA) proposed Tentative Interim Amendment, published in 2009, Mr. Torbin further noted the dangers associated with CSST: "There have been numerous accounts of damage to corrugated stainless steel tubing from both direct and indirect lightning strikes on or near residential structures containing this type of gas piping system. The damage is consistent: an arc-induced perforation is created through the tubing wall from a voltage imbalance between the CSST and another electrically conductive system in close proximity. Fires are often associated with this type of damage and have resulted in partial or total losses of property." *See* Exhibit F: 2009 NFPA SUBMISSION - TENTATIVE INTERIM AMENDMENT 941, attached hereto and incorporated herein.

9

f.      James Dickens, Ph.D, P.E., an expert electrical engineer retained by Omega Flex to testify against a proposed building code standard for Lubbock, Texas that Omega Flex's new black CSST product, FlashShield, could not meet, testified before the Lubbock City Council on May 12, 2016 that:

> I think all of the pipes that offer the lightning protection, to varying degrees, are more than acceptable.
> Unfortunately, I have yellow pipe in my house. My children, I have two young children, and we are going to work on getting it out of there. I've known I've had it for a while. And, you know, in the interim, when there is a lightning strike, the kids are instructed to go inside. And, we will replace it. But I would replace it with any of the lightning resistant materials. And so, again, I'm not criticizing that material, saying it's not acceptable. I think it is more than acceptable, but I think the standard as Lubbock has it now and the codes committee has written it, is not quite where it needs to be. You see the yellow pipe that was here, that yellow pipe, obviously, got a hole in it. And the yellow CSST has been shown to fail at .1 coulombs. That is nothing. That – that is awful. That is so dangerous. This is a dangerous product. There is no question about that.

Plaintiffs allege that Dr. Dickens statements about yellow CSST recited above are true and that defendants, like their expert, were well aware that there is no question that yellow CSST is a dangerous product and familiar with the earlier testing referred to by Dr. Dickens.

33.     Defendants were also made aware of the dangers of yellow CSST alleged herein in litigation alleging that yellow CSST was a dangerous product subject to failure from electrical insult, including Lovelis, et al. v. Titeflex Corporation, Ward Manufacturing, Inc., Omegaflex, Inc., et al., Case No. CIV-2004-211, Circuit Court of Clark County, Arkansas, filed in 2004.

## C.      Defendants Made False Statements to Mislead Consumers and the Market about the Safety of Yellow CSST

34.     Despite knowing these safety risks, defendants concertedly and repeatedly made false and misleading statements to the public about the safety of yellow CSST. Indeed, the defendants sold millions of feet of yellow CSST for millions of dollars more in profits after having confirmed the dangers of yellow CSST.

10

35.     So that they could continue to market and sell yellow CSST, the defendants represented to the public as part of an agreed settlement of the prior Lovelis class action in 2006 that specified "bonding and grounding" of yellow-jacketed CSST provided a viable solution to the risk of injury, damage and fire due to lightning electrical flashover and arcing propensities. Defendants agreed to require a direct method of electrical bonding of their products within their respective Design and Installation Guides ("D&I Guides") and to provide notification to consumers warning them of the dangers associated with the continued use of yellow-jacketed CSST.     However, the bonding and grounding claims made and still made by defendants misleads consumers regarding protection from indirect lightning strikes, electrical arcing possible from household currents and direct lightning strikes.  The yellow jacketing placed on the CSST actually focuses the electrical energy from a lightning strike onto the surface of the CSST making bonding and grounding a worthless "fix" to the danger.  Rather than honestly warn consumers about the dangers of yellow CSST, defendants failed to mention the danger of CSST failure from arcing at levels of household currents and emphasized a "fix" that is not a "fix".

36.     In 2008, Robert Torbin, then a principal of Cutting Edge Solutions (and now an employee of Defendant Omega Flex), published what was described as a "guide" for the design and installation of electrical bonding for a CSST system. *See* Exhibit E:  ELECTRICAL BONDING OF CSST SYSTEMS.  Defendants were aware of this guide and aware that bonding and grounding could only *reduce, not eliminate* the risk of damage to the CSST system based on *indirect lightning strikes only.*

37.     In this "guide", Torbin explicitly noted that although the installation instructions of each commercially available CSST system required the direct bonding of the yellow-jacketed CSST system, these CSST installation requirements were affected by differences in the

accessories and components. *See id.* Torbin thereafter submitted a Tentative Interim Amendment ("TIA") to the appropriate National Fire Protection Association (NFPA) committee to revise 250.104 of the 2008 and proposed 2011 Edition of the NFPA 70. *See* Exhibit F: 2009 NFPA SUBMISSION - TENTATIVE INTERIM AMENDMENT 941.

38. The Tentative Interim Amendment #941 ("TIA 941") falsely represented that "[t]he CSST industry has performed laboratory testing and engineering analysis on direct bonding that demonstrates a significant reduction in the potential for arc-induced damage to CSST when energized by lightning energy."

39. TIA 941 was not approved, and Mr. Torbin appealed to the NFPA Standards Council. The Council found no basis to issue the TIA, and it further requested the organization of a Council task group, in part to identify potential research or data needs. See Exhibit G, attached hereto and incorporated herein.

40. The CSST Task Group reported to the NFPA Standards Council that it had sought information on the purported "research" allegedly supporting the sufficiency of the CSST bonding requirements, including any research performed by or on behalf of any CSST manufacturers. Although this information was specifically requested, the CSST Task Group reported that the information provided to it from the manufacturers was of "limited value" and "did not provide enough information for the CSST Task Group to ascertain that the proposed bonding remedy will provide adequate protection from lightning induced surges." See Exhibit H attached hereto and incorporated herein.

41. The Standards Council directed that the CSST industry or others advocating the continued use of CSST in gas piping systems should validate the safe use of the product through "independent third-party validated research and testing" that could be reviewed and evaluated by

the standards developers in a timely way. *Id*.

42. The CSST proponents, including defendants, initially chose to utilize the services of the Fire Protection Research Foundation, and the Foundation initiated activities that resulted in a proposal entitled "Validation of Installation Methods for CSST Gas Piping to Mitigate Lightning Related Damage, Phase I (April 2011) – the "Phase I Report. See Exhibit I: NFPA Final Decision D#12-15, attached hereto and incorporated herein. The proposal constituted a review and gap analysis to inform a future research project designed to validate the proposed installation methods touted by the CSST defendants as a "solution" to the yellow CSST dangers. *See id.* The Foundation further prepared the "Validation of Installation Methods for CSST Gas Piping to Mitigate Lightning Related Damage, Phase II, Proposal V2 (November 2011) – the "Phase II Test Plan". The Research Foundation solicited and incorporated input from the NFPA CSST Task Group and the NFPA Technical Committee in order to ensure that the test plan would meet the needs of the standards developers. *See id.*

43. The Research Foundation proceeded to solicit funding to carry out the proposed test plan. A delay was noted by the Standards Council as the Research Foundation waited for the industry's response and engaged in discussions with industry representatives regarding the scope of the proposed test plan. Ultimately, the CSST industry, and defendants, objected to the scope of the test plan, particularly to the implementation of a test to evaluate the response to a simulated arc from a home electrical system. *See* Exhibit I: NFPA FINAL DECISION D#12-15. "The Research Foundation declined to revise the test plan to eliminate this test and sometime in early April of 2012, CSST industry representatives notified the Research Foundation that it had been decided not to proceed with the project at the Research Foundation." *Id.* Defendants were seeking to avoid any testing or disclosure of the impact of arcs from home electrical systems, as

had that danger been made public, defendants could not have continued to market and sell yellow CSST as safe.

44. In a letter dated April 9, 2012, an AHRI representative provided an "update" to the Standards Council regarding actions taken within the "CSST industry" to comply with the directives of NFPA FINAL DECISION D#10-02. Although nearly two years had passed since the Standards Council's request for a "timely" response to the lack of independent validation of the bonding and grounding "solution," the letter "asserted, without support, that the Phase I Reports results validated the appropriateness of using bonding to protect CSST against lightning induced arcing damage." The letter made no mention of the CSST defendants' disagreement with the Phase II Test Plan, or the resulting decision to separate from the Research Foundation. *See* Exhibit I: NFPA FINAL DECISION D#12-15. Instead, the letter indicated that the CSST manufacturers agreed to fund additional research in an unspecified "Phase II Project," and in so doing identified the Gas Technology Institute ("GTI") and PowerCET Corporation ("Powercet") as providing testing in support of the Project, among others. *Id.*

45. During this timeframe, and since 2007, defendants jointly engaged in a national "Yellow CSST Safety Campaign," affirmatively representing to the public, government agencies and officials, fuel gas trade associations, the construction industry, Fire Marshalls, home inspectors and regulators, insurance commissioners, and insurance industry associations that additional bonding and grounding of yellow-jacketed CSST gas systems will eliminate damage and failure of that product when exposed to lightning energy. *See* Exhibit D: YELLOW CSST SAFETY CAMPAIGN ACTIVITY UPDATE/ACTIONS 2013, attached hereto and incorporated herein. However, the "fix" does nothing to protect homeowners from the risk of explosion or fire as a result of a direct or indirect lightning strike or due to electrical arcing.

46.     As a part of their unified "Yellow CSST Safety Campaign," the CSST defendants acknowledged, but misleadingly minimized, the risk that if lightning strikes "on or near a structure" the electrical current can travel "through the structure's gas piping system and cause a leak, and in some cases a fire." *See* Exhibit B - YELLOW CSST SAFETY CAMPAIGN BULLETIN, attached hereto and incorporated herein.  However, despite defendants' awareness that there are two forms of damaging lightning strikes: direct strikes – where lightning attaches to the home/structure and indirect strikes – where lightning strikes nearby a structure, the Bulletin significantly omits the reality that bonding and grounding does not protect the structure from direct strikes, nor is there any reference to the limitations on conduction by the yellow-jacketed system.  Instead, the Bulletin generically, and misleadingly, associates bonding and grounding with an unquantified reduction of an unspecified risk based broadly on "lightning activity." *See* Exhibit B - YELLOW CSST SAFETY CAMPAIGN BULLETIN.

47.     The "Safety Campaign" materials omits the critical fact that the yellow jacket on the CSST *actually helps cause damage when arcing occurs*.  The defendants are aware of industry expert opinions that the yellow CSST has no conductive value at all (meaning it does not distribute the electric charge); instead, the yellow-jacketing serves to *focus* the energy from an arc into the weakest points of the yellow-jacketing, disintegrating those points first and exposing the metal tubing to further energy, causing holes or perforations in the gas line, which can cause gas to leak from the tube and ignite.

48.     The solution defendants proffer, bonding and grounding, is a false and illusory "fix" for the admitted lightning risks. Starting in 2007 and through today, the CSST defendants represent to the public at large, to encourage and enable sales of yellow CSST, that: "Proper bonding and grounding will reduce the risk of damage and fire from a lightning strike."

15

http://www.csstsafety.com/CSST-solution.html. *See* Exhibit A, attached hereto and incorporated herein, p.4: WWW.CSSTSAFETY.COM; *see also* Exhibit C- GASTITE TECHNICAL BULLETIN TB2007-01-01-26-07, attached hereto and incorporated herein; WARDFLEX TECHNICAL BULLETIN #16-2007; OMEGA FLEX TRACPIPE 2007 INSTALLATION GUIDE §4.10; 4.10A. This representation implicitly indicates protection from both a direct and indirect lightning strike, yet defendants know that such intended inference is wholly inaccurate.

49. Defendants also promoted bonding and grounding as a safety fix to numerous agencies, including code and building officials, state and federal legislators, home inspection organizations, Governors, local, state and national fire marshals, fire commissioners, and Attorneys General. They did so to be able to continue selling and marketing yellow CSST and make sure building codes, regulations, and statutes did not prohibit the use of yellow CSST to carry fuel gas.

50. The defendants thereafter jointly conspired and cooperated in the creation of what is commonly referred to as the "2013 GTI Final Report."

51. In their 2013 GTI Final Report defendants further promulgated the false notion that bonding and grounding is a solution to the dangers associated with yellow CSST.

52. Not only is the Report fundamentally and materially incorrect, but by the intentional design of defendants and the CSST industry it is limited to addressing energy transfer from indirect lightning strikes. Additionally, among other inaccuracies, the pertinent calculations in the Report are off by a factor of 10x, rendering the safety conclusions false and misleading.

53. When the conclusions in the report are recalculated using the correct figures, it is unassailable that bonding and grounding will not provide a reasonable level of safety in the event

16

of a nearby lightning strike.

54.     In an October 2015 proposed revision to the GTI Report, GTI acknowledged that the prior report was unreliable because the calculations were inaccurate and were based on unsubstantiated methodologies.  See Exhibit J, attached hereto and incorporated herein.

55.     The woefully inaccurate 2013 GTI Final Report was submitted by defendants and their agents to state and federal legislators, home inspection organizations, Governors, local, state and national fire marshals, fire commissioners, Attorney Generals, regulatory agencies, members of trade industry groups, and countless others.  They did so to be able to continue selling and marketing yellow CSST and make sure building codes, regulations, and statutes did not prohibit the use of yellow CSST to carry fuel gas.  The false 2013 GTI report is relied upon in their ongoing marketing efforts and "Safety Campaign," and the defendants continue to this day to capitalize on their 2009 decision to not use an independent, third-party research group to validate the bonding and grounding safety "solution."  Furthermore, the CSST defendants used this same misinformation to block legislation that would have banned yellow CSST or required other products to be used, arguing that bonding and grounding should be legislatively adopted as the proper standard in light of the 2013 GTI Final Report.

56.     The representations to consumers, regulatory agencies, contracting groups, legislators, and others were and are made without valid testing and verification to support defendants' safety claims.  Not only is defendants' claim that bonding and grounding prevents arcing unsubstantiated, it is actually *false*.  Bonding and grounding as set forth in the CSST defendants' Design and Installation Guides, and purportedly validated by the inaccurate 2013 GTI Final Report, are ineffective to prevent the danger of arcing that causes holes, leaks, fires and explosions.

17

57.     Defendants' intentional, ongoing, and systematic disinformation "safety campaign," begun in 2007, was intended to hide and conceal the true dangers of CSST from plaintiffs and class members, and was designed to lull consumers into purchasing CSST, or homes that contain CSST, by falsely representing and/or omitting facts to misleadingly make it appear that CSST is not as inherently dangerous as it actually is.  It was and is a vital part of defendants' marketing and sale of yellow CSST and was undertaken in connection with the sale and advertising of yellow CSST.

## CLASS ALLEGATIONS

58.     Plaintiffs repeat and re-allege the allegations of all other paragraphs in this complaint as if fully set forth herein.

59.     Plaintiffs bring the below causes of action individually and on behalf of others who are similarly situated pursuant to Federal Rule of Civil Procedure 23(a), (b).

60.     The putative class for Counts I, II and III is: all persons who purchased for personal, family or household purposes yellow CSST or a structure with yellow CSST in the State of Missouri between January 1, 2007 and the date of class certification ("Missouri Consumer Class").

61.     The putative class for Counts IV and V is: all persons in the United States who purchased for personal, family or household purposes, Yellow CSST or a structure with Yellow CSST  between January 1, 2007 and the date of class certification ("Nationwide Class").

62.     Further, proposed additional subclasses may ultimately be defined at a later time.

63.     Excluded from all Classes are:

18

(a)    federal, state, and/or local governments, including, but not limited to, their departments, agencies, divisions, bureaus, boards, sections, groups, counsels, and/or subdivisions;

(b)    any entity in which defendants have a controlling interest, to include, but not limited to, their legal representative, heirs, and successors;

(c)    any member of the law firms or the Court or their respective staff or employees;

(d)    Persons who timely opt out of this proceeding using the correct protocol for opting out that will be formally established by this Court.

(e)    Persons whose homes were damaged or destroyed because of CSST related fires or explosions, inclusive of subrogated carriers.

64.    *Numerosity – Rule 23(a)(1).* Upon information and belief, the Nationwide Class consists of hundreds of thousands of purchasers dispersed throughout the United States, and the Missouri Class consists of thousands of purchasers throughout the State of Missouri. Accordingly, it would be impracticable to join all members of the Classes before the Court.

65.    *Predominance and Commonality – Rule 23(a)(2); (b)(3).* There are numerous and substantial questions of law or fact common to all members of the Classes that predominate over any individual issues. Included within the common questions of law or fact are:

    a.    Whether defendants made misleading and/or false statements concerning the safety of yellow CSST;

    b.    Whether defendants' actions alleged herein constitute an unlawful practice under the MMPA;

    c.    Whether defendants' actions alleged herein constitute an unfair practice under the MMPA;

19

d.  Whether defendants' actions alleged herein were unethical, oppressive, or unscrupulous;

e.  Whether defendants' actions alleged herein constituted concealment or omission of any material fact;

f.  Whether defendants' actions alleged herein present a risk of substantial injury to consumers;

g.  Whether defendants engaged in the alleged acts in furtherance of the alleged conspiracy;

h.  Whether, and to what extent, injunctive relief should be granted to prevent such conduct in the future;

i.  Whether defendant has been unjustly enriched by the sale of the yellow CSST to the plaintiff and members of the Classes;

j.  whether plaintiff and members of the Classes have sustained damages as a result of defendant's unlawful conduct; and

k.  The proper measure of damages sustained by plaintiff and members of the Classes.

66.  *Typicality – Rule 23(a)(3)*. The claims of the plaintiffs are typical of the claims of members of the Classes, in that they share the facts referenced in this complaint and legal claims and remedial theories with members of the Classes, the claims of plaintiffs and the class members arise from the same events or course of conduct, there is a sufficient relationship between the damage to plaintiffs and defendants' conduct affecting members of the Classes, so that they have suffered the same injuries as the Classes, and plaintiffs share the interests of other members of the Classes in this litigation.

20

67.     *Adequacy of Representation – Rule 23(a)(4).* Plaintiffs will fairly and adequately protect the interests of members of the Classes and have retained counsel experienced and competent in the prosecution of complex class actions, including complex questions that arise in consumer protection litigation.  Furthermore, plaintiffs do not have any conflicts of interest which will adversely affect the interests of the class.

68.     *Superiority – Rule 23(b)(3).* A class action is superior to other methods for the fair and efficient adjudication of this controversy, since individual joinder of all members of the Classes is impracticable and no alternative method of adjudication of the claims asserted herein is more fair, efficient and manageable for at least the following reasons:

(a).     The joinder of thousands of geographically diverse individual Class Members is impracticable, cumbersome, unduly burdensome, and a waste of judicial and/or litigation resources;

(b)     There is no special interest by Class Members in individually controlling prosecution of separate causes of action;

(c)     Class Members' individual claims now may be relatively modest compared with the expense of litigating the claim, thereby making it impracticable, unduly burdensome, expensive, if not totally impossible, to justify individual Class Members addressing their losses;

(d)     When defendants' liability has been adjudicated, claims of all Class Members can be determined by the Court and administered efficiently in a manner which is far less erroneous, burdensome, and expensive than if it were attempted through filing, discovery, and trial of all individual cases;

(e)     This Class Action will promote orderly, efficient, expeditious, and appropriate adjudication and administration of class claims to promote economies of time, resources, and the available pool of recovery;

(f)     This Class Action will assure uniformity of decisions among Class Members;

(g)     Without the Class Action, Class Members will go without restitution or money damages;

(h)     Without this Class Action, defendants will reap the benefits of profits from their illegal conduct;

(i)     The resolution of this controversy through this Class Action presents fewer management difficulties than individual claims filed in which the parties may be subject to varying and different adjudications of their rights;

(j)     Injunctive relief will be available to protect all future consumers from the sale, marketing, and/or distribution of defective products and further from defendants' false and misleading statements regarding the safety of Yellow CSST.

(k)     This action presents no difficulty that would impede its management by the Court as a class action, which is the best available means by which plaintiffs and members of the Classes can seek redress for the harm caused to them by defendants.

69.     Because plaintiffs seek relief for all members of the Classes, the prosecution of separate actions by individual members would create a risk of inconsistent or varying adjudications with respect to individual members of the Classes, which would establish incompatible standards of conduct for defendants.

70.     Further, bringing individual claims would overburden the Courts and be an inefficient method of resolving the dispute which is the center of this litigation.  Adjudications with respect to individual members of the Classes would, as a practical matter, be dispositive of the interest of other members of the Classes who are not parties to the adjudication and may impair or impede their ability to protect their interests.  As a consequence, class treatment is a superior method for adjudication of the issues in this case.


## CAUSES OF ACTION

## COUNT I

### VIOLATION OF MISSOURI MERCHANDISING PRACTICES ACT - (MISREPRESENTATIONS AND FALSE STATEMENTS)

71.     Plaintiffs repeat and re-allege the allegations of all other paragraphs in this complaint as if fully set forth herein.

72.     Plaintiffs bring this claim individually and on behalf of the Missouri Consumer

class for defendants' violations of the MMPA. The MMPA "is designed to regulate the marketplace to the advantage of those traditionally thought to have unequal bargaining power as well as those who may fall victim to unfair practices." *Huch v. Charter Commc'ns Inc.*, 290 S.W. 3d 721, 725 (Mo. banc 2009). The MMPA provides that it is unlawful to "act, use or employ . . . deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce . . . ." § 407.020.1, RSMo. Defendant's conduct as described herein constitutes an unlawful practice under the MMPA and the act, use or employment of deception, fraud, false pretenses, false promises, misrepresentation, unfair practices and/or the concealment, suppression, or omission of any material facts in connection with the sale or advertisement of any merchandise in trade or commerce in that defendants, in marketing yellow CSST and making sure they are able to sell yellow CSST, made and still make the false statement and material misrepresentation that the yellow CSST they manufacture and sell is safe and not defective. Furthermore, they denied and continue to deny the inherent dangers in yellow CSST.

73. The MMPA applies to acts committed "before, during or after the sale, advertisement or solicitation" of merchandise, and provides a cause of action for "any person who purchases or leases merchandise primarily for personal, family or household purposes." Section 407.020 is intended to supplement the definitions of common law fraud to "preserve fundamental honesty, fair play and right dealings in public transactions."

74. In addition to defendants' misrepresentations and false statements set out previously in this Complaint regarding the safety of yellow CSST, their testing of yellow CSST, the efficacy of bonding and grounding to prevent failure of yellow CSST when

exposed to electrical current and their disclaimer of defects, all of which were in connection with the sale and marketing of yellow CSST, the defendants jointly own and control the website WWW.CSSTSAFETY.COM, which they instituted in approximately 2009 and still operate in the same form with the same statements noted below. This website is used in connection with the marketing and sale of yellow CSST and is intended for and available to the public at large. It begins with a section extolling the supposed benefits of yellow CSST over "the traditional method." It also attempts to justify the admittedly "more expensive" yellow CSST purchase by claiming its "overall cost is less when factoring in labor and installation." Even the name of the website is designed to convince consumers that yellow CSST is safe. Attached hereto and incorporated herein is Exhibit A, printouts of material contained on defendants' website WWW.CSSTSAFETY.COM. Defendants' website notes "Areas with high lightning risk include but are not limited to: …Missouri…", and contains the following statements:

a. "Properly bonding and grounding the Corrugated Stainless Steel Tubing (CSST) significantly reduces the risk of damage and fire from a lightning strike.").

b. "Lightning is a highly destructive force. Even a nearby lightning strike that does not strike a structure directly can cause all electrically conductive systems in the structure to become energized. Nearby lightning strikes can result in a power surge that can damage certain gas tubing systems and ultimately cause a fire. Properly bonding and grounding the Corrugated Stainless Steel Tubing (CSST) significantly reduces the risk of damage and fire from a lightning strike."

c. Upon clicking a tab entitled "CSST Safety", the reader encounters a heading of "CSST SAFETY SOLUTION", under which is stated: "Proper bonding and grounding will

24

reduce the risk of damage and fire from a lightning strike."

      d.     Under the "frequently asked questions" section, the website poses the question "Is CSST safe to use in my home?", and answers "CSST is safe when properly installed."

      75.    These statements on defendants' CSSTSAFETY website are false, incorrect, misleading, create a false impression, and are not in *accord with* the facts. They constitute misrepresentations and deception under the MMPA and supporting regulations, including 15 CSR 60 – 9.020 (Deception in General) and 15 CSR 60 – 9.070 (Misrepresentation in General). Yellow CSST is not safe, even if installed in accordance with defendants' D&I Guide instructions on bonding and grounding. Bonding and grounding does nothing to protect from direct lightning strikes (and such protection is at least implied in the above statements, which refer to the risk of damage and fire from "lightning strikes"). Furthermore, bonding and grounding does not provide a reasonable level of safety in the presence of nearby lightning strikes, and is ineffective to prevent the danger of electrical arcing that causes holes, leaks, fires, and explosions associated with CSST.

      76.    Defendant's false statements and misrepresentations as set forth in this Complaint are material in that they relate to matters that are important to consumers and/or are likely to affect the purchasing decisions or conduct of consumers, including plaintiff and members of the Missouri Consumer class. Builders would not recommend, and consumers would not purchase, yellow CSST if they knew that bonding and grounding does not make yellow CSST safe to use.

      77.    In violation of the MMPA, Defendant used and employed deception, fraud, false pretense, misrepresentation, unfair practices and/or the knowing concealment, suppression or omission of material facts in connection with its sale and advertisement of yellow CSST.

      78.    Plaintiff and members of the Missouri Consumer Class purchased the yellow

CSST for personal, family, or household purposes.

79.     Plaintiff and the Missouri Consumer Class members suffered an ascertainable loss and economic damages as a result of Defendant's unlawful conduct in that the product they and other class members purchased was worth less than the product they thought they had purchased and would have received had defendants' representations been true and the product been as represented.   Plaintiffs have also been damaged in that they paid for a worthless and dangerous product (yellow CSST).

80.     By falsely and deceptively representing yellow CSST, defendants have caused economic harm to plaintiffs and all other consumers who have purchased yellow CSST. Plaintiffs and these other consumers have been deprived of the benefit of the bargain by purchasing yellow CSST which was represented as safe and non-defective, but is worth less than fuel gas pipe of this character and quality because the yellow CSST is designed with the inherent defects alleged herein which make them susceptible to failure when exposed to electrical insult. The design defect in the yellow CSST places a stigma on homes that have the product installed, and reduces their marketability and resale value.   The ineffectiveness of bonding and grounding to eliminate the inherent defects alleged herein also places consumers in a position of bearing the cost for alternative repairs.   Under the benefit of the bargain model, plaintiffs and class members are entitled to recover the lesser amount of (1) the dimunition in value of the homes with yellow CSST, or (2) the cost of repair to bring the yellow CSST into conformance with defendants' representations that yellow CSST can be safely used, or (3) the cost of alternative remedial measures to remove the danger of yellow CSST from the homes, such as replacing the yellow CSST with a product that will safely transport fuel gas, installing a lightning protection system that meets code standards, or switching the home from gas to electric utilities.   (See further

26

supporting factual allegations in this regard in the following paragraph).

81.    Plaintiffs and the Missouri Consumer Class members also suffered an ascertainable loss and economic damages as a result of Defendant's unlawful conduct in that their home's value is decreased because of the presence of yellow CSST.  Among other facts supporting that allegation are the following:

a.    The International Association of Fire Chiefs Fire and Life Safety Section proposed, and the IAFC Board of Directors adopted, a position statement, attached hereto as Exhibit K, and incorporated herein, which states as follows:  "[t]he Fire and Life Safety Section strongly urges the IAFC and its members to support the adoption of the following recommended changes in legislation: … "[p]ropose new real property transfer regulations in each state that would require homeowners to disclose the installation and hazards of CSST that do not meet LC 1027 [newly established product standard already developed, but not yet recognized by model codes or product testing agencies] in homes located in areas with a ground flash density greater than 4 flashes/km²/yr as recorded by the National Lightning Detection Network."  The entire state of Missouri exceeds that flash density.  According to the National Weather Service, Missouri ranks sixth in the nation in average lightning strikes per square mile and averages more than a million lightning strikes per year. Although the deceptive acts of the defendants certainly affect the United States as a whole, the importance of such deception severely affects the jurisdiction of Missouri in light of the increased lightning risks.

b.    Real Estate Agents in Missouri are required to disclose 'all adverse material facts actually known or that should have been known" to the agent, and standard and widely utilized seller's disclosure statements, including Missouri Association of Realtors form DSC-8000, contain detailed disclosures regarding HVAC, plumbing, and electrical systems in the house, and

27

instruct sellers that "[i]f you know of or suspect some condition which may negatively affect the value of the property or impair the health or safety of future occupants …then you may use the space at the end of this form to further describe that condition". The heating, cooling, and ventilating section, the plumbing section, and the electrical section of the DSC-8000 all ask if the seller is "aware of any problems or repairs needed with any item in this section". As alleged and explained herein, yellow CSST presents a threat to the health and safety of future occupants of the home, and will be, and should be, disclosed on the DSC-8000 and other standard forms and by real estate agents marketing the house, and negatively impacts the value and sale price of the home.

c. Prospective homebuyers discount the price they are willing to pay for a home with yellow CSST or insist that the current owner pay to remedy the situation, which also reduces the home's value. John Rocheleau, an expert on gas piping, stated that in his professional opinion "if you leave CSST in your building, then you are gambling or are just plain stupid." John Rocheleau, "*CSST Gas Pipe/Lightning Fires*," PROTECH HVAC (August 1, 2012). Mark Goodson, an expert in electrical and mechanical failure analysis, has recommended the following three remediations to prevent CSST induced fires, including complete removal of CSST from the structure: "(1) convert the structure to electricity only and remove all gas delivery; (2) retain gas but remove all CSST from the structure and install black iron pipe; or (3) prevent lightning from contacting the CSST which would prevent perforation and ensuing fire – i.e., install a NFPA 780 type lightning arrestor system. Without paying for the costs associated with one of these three solutions, homes or structures containing the CSST are subject to fire due to uniform failure when electrical current caused by lightning contacts the CSST." Mark Goodson and Mark Hergenrether, "*The Causal Link Between Lightning Strikes, CSST, And Fire*,"

Fire and Arson Investigator (October 2005).

82.     In addition, those class members that have incurred the expense of bonding and grounding as a result of defendants' false claim that bonding and grounding remedies the dangers of yellow CSST have been damaged in the amount paid to implement this ineffective "fix."

83.     In addition, defendants' conduct has caused plaintiffs and the Missouri Consumer class members irreparable injury.  As described herein, defendant has engaged in unlawful and misleading conduct on a routine and consistent basis, harming Missouri consumers in a uniform manner.  Unless restrained and enjoined, defendant will continue such conduct.  As authorized under § 407.025.2, RSMo., plaintiffs request injunctive relief, and such other equitable relief as the Court deems just and proper.

84.     The defendants' conduct alleged herein was outrageous because of evil motive or reckless indifference to the rights of others, and showed complete indifference to or conscious disregard for the safety of others, such that plaintiffs and Class Members are entitled to the recovery of punitive damages as authorized by § 407.025.

85.     Plaintiffs and Class Members are also entitled to recover attorney fees as authorized by  § 407.025.

86.     This private civil action by plaintiffs to enforce § 407.010 *et. seq.* is authorized by § 407.025.

87.     Class actions are authorized by the MMPA where an unlawful practice "has caused similar injury to numerous other persons." § 407.025.2.

## COUNT II

### VIOLATION OF MISSOURI MERCHANDISING PRACTICES ACT - UNFAIR PRACTICE (15 CSR 60-8.020)

88.     Plaintiffs repeat and re-allege the allegations of all other paragraphs in this complaint as if fully set forth herein.

89.     As noted above, the MMPA prohibits as an unlawful practice the act, use or employment of any "unfair practice" in connection with the sale or advertisement of any merchandise in trade or commerce.     § 407.020.1, RSMo.

90.     "Unfair practice" is defined as "any practice which –

(A)  Either—

1.     Offends any public policy as it has been established by the Constitution, statutes or common law of this state, or by the Federal Trade Commission, or its interpretive decisions; or

2.     Is unethical, oppressive or unscrupulous; and

(B) Presents a risk of, or causes, substantial injury to consumers.

15 CSR 60-8.020.

91.     Defendants' actions in connection with the sale and advertising of yellow CSST, and the marketing of yellow CSST, as alleged herein, were and are unethical, oppressive, and unscrupulous.  These actions are detailed further in numerous paragraphs of Count I, Count III, and Count IV as well as the paragraphs of this Complaint setting out the factual background, but, for example, see paragraph 122 of Count IV, paragraphs 107 and 108 of Count III, and paragraph 71 of Count I.

92.     Defendants' actions as alleged herein present a risk of substantial injury to consumers, and have caused substantial injury to consumers, including household fires with catastrophic and sometimes fatal results.

93.     The International Association of Fire Chiefs has concluded, and plaintiffs allege, that "[s]ince the use of CSST became widespread, jurisdictions in lightning prone areas have witnessed a significant increase in the incidence of fires involving CSST following lightning

events. Although the precise number of these incidents is difficult to estimate, anecdotal evidence collected by fire officials at the state and local levels suggest that the use of CSST for fuel gas installations in areas with high incidence of lightning strikes may increase the likelihood of fires by 10 times compared with other dwellings not equipped with CSST." *See* Exhibit K, attached hereto and incorporated herein.

94.     The IAFC also concluded, and plaintiffs allege, that "[e]fforts to reduce the likelihood of leaks by introducing bonding requirements in 2009 have not significantly reduced the occurrence of fires involving products that meet the current product standards governing CSST performance." *Id*.

95.     Plaintiff and the Missouri Consumer Class members suffered an ascertainable loss and economic damages as a result of defendants' unlawful conduct and unfair practice in that the product they and other class members purchased was worth less than the product they thought they had purchased and would have received had defendants' representations been true and the product been as represented. Plaintiffs have also been damaged in that they paid for a worthless and dangerous product (yellow CSST).

96.     By falsely and deceptively representing yellow CSST, defendants have caused economic harm to plaintiffs and all other consumers who have purchased yellow CSST. Plaintiffs and these other consumers have been deprived of the benefit of the bargain by purchasing yellow CSST which was represented as safe and non-defective, but is worth less than fuel gas pipe of this character and quality because the yellow CSST is designed with the inherent defects alleged herein which make them susceptible to failure when exposed to electrical insult. The design defect in the yellow CSST places a stigma on homes that have the product installed, and reduces their marketability and resale value. The ineffectiveness of bonding and grounding

to eliminate the inherent defects alleged herein also places consumers in a position of bearing the cost for alternative repairs. Under the benefit of the bargain model, plaintiffs and class members are entitled to recover the lesser amount of (1) the dimunition in value of the homes with yellow CSST, or (2) the cost of repair to bring the yellow CSST into conformance with defendants' representations that yellow CSST can be safely used, or (3) the cost of alternative remedial measures to remove the danger of yellow CSST from the homes, such as replacing the yellow CSST with a product that will safely transport fuel gas, installing a lightning protection system that meets code standards, or switching the home from gas to electric utilities.

97.     Plaintiffs and the Missouri Consumer Class members also suffered an ascertainable loss and economic damages as a result of Defendant's unlawful conduct and unfair practice in that their home's value is decreased because of the presence of yellow CSST as alleged in Count I.

98.     In addition, those class members that have incurred the expense of bonding and grounding as a result of defendants' false claim that bonding and grounding remedies the dangers of yellow CSST have been damaged in the amount paid to implement this ineffective "fix."

99.     In addition, defendants' conduct has caused plaintiffs and the Missouri Consumer Class members irreparable injury. As described herein, defendants have engaged in unlawful and misleading conduct on a routine and consistent basis, harming Missouri consumers in a uniform manner. Unless restrained and enjoined, defendants will continue such conduct. As authorized under § 407.025.2, RSMo., plaintiffs request injunctive relief, and such other equitable relief as the Court deems just and proper.

100.     The defendants' conduct alleged herein was outrageous because of evil motive or reckless indifference to the rights of others, and showed complete indifference

to or conscious disregard for the safety of others, such that plaintiffs and Class Members are entitled to the recovery of punitive damages as authorized by § 407.025.

101.    Plaintiffs and Class Members are also entitled to recover attorney fees as authorized by § 407.025.

102.    This private civil action by plaintiffs to enforce § 407.010 *et. seq.* is authorized by § 407.025.

103.    Class actions are authorized by the MMPA where an unlawful practice "has caused similar injury to numerous other persons." § 407.025.2.

<u>**COUNT III**</u>

**VIOLATION OF MISSOURI MERCHANDISING PRACTICES ACT -
CONCEALMENT OR OMISSION OF ANY MATERIAL FACT
(15 CSR 60-9.110)**

104.    Plaintiffs repeat and re-allege the allegations of all other paragraphs in this complaint as if fully set forth herein.

105.    As noted above, the MMPA prohibits as an unlawful practice the act, use or employment of the "concealment, suppression or omission of any material fact" in connection with the sale or advertisement of any merchandise in trade or commerce.    §407.020.1, RSMo.

106.    A "material fact" is defined as "any fact which a reasonable consumer would likely consider to be important in making a purchasing decision, or which would be likely to induce a person to manifest his/her assent, or which the seller knows would be likely to induce a particular consumer to manifest his/her assent, or which would be likely to induce a reasonable consumer to act, respond or change his/her behavior in any substantial manner."  15 CSR 60-9.010(1)(C).

33

107.    "Concealment of a material fact" is defined as "any method, act, use or practice which operates to hide or keep material facts from consumers."

15 CSR 60-9.110(1).

108.    "Omission of a material fact" is defined as "any failure by a person to disclose material facts known to him/her, or upon reasonable inquiry would be known to him/her."

15 CSR 60-9.110(3).

109.    Defendants' actions as alleged herein constituted the concealment and omission of material facts relating to the safety of yellow CSST in connection with the sale, advertising, and marketing of yellow CSST.  These actions are detailed further in numerous paragraphs of Counts I, II and Count IV as well as the paragraphs of this Complaint setting out the factual background, but, for example, see paragraph 122 of Count IV and paragraph 71 of Count I and paragraphs 107 and 108 of Count III.

110.    Yellow CSST presents a risk of substantial injury to consumers, and has caused substantial injury to consumers, including household fires with catastrophic and sometimes fatal results.  Facts regarding the inherent defects and risks of yellow CSST, and the inherent risks of yellow CSST even if bonded and grounded according to defendants' D & I guides, as alleged herein, are facts material to consumers.  These facts were known by defendants, but omitted from defendants' communications to the public on their website WWW.CSSTSAFETY.COM, (Exhibit A) from their yellow CSST "safety campaign" messages (Exhibit B), and in defendants' installation instructions (Exhibit C).  No later than 2008, defendants knew that bonding and grounding was "intended" to *reduce* the risk of damage to CSST from indirect lightning strikes *only*, and the industry consultant, Robert Torbin, recommended that "consideration must also be given to the installation of a lightning protection system in accordance with NFPA 780 and/or other lightning protection standards that go beyond the scope of this manual."  (Exhibit E).  Yet

34

defendants omitted the lightning protection system recommendation, and the dangers remaining when yellow CSST is bonded and grounded, when stating, on their joint website, that yellow "CSST is safe if properly installed."  They further omitted these inherent risks and dangers when lobbying trade groups and governmental authorities and seeking to ensure building codes did not change to reflect the evidence that yellow CSST is just not safe.  Builders, for example, were never told about the inherent dangers of yellow CSST or that lightning protection systems should be "considered" when yellow CSST is utilized in a home.

111.    Defendants also engaged in the actions alleged herein designed to conceal the inherent defects and risks of yellow CSST.  In addition to the omissions described above, these actions include failing to test yellow CSST prior to marketing, refusing to engage in testing recommended by industry groups such as the NFPA, failing to provide the NFPA CSST Task Group with information regarding yellow CSST "research" allegedly supporting the sufficiency of bonding and grounding requirements, failing to validate through independent third-party research and testing that CSST use is safe (despite being instructed to by the NFPA standards council ), refusing to conduct testing recommended by the Fire Protection Research Foundation in 2012, conspiring to produce the false and inaccurate 2013 GTI report, and denying to the public, trade industry, and governmental authorities that yellow CSST is dangerous and has an inherent defect that cannot be fixed by bonding and grounding.  Without this concealment, which occurred in connection with the sale and marketing of yellow CSST, defendants could not have sold or marketed yellow CSST, as consumers would not have purchased, and building codes and regulations and statutes would not have allowed, the sale of yellow CSST had the inherent defects and risks of yellow CSST, and the ineffectiveness of bonding and grounding as a remedy, been known.

112. Plaintiffs and the Missouri Consumer Class members suffered an ascertainable loss and economic damages as a result of defendants' unlawful conduct and unfair practice in that the product they and other class members purchased was worth less than the product they thought they had purchased and would have received had defendants' representations been true and the product been as represented. Plaintiffs have also been damaged in that they paid for a worthless and dangerous product (yellow CSST).

113. By falsely and deceptively representing yellow CSST, defendants have caused economic harm to plaintiffs and all other consumers who have purchased yellow CSST. Plaintiffs and these other consumers have been deprived of the benefit of the bargain by purchasing yellow CSST which was represented as safe and non-defective, but is worth less than fuel gas pipe of this character and quality because the yellow CSST is designed with the inherent defects alleged herein which make them susceptible to failure when exposed to electrical insult. The design defect in the yellow CSST places a stigma on homes that have the product installed, and reduces their marketability and resale value. The ineffectiveness of bonding and grounding to eliminate the inherent defects alleged herein also places consumers in a position of bearing the cost for alternative repairs. Under the benefit of the bargain model, plaintiffs and class members are entitled to recover the lesser amount of (1) the dimunition in value of the homes with yellow CSST, or (2) the cost of repair to bring the yellow CSST into conformance with defendants' representations that yellow CSST can be safely used, or (3) the cost of alternative remedial measures to remove the danger of yellow CSST from the homes, such as replacing the yellow CSST with a product that will safely transport fuel gas, installing a lightning protection system that meets code standards, or switching the home from gas to electric utilities.

36

114. Plaintiffs and the Missouri Consumer Class members also suffered an ascertainable loss and economic damages as a result of Defendant's unlawful conduct and unfair practice in that their home's value is decreased because of the presence of yellow CSST as alleged in Count I.

115. In addition, those class members that have incurred the expense of bonding and grounding as a result of defendants' false claim that bonding and grounding remedies the dangers of yellow CSST have been damaged in the amount paid to implement this ineffective "fix."

116. In addition, defendants' conduct has caused plaintiff and the Missouri Consumer Class members irreparable injury. As described herein, defendant has engaged in unlawful and misleading conduct on a routine and consistent basis, harming Missouri consumers in a uniform manner. Unless restrained and enjoined, defendant will continue such conduct. As authorized under § 407.025.2, RSMo., plaintiffs request injunctive relief, and such other equitable relief as the Court deems just and proper.

117. The defendants' conduct alleged herein was outrageous because of evil motive or reckless indifference to the rights of others, and showed complete indifference to or conscious disregard for the safety of others, such that plaintiffs and Class Members are entitled to the recovery of punitive damages as authorized by § 407.025.

118. Plaintiffs and Class Members are also entitled to recover attorney fees as authorized by § 407.025.

119. This private civil action by plaintiffs to enforce § 407.010 *et. seq.* is authorized by § 407.025.

120. Class actions are authorized by the MMPA where an unlawful practice "has caused similar injury to numerous other persons." § 407.025.2.

**CONSPIRACY**

121.    Plaintiffs repeat and re-allege the allegations of all other paragraphs in this complaint as if fully set forth herein.

122.    The defendants knowingly agreed, contrived, combined, confederated, and conspired among themselves to cause plaintiffs' injuries by continuing to promote, manufacture and sell yellow CSST and by knowingly promoting bonding and grounding as a "safety fix," when it, in fact, is not, and by concealing the known and true dangers of yellow CSST from consumers, trade groups, and governmental authorities.   Their joint actions violated the MMPA as alleged above and were unlawful.

123.    The defendants acted with joint intentions in their retroactive and wildly inaccurate "validation" process and their actions alleged herein in furtherance of their objective of engaging in unlawful practices prohibited by the MMPA to the detriment of consumers so that they could sell yellow CSST.   Such meeting of the minds in furtherance of these unlawful objectives establishes the existence of a civil conspiracy between all of the defendants, and such acts have damaged the plaintiffs and Class Members.

124.    Defendants committed the above-described wrongs by willfully misrepresenting and suppressing the truth as to the risks and dangers associated with the use of CSST and the continued dangers of yellow CSST even with the bonding and grounding "fix" as alleged herein.

125.    In furtherance of this conspiracy, defendants performed the following overt acts, among others:

> (a) Since at least 2008, and likely earlier, defendants have been actively and concertedly involved in deceiving the public into believing that the dangers inherent in the use of the yellow-jacketed CSST product can be eliminated through the use of additional "bonding and grounding"

techniques when, in fact, those claims are not only misleading, but completely false;

(b) Defendants engaged in a unified "Yellow CSST Safety Campaign" touting the false "effectiveness" of bonding and grounding while failing to differentiate the dangers associated with indirect versus direct lightning strikes;

(c) Defendants concealed their research demonstrating that yellow-jacketed CSST is susceptible to failure at electrical insult levels equal to common household electrical current, in addition to direct lightning strikes;

(d) Defendants continue to participate in the misleading "Safety Campaign" to promote the sale and installation of yellow-jacketed CSST;

(e) Defendants promoted their scheme via a letter campaign, email campaign, Internet marketing, and through in-person meetings with code and building officials, state and federal legislatures, home inspection organizations, governors, local, state and national fire marshals, fire commissioners, Attorney Generals, and others;

(f) Defendants worked jointly to craft the 2013 GTI Final Report, as detailed above, that facially, but falsely, promotes bonding and grounding as a "solution" to the dangerous propensities of yellow jacketed CSST in an attempt to retroactively validate the efficacy of bonding and grounding. The 2015 Revised Draft Report establishes the ongoing collusion between the defendants to further the circulation of misinformation; and

(g) The defendants colluded to mislead electricians, builders, home inspection groups, installers, and distributors with false information regarding the efficacy of bonding and grounding in an attempt to: (1) insulate the defendants from liability for failures of yellow-jacketed CSST; and (2) generate additional profit from additional sales of yellow CSST.

126.  In furtherance of the conspiracy, defendants committed unlawful overt acts including misrepresentations, false statements, and unfair practices in violation of the Missouri Merchandising Practices Act and other state consumer protection laws.

127.  Defendants furthered the conspiracy through their joint CSST Safety Campaign

that promoted bonding and grounding.

128.    As a direct result of this conspiracy, plaintiffs and members of the Class were damaged as alleged in Counts I, II and II.

129.    Defendants were motivated by their bottom line without regard for the well-being and economic interests of consumers who installed yellow-jacketed CSST in their homes, or purchased homes with yellow CSST, notwithstanding defendants' actual knowledge that the potential and probability for harm from yellow CSST is great.

130.    The defendants' conduct alleged herein was outrageous because of evil motive or reckless indifference to the rights of others, and showed complete indifference to or conscious disregard for the safety of others, such that plaintiffs and Class Members are entitled to the recovery of punitive damages.

## COUNT V

## UNJUST UNRICHMENT

131.    Plaintiffs    repeat    and    re-allege    the    allegations    of    all    other paragraphs in this complaint as if fully set forth herein.

132.    Plaintiffs and Class Members conferred upon defendants benefits that were non-gratuitous and constitute unjust takings.

133.    The defendants accepted or retained the benefits conferred by plaintiffs and the    Class    Members    despite    the    defendants'    deceptive    advertising,    material misrepresentations, and omissions of material fact with regard to the safety of yellow CSST and the efficacy of the bonding and grounding "fix."

134.    Retaining the benefits conferred upon the defendants by plaintiffs and the Class Members under these circumstances makes the defendants' retention of the benefits

unjust and inequitable.

135.    As a result of the foregoing, plaintiffs and the Class Members have suffered damages, as set forth more fully above.

136.    Because the defendants' retention of the benefits conferred by plaintiffs and the Class Members is unjust and inequitable, the defendants must pay restitution in a manner established by the Court.

**RELIEF REQUESTED**

137.    Plaintiffs, on behalf of themselves and all others similarly situated, respectfully request the Court to enter judgment on their behalf and against defendants, as follows:

> i.    Certifying the Classes, as requested herein, certifying plaintiffs as the named representatives, and appointing plaintiffs' counsel as counsel for the Class;
>
> ii.    Ordering that defendants must pay for notice to be sent to all Class Members;
>
> iii.    Finding that the defendants are jointly and severally liable for plaintiffs' and Class Member's injuries and economic losses;
>
> iv.    Awarding plaintiffs and Class Members disgorgement and restitution;
>
> v.    Awarding plaintiffs the cost of alternative repairs;
>
> vi.    Awarding plaintiffs and the Class punitive damages;
>
> vii.    Awarding declaratory and injunctive relief as permitted by law or equity, including: enjoining defendants from propagating any further falsehoods about yellow CSST and to issue corrective advertising and public relations campaigns; and directing defendants to identify any further faults or inadequacies in current products or practices and correcting same;
>
> viii.    Ordering defendants to engage in accurate, corrective educational advertising;
>
> ix.    Awarding interest on monies wrongfully obtained from the date of collection through the date of judgment;

41

x. Awarding attorney's fees, expenses, and recoverable costs reasonably incurred in prosecuting this action; and

xi. Any such further relief as the Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

138. Plaintiffs demand trial by jury on all issues triable to a jury under law or equity.

Dated: January 31, 2019                    Respectfully submitted,

**STEELMAN & GAUNT**

By:    /s/ David Steelman
David Steelman, MO #27334
Stephen F. Gaunt, MO #33183
901 N. Pine Street, Ste. 110
P.O. Box 1257 Rolla, MO 65402
Telephone: 573-341-8336
Fax: 573-341-8548
dsteelman@steelmanandgaunt.com
sgaunt@steelmanandgaunt.com

and

**CARPENTER & SCHUMACHER, P.C.**
N. Scott Carpenter  *(pro hac vice)*
Rebecca Bell-Stanton *(pro hac vice)*
2701 North Dallas Parkway, Suite 570
Plano, TX 75093
Telephone: (972) 403-1133
scarpenter@cstriallaw.com
rstanton@cstriallaw.com

and

**TED B. LYON & ASSOCIATES, P.C.**
Marquette William Wolf *(pro hac vice)*
18601 LBJ Freeway, Suite 525
Mesquite, Texas 75150
Telephone: (972) 279-6571
mwolf@tedlyon.com

and

42

**KAMBERLAW, LLP**
Deborah Kravitz (*pro hac vice*)
401 Center Street
Suite 111
Healdsburg, CA 95448
Telephone: (707) 820-4247
dkravitz@kamberlaw.com

and

**KAMBERLAW, LLP**
Naomi Spector *(pro hac vice)*
9404 Genesee Ave., Suite 340
La Jolla, CA 92037
Telephone: (310) 400-1053
nspector@kamberlaw.com

***Attorneys for Plaintiffs and the putative Class***


## CERTIFICATE OF SERVICE

The undersigned certifies that on this 31st day of January, 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which sent notification of such filing to all counsel of record.

/s/ David L. Steelman
David L. Steelman

43