# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI

BONNIE GEORGE, *et al*,

        *Plaintiffs,*

v.

OMEGA FLEX, INC., *et al*,

        *Defendants.*

Case No. 6:17-cv-03114-MDH

## DEFENDANTS' SUGGESTIONS IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

# TABLE OF CONTENTS

Page

INTRODUCTION ............................................................................................................. 1

BACKGROUND .............................................................................................................. 2

I.    DIFFERENT CSST MANUFACTURERS DEVELOPED DIFFERENT CSST
      PRODUCTS WITH DIFFERING CHARACTERISTICS AT DIFFERENT
      TIMES ..................................................................................................................... 2

      A.    CSST Was Developed For And Marketed To Gas Piping Installers (Not
            To Consumers) As A Safe And Superior Alternative To Black Iron Pipe. ........... 2

      B.    Different CSST Manufacturers Have Produced And Sold Separate CSST
            Products With Differing Characteristics. ........................................................... 3

      C.    National, State, And Local Code Bodies Have Long Recognized And
            Approved CSST As Safe. ................................................................................ 5

II.   THE RISK OF LIGHTNING-INDUCED DAMAGE TO CSST IS EXTREMELY
      REMOTE, PARTICULARLY WHEN IT IS BONDED AND GROUNDED .................. 6

      A.    The Risk Of CSST Sustaining Damage From A Direct Or Nearby
            Lightning Strike Is Minuscule. ........................................................................ 6

      B.    Bonding and Grounding Significantly Reduces The Already Minimal Risk
            Of Damage To CSST Due To A Direct or Nearby Lightning Strike ..................... 7

III.  DEFENDANTS HAVE MADE NO UNIFORM MISREPRESENTATIONS OR
      ENGAGED IN ANY UNIFORM MISCONDUCT RELATING TO CSST
      SAFETY. ................................................................................................................. 9

      A.    Defendants Are Competitors Who Market And Sell Their CSST Products
            In Different Ways. .......................................................................................... 9

      B.    Defendants Made No "Uniform" Misrepresentations About CSST Safety. ........... 9

      C.    Defendants Have Made No "Uniform" Misrepresentations About The
            Efficacy Of Bonding And Grounding. ............................................................... 10

            1.    Defendants Have Each Made Different Statements About Bonding
                  and Grounding at Different Times. ........................................................ 11

            2.    Certain of Defendants' Statements About Bonding and Grounding
                  Were Expressly Required by Court Order. .............................................. 11

i

IV.   PLAINTIFFS PURCHASED DIFFERENT CSST PRODUCTS UNDER
      DIFFERENT CIRCUMSTANCES AND WITH DIFFERENT KNOWLEDGE
      AND EXPECTATIONS ABOUT THE PRODUCTS........................................ 12

      A.    Plaintiffs And Putative Class Members Purchased Their CSST Products
            From Different Subcontractors At Different Times And With Varying
            Knowledge And Expectations About The Products. ............................. 13

      B.    Plaintiffs' And Class Members' Exposure To Defendants' Representations
            About Their Respective CSST Products Varies On An Individual Basis. .......... 15

            1.    Plaintiffs Never Saw or Heard any Statements by Defendants
                  About CSST............................................................. 15

            2.    Plaintiffs Never Saw or Heard Any Statements by Any Defendants
                  About Bonding and Grounding............................................ 16

      C.    Plaintiffs' Homes And CSST Have Varying Risks Of Lightning-Induced
            Damage, But None Has Sustained Any Such Damage......................... 17

            1.    Unique Features of Plaintiffs' Homes and CSST Create Differing
                  Risks of Lightning Damage. ........................................... 18

            2.    No Plaintiff Has Ever Experienced Lightning Damage to Their
                  CSST................................................................. 19

      D.    Plaintiffs Have Not Sustained Any Economic Losses. ........................ 19

V.    PLAINTIFFS SEEK CERTIFICATION OF CLASSES OF CSST
      PURCHASERS WHO, LIKE PLAINTIFFS, PURCHASED DIFFERENT
      PRODUCTS AT DIFFERENT TIMES WITH DIFFERENT KNOWLEDGE. .............. 20

ARGUMENT ............................................................................ 21

I.    PLAINTIFFS' PROPOSED CLASSES ARE NOT ASCERTAINABLE AND
      ARE FATALLY OVERBROAD. ..................................................... 22

      A.    Plaintiffs Offer No Method For Objectively Identifying Putative Class
            Members. ................................................................. 23

      B.    Plaintiffs' Proposed Class Definitions Are Overbroad. ...................... 25

II.   PLAINTIFFS CANNOT DEMONSTRATE COMMONALITY, MUCH LESS
      PREDOMINANCE.................................................................. 25

      A.    Plaintiffs Cannot Show Commonality Because They Have Not Shown
            Any Common Injury Or Common Conduct Among Defendants. ............. 26

            1.    Plaintiffs' "Common Issues of Fact" Are Not Common. ............. 27

ii

2.     Plaintiffs' "Common Questions for Expert Opinion" Are Not Common..................................................................................... 28

3.     Plaintiffs' "Common Questions of Law" Are Not Common.................... 29

B.     Common Issues Do Not Predominate Because Common Evidence Cannot Be Used To Prove The Putative Missouri Class's MMPA Claims. ..................... 30

1.     Common Evidence Cannot Show Which Class Members Purchased CSST For "Personal, Family or Household Purposes." .......... 31

2.     Common Evidence Cannot Be Used to Prove Ascertainable Loss........... 32

3.     Common Evidence Cannot Be Used to Prove Common "Misrepresentations," Common "Omissions," or a Uniform, Unfair, or Deceptive Trade Practice. ......................................................... 35

4.     Common Evidence Cannot Be Used to Show that Defendants' Statements About CSST Were Made "In Connection With" Class Members' Purchases. .................................................................... 36

5.     Common Evidence Cannot Be Used to Prove Causation. ........................ 39

6.     Common Evidence Cannot Be Used to Prove Materiality. ..................... 40

III.     PLAINTIFFS HAVE NOT PRESENTED A METHOD OF CALCULATING CLASS-WIDE DAMAGES CONSISTENT WITH COMCAST V. BEHREND. .......... 41

A.     Plaintiffs Offer No Class-Wide Damages Model For Their Refund/Restitution Damages Theory..................................................... 43

B.     Plaintiffs' Replacement-Cost Methodology Is Also Deficient. ............................ 46

C.     Plaintiffs' Disgorgement Methodology Similarly Fails to Satisfy *Comcast.* ....... 48

IV.     PLAINTIFFS ALSO CANNOT SATISFY PREDOMINANCE FOR THE CLAIMS OF THE PUTATIVE NATIONWIDE CLASS................................................. 49

A.     Individualized Factual Issues Predominate In Any Unjust Enrichment Class.................................................................................................... 49

B.     Individual Legal Issues Predominate As To The Claims Of The Putative Nationwide Class Due To Variations In State Laws. ........................................... 51

C.     Individual Issues Predominate In The Conspiracy Claims Of The Putative Nationwide Class. ................................................................ 54

V.     A CLASS ACTION IS NOT A SUPERIOR METHOD FOR ADJUDICATION........... 55

VI.     PLAINTIFFS' CLAIMS ARE NOT TYPICAL OF THE CLASS CLAIMS, NOR
        ARE PLAINTIFFS ADEQUATE CLASS REPRESENTATIVES. ............................... 56

VII.    CERTIFICATION UNDER RULE 23(B)(2) IS NOT WARRANTED.......................... 59

        A.      Certification Of A (b)(2) Class Is Inappropriate Because Plaintiffs Seek
                Primarily Monetary Relief. ................................................................................. 59

        B.      Plaintiffs' Proposed Class Is Not Sufficiently Cohesive To Warrant (b)(2)
                Certification ........................................................................................................ 61

        C.      The MMPA Does Not Authorize Plaintiffs' Requested Injunctive Relief. .......... 62

VIII.   ISSUE CERTIFICATION UNDER RULE 23(C)(4) IS NOT APPROPRIATE. ............ 62

CONCLUSION.................................................................................................................... 64

Case 6:17-cv-03114-MDH     Document 271     Filed 09/13/19     Page 5 of 79

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 5-Hour Energy Mktg. & Sales Practices Litig.*,
2017 WL 2559615 (C.D. Cal. June 7, 2017) ........................................................36

*In re Actiq Sales and Marketing Practices Litig.*,
307 F.R.D. 150 (E.D. Pa. 2015) ...........................................................................55

*Affordable Communities of Mo. v. Fed. Nat. Mortg. Ass'n*,
714 F.3d 1069 (8th Cir. 2013) ..............................................................................50

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997) ..............................................................................................26

*Anderson v. Bass Pro Outdoor World, LLC*,
355 F. Supp. 3d 830 (W.D. Mo. 2018) .................................................................62

*Arnold v. Directv, LLC*,
2017 WL 1251033 (E.D. Mo. March 31, 2017) ...................................................63

*Avritt v. Reliastar Life Ins. Co.*,
615 F.3d 1023 (8th Cir. 2010) .........................................................................30, 61

*Badahman v. Catering St. Louis*,
395 S.W.3d 29 (Mo. 2013) ...................................................................................62

*Barfield v. Sho-Me Power Elec. Co-op.*,
2013 WL 3872181 (W.D. Mo. July 25, 2013) ......................................................61

*Beck v. Prupis*,
529 U.S. 494 (2000) ..............................................................................................54

*In re Bisphenol-A (BPA) Polycarbonate Plastic Prod. Liab. Litig.*,
276 F.R.D. 336 (W.D. Mo. 2011) ................................................................ *passim*

*In re Bisphenol-A (BPA) Polycarbonate Plastic Prods. Liab. Litig.*,
2011 WL 6740338 (W.D. Mo. Dec. 22, 2011) ..........................................40, 51, 63

*Blades v. Monsanto Co.*,
400 F.3d 562 (8th Cir. 2005) ...........................................................................45, 54

*Blake v. Career Educ. Corp.*,
2009 WL 140742 (E.D. Mo. Jan. 20, 2009) .........................................................62

*Bratton v. Hershey Co.*,
    2018 WL 934899 (W.D. Mo. Feb. 16, 2018) ........................................................51

*Brazil v. Dole Packaged Foods, LLC*,
    660 F. App'x 531 (9th Cir. 2016) ...........................................................42, 43

*Brown v. Kerkhoff*,
    279 F.R.D. 479 (S.D. Iowa 2012) ..........................................................60

*Buckeye Tree Lodge & Sequoia Vill. Inn, LLC v. Expedia, Inc.*,
    2019 WL 1170489 (N.D. Cal. Mar. 13, 2019) ..............................................49

*Butler v. Sears, Roebuck & Co.*,
    727 F.3d 796 (7th Cir. 2013) .................................................................63

*Caldera v. J.M. Smucker Co.*,
    2014 WL 1477400 (C.D. Cal. Apr. 15, 2014) ...............................................42, 43

*Campbell v. Purdue Pharma, L.P.*,
    2004 WL 5840206 (E.D. Mo. June 25, 2004) .............................................40

*Clay v. American Tobacco Co.*,
    188 F.R.D. 483 (S.D. Ill. 1999) ...........................................................54

*State ex rel. Coca-Cola Co. v. Nixon*,
    249 S.W.3d 855 (Mo. 2008) .................................................................38

*Cole v. Gen. Motors Corp.*,
    484 F.3d 717 (5th Cir. 2007) ...............................................................51

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013) ................................................................. *passim*

*Davenport v. Charter Commc'ns, LLC*,
    302 F.R.D. 520 (E.D. Mo. 2014) .........................................................55

*In re Deepwater Horizon*,
    739 F.3d 790 (5th Cir. 2014) ...............................................................63

*DePeralta v. Dlorah, Inc.*,
    2012 WL 4092191 (W.D. Mo. Sept. 17, 2012) .............................................36

*In re Dial Complete Mktg. & Sales Practices Litig.*,
    312 F.R.D. 36 (D.N.H. 2015) ..............................................................49

*Dumas v. Albers Med., Inc.*,
    2005 WL 2172030 (W.D. Mo. Sept. 7, 2005) .............................................23

*Ebert v. Gen. Mills, Inc.*,
    823 F.3d 472 (8th Cir. 2016) ........................................................................ *passim*

*Faltermeier v. FCA US LLC*,
    2017 WL 1128467 (W.D. Mo. Mar. 24, 2017) ................................................30, 38

*Faltermeier v. FCA US LLC*,
    899 F.3d 617 (8th Cir. 2018) ........................................................................36, 38

*Farning v. Brendal*,
    150 S.W.3d 384 (Mo. Ct. App. 2004) ..............................................................46

*Ferrell Mobile Homes, Inc. v. Champion Home Builders*,
    2018 WL 4961489 (E.D. Mo. Oct. 15, 2018) ................................................50, 51

*In re Fluidmaster, Inc., Water Connector Components Prod. Liab. Litig.*,
    2017 WL 1196990 (N.D. Ill. Mar. 31, 2017) ..........................................35, 42, 43

*Fogarazzo v. Lehman Bros.*,
    263 F.R.D. 90 (S.D.N.Y. 2009) ......................................................................22

*Foster v. St. Jude Med., Inc.*,
    229 F.R.D. 599 (D. Minn. 2005) ....................................................................61

*Gaisser v. Portfolio Recovery Assocs., LLC*,
    2009 WL 10666810 (S.D. Fla. Mar. 2, 2009) ....................................................31

*Galitski v. Samsung Telecommunications Am., LLC*,
    2015 WL 5319802 (N.D. Tex. Sept. 11, 2015) ..................................................48

*In re Genetically Modified Rice Litig.*,
    251 F.R.D. 392 (E.D. Mo. 2008) ....................................................................64

*Gentry Tech. of S.C., Inc. v. Baptist Health South Fl., Inc.*,
    2016 WL 403879 (D.S.C. Feb. 3, 2016) ..........................................................55

*Gonzalez v. Corning*,
    317 F.R.D. 443 (W.D. Pa. 2016) ....................................................................35

*Hallaba v. Worldcom Network Servs. Inc.*,
    196 F.R.D. 630 (N.D. Okla. 2000) ..................................................................58

*Hallmark Indus., Inc. v. Hallmark Licensing, LLC*,
    2018 WL 5828687 (W.D. Mo. Aug. 14, 2018) ..................................................57

*Hartis v. Chicago Title Ins. Co.*,
    2010 WL 11545067 (W.D. Mo. Sept. 20, 2010) ................................................34

*Henke, v. Arco Midcon, L.L.C.*,
    2014 WL 982777 ......................................................................................55, 59, 60, 63

*Hicks v. Sw. Energy Co.*,
    330 F.R.D. 183 (E.D. Ark. 2018)...........................................................................60

*Hood v. Gilster-Mary Lee Corp.*,
    2016 WL 5852866 (W.D. Mo. Sept. 30, 2016) .....................................................55

*Hughes v. The Ester C Co.*,
    317 F.R.D. 333 (E.D.N.Y. 2016) ...........................................................................49

*Jackson v. Charlie′s Chevrolet, Inc.*
    664 S.W.2d 675 (Mo. Ct. App. 1984)....................................................................62

*Jackson v. Crawford*,
    2015 WL 2173646 (W.D. Mo. May 8, 2015) ........................................................22

*Johnson v. Harwood*,
    945 A.2d 875 (Vt. 2008) ........................................................................................53

*Keilholtz v. Lennox Hearth Prods Inc.*,
    268 F.R.D. 330 (N.D. Cal. 2010)...........................................................................52

*Kerr v. Vatterott Educ. Centers, Inc.*,
    439 S.W.3d 802 (Mo. Ct. App. 2014).....................................................................44

*Lambert v. Nutraceutical Corp.*,
    2015 WL 12655392 (C.D. Cal. June 24, 2015) .....................................................45

*Lee-Bolton v. Koppers Inc.*,
    319 F.R.D. 346 (N.D. Fla. 2017) ...........................................................................47

*Loughlin v. Amerisave Mortg. Corp.*,
    2018 WL 1887292 (N.D. Ga. Mar. 19, 2018) .......................................................31

*Luiken v. Domino′s Pizza, LLC*,
    705 F.3d 370 (8th Cir. 2013) ...........................................................................27, 30

*Martinez v. Triple S. Props.*,
    2019 WL 1646405 (W.D. Mo. April 16, 2019).....................................................22

*Mayo v. USB Real Estate Sec., Inc.*,
    2012 WL 4361571 (W.D. Mo. Sept. 21, 2012) ................................................24, 25

*McCall v. Monro Muffler Brake Inc.*,
    2013 WL 3418089 (E.D. Mo. July 8, 2013) .........................................................38

*McKeage v. TMBC, LLC*,
847 F.3d 992 (8th Cir. 2017) .......................................................................................23

*McKinnon v. Dollar Thrifty Auto. Grp., Inc.*,
2015 WL 4537957 (N.D. Cal. July 27, 2015).............................................................30

*In re Methyl Tertiary Butyl Ether (MBTE) Prods. Liab. Litig.*,
175 F. Supp. 2d 593 (S.D.N.Y. 2001).........................................................................54

*In re Milk Prods. Antitrust Litig.*,
195 F.3d 430 (8th Cir. 1999) ..................................................................................57, 58

*State ex rel Nixon v. Am. Tobacco Co.*,
34 S.W.3d 122 (Mo. 2000) ..........................................................................................43

*Nobles v. State Farm Mut. Auto. Ins. Co.*,
2013 WL 12153517 (W.D. Mo. June 5, 2013) ............................................................51

*O'Shaughnessy v. Cypress Media, L.L.C.*,
2015 WL 4197789 (W.D. Mo. July 13, 2015).......................................................56, 58

*Oak Bluff Partners, Inc. v. Meyer*,
3 S.W.3d 777 (Mo. 1999) .............................................................................................54

*Oddo v. Arcoaire Air Conditioning & Heating*,
2019 WL 1460627 (C.D. Cal. Mar. 22, 2019)......................................................56, 57

*Owner-Operator Indep. Drivers Ass'n, Inc. v. New Prime, Inc.*,
213 F.R.D. 537 (W.D. Mo. 2002).................................................................................34

*Philips v. Ford Motor Co.*,
2016 WL 7428810 (N.D. Cal. Dec. 22, 2016).............................................................47

*Radner v. IAS Warranty*,
2018 WL 4352692 (E.D. Mich. Sep. 12, 2018)...........................................................57

*Ramthun v. Bryan Career Coll. Inc.*,
93 F. Supp. 3d 1011 (W.D. Ark. 2015).........................................................................45

*Rothman v. Gen. Nutrition Corp.*,
2011 WL 6940490 (C.D. Cal. Nov. 17, 2011)..............................................................30

*Sample v. Monsanto Co.*,
218 F.R.D. 644 (E.D. Mo. 2003) ..................................................................................30

*Sandusky Wellness Ctr., LLC v. Medtox Sci., Inc.*,
821 F.3d 992 (8th Cir. 2016) ........................................................................................23

ix

*Scott v. Blue Springs Ford Sales, Inc.*,
  215 S.W.3d 145 (Mo. Ct. App. 2006).........................................................................62

*In re Sears, Roebuck & Co. Tools Mktg. & Sales Practices Litig.*,
  2006 WL 3754823 (N.D. Ill. Dec. 18, 2006)...........................................................52

*Shiplet v. Copeland*,
  450 S.W.3d 433 (Mo. Ct. App. 2014).......................................................................43

*Siegel v. Shell Oil Co.*,
  256 F.R.D. 580 (N.D. Ill. 2008)................................................................................54

*Smith v. ConocoPhillips Pipe Line Co.*,
  801 F.3d 921 (8th Cir. 2015) ..............................................................................26, 56

*In re St. Jude Med., Inc.*,
  425 F.3d 1116 (8th Cir. 2005) .....................................................................21, 59, 61

*In re St. Jude Med., Inc.*,
  522 F.3d 836 (8th Cir. 2008) ....................................................................................63

*Sunset Pools of St. Louis, Inc. v. Schaefer*,
  869 S.W.2d 883 (Mo. Ct. App. 1994)................................................................32, 43

*Swift v. Pandey*,
  2014 WL3362370 (D.N.J. July 8, 2014)..................................................................55

*In re Terazosin Hydrochloride*,
  220 F.R.D. 672 (S.D. Fla. 2004)..............................................................................52

*Ticknor v. Rouse's Enters., L.L.C.*,
  592 F. App'x. 276 (5th Cir. 2014) ...........................................................................31

*True v. Conagra Foods, Inc.*,
  2011 WL 176037 (W.D. Mo. Jan. 4, 2011) ..............................24, 34, 51, 52, 63

*Victorino v. FCA US LLC*,
  326 F.R.D. 282 (S.D. Cal. 2018) .............................................................................45

*Wal–Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011).............................................................................22, 26, 59, 60

*Walsh v. Al W. Chrysler, Inc.*,
  211 S.W.3d 673 (Mo. Ct. App. 2007).......................................................................58

*Wasson v. Schubert*,
  964 S.W.2d 520 (Mo. Ct. App. 1998).......................................................................46

x

*Webb v. Exxon Mobil Corp.*,
  856 F.3d 1150 (8th Cir. 2017) ..............................................................26

*White v. Just Born, Inc.*,
  2018 WL 3748405 (W.D. Mo. Aug. 7, 2018) ................................. *passim*

*Wiles v. Sw. Bell Tel. Co.*,
  2010 WL 1463025 (W.D. Mo. Apr. 13, 2010) ...........................................49, 50

**Statutes**

Mo. Ann. Stat. § 407.025 ..............................................................................31

Mo. Ann. Stat. § 407.100 ..........................................................................44, 62

**Rules**

Fed. R. Civ. P. 23 ...........................................................................1, 21, 22, 26

Fed. R. Civ. P. 23(a) ................................................................21, 22, 56, 59

Fed. R. Civ. P. 23(a)(2) ..............................................................................27

Fed. R. Civ. P. 23(b) ...............................................................................22, 63

Fed. R. Civ. P. 23(b)(2) ................................................................. *passim*

Fed. R. Civ. P. 23(b)(3) ................................................................. *passim*

Fed. R. Civ. P. 23(c)(4) ..........................................................2, 62, 63, 64

**Other Authorities**

Mo. Code Regs. Ann. tit. 2 § 90-10.020 ......................................................6

Mo. Code Regs. Ann. tit. 15, § 60-9.110 ...............................................36, 40

National Fuel Gas Code ....................................................................5, 6, 7, 9

# INTRODUCTION

Plaintiffs' motion for class certification[1] asks this Court to certify sweeping state and nationwide classes of differing current and former home and building owners, all of whom have or had differing corrugated stainless steel tubing ("CSST") products installed under widely differing circumstances and who are or were exposed to differing lightning risks. Plaintiffs seek certification solely to challenge an irrefutable scientific fact—that bonding CSST to the building ground reduces the risk of electrically induced damage to the product—that not even Plaintiffs have found an expert to dispute. Even more remarkably, Plaintiffs pursue their state and nationwide class claims even though none of them has experienced ***any*** malfunction or problem with their CSST (even one plaintiff whose home was struck by lightning), and despite the fact that they admit they have suffered no economic harm. Indeed, the vast majority of Plaintiffs gave no thought to the type of gas piping in their homes or questioned the safety of their CSST— that is, until local attorneys approached them and persuaded them that their CSST was unsafe and that bonding and grounding allegedly does not mitigate the product's alleged "risks."

Leaving aside that the central premise of Plaintiffs' claims has been proven false, Plaintiffs far from satisfy the rigorous requirements of Rule 23 on a state-wide (much less nationwide) basis. ***First***, Plaintiffs' proposed classes are not ascertainable and are overly broad, because Plaintiffs do not, and cannot, explain how putative class members (many of whom do not, and never have, owned Defendants' CSST products) could be objectively identified with available records or other information. ***Second***, Plaintiffs cannot satisfy Rule 23's commonality or predominance requirements because (i) the differing circumstances under which they acquired

---

[1] Plaintiffs' suggestions in support of their motion (Dkt. No. 226) are cited herein as "Pl. Br." Exhibits to that motion (Dkt. Nos. 226-1 to 226-54) are cited as "Pl. Ex." using Plaintiffs' number conventions.

their CSST, including their differing knowledge of and exposure to information about the product, and (ii) the vastly different purported lightning "risk" factors due to each home's unique location, surroundings, and construction, preclude them from satisfying essential elements of their claims with common evidence—indeed, they have failed to identify a *single* question common to all class members. Moreover, broad differences in state laws of conspiracy and unjust enrichment further undermine predominance as to the claims of the putative nationwide class. ***Third***, Plaintiffs also fail to satisfy predominance because they have not put forth a method of calculating class-wide damages consistent with their theory of liability, as required under *Comcast Corporation v. Behrend*, 569 U.S. 27 (2013). ***Fourth***, the differing factual circumstances of Plaintiffs' CSST purchases mean that their claims are not typical of the class claims and that they cannot adequately represent the putative class. ***Fifth***, Plaintiffs' alternative request for certification under Rule 23(b)(2) fails because they seek primarily monetary, not injunctive, relief. ***Finally***, Plaintiffs' scant request for certification of an issues class under Rule 23(c)(4) fails as well because none of the issues they identify for certification will advance this litigation, nor are any such issues susceptible of common proof. For all these reasons, and those addressed below, Defendants respectfully request that the Court deny Plaintiffs' motion for class certification.

## BACKGROUND

I.  **DIFFERENT CSST MANUFACTURERS DEVELOPED DIFFERENT CSST PRODUCTS WITH DIFFERING CHARACTERISTICS AT DIFFERENT TIMES.**

A.  **CSST Was Developed For And Marketed To Gas Piping Installers (Not To Consumers) As A Safe And Superior Alternative To Black Iron Pipe.**

CSST transports natural gas or propane within homes and other structures. It was developed in the 1980s as an alternative to rigid black iron pipe, a common type of gas piping

2

within buildings.[2] CSST offers significant advantages—including safety advantages—over black iron pipe. (*See* Ex. 2, Exponent Report at 4.) For instance, CSST is flexible and can be installed in wall cavities, basements, attics, and other spaces in a single, continuous run. (*Id.*; ███████████ ███████████████████████) Its flexibility also allows it to resist damage during earthquakes, tornadoes, and hurricanes. (Ex. 2, Exponent Report at 4–5.) Black iron pipe, on the other hand, is rigid. Installers must cut and thread segments on-site and attach them to angled fittings, which must be sealed using a paste or tape material—a process that sometimes results in gas leaks. (*Id.* at 3–4; ███████████████) Black iron pipe's rigidity also makes it susceptible to breaks or fractures during storms or earthquakes that cause structural movement, and it can corrode, again resulting in leaks. (Ex. 2, Exponent Report. at 4.)[3]

Although it is used in private residences, CSST is ***not*** a consumer product sold directly to the public. Defendants sell CSST to distributors and wholesalers, who in turn sell the product to trained CSST installers, who then install the product in homes. (█████████████████ ███████████████████████) As a result, marketing materials for CSST are directed not to homeowners or the general public, but instead to distributors, installers, and others within the industry. (███████████████████████████████)

### B. Different CSST Manufacturers Have Produced And Sold Separate CSST Products With Differing Characteristics.

Omega Flex, Titeflex, and Ward manufacture some (but not all) brands of CSST sold in the United States, and the CSST products Defendants sold during the relevant time differ.[4] Titeflex

---

[2] "Black iron pipe" is a generic term used to describe rigid gas piping that was originally made out of iron, but now is more frequently made of carbon steel.

[3] Indeed, plaintiff Cedar Deraps, who installs gas piping professionally, testified that he had frequently witnessed the corrosion of black iron pipe. (*See* Ex. 1, Deraps Dep. Tr. at 66:1–6.)

[4] Other CSST manufacturers include Pro-Flex, which makes Pro-Flex 1™ brand CSST, and Valencia Pipe

3

released its Gastite® brand CSST ("Gastite") in 1992 (██████████████), which it sold in the United States until 2015. Omega Flex introduced its TracPipe® brand CSST ("TracPipe") in 1997, which it sold in the United States until 2011. (████████████████████████████ ██████████) And Ward introduced its WARDFlex® brand CSST ("WARDFlex") in the early 1990s, which it continues to sell in the United States today. (████████████████) Each of these products is sold in various sizes and with differing fittings specific to each brand. (███ ██████████████████████████████) Further, although TracPipe, Gastite, and WARDFlex are each encased in an electrically insulating (dielectric) jacket that is yellow in color (and Plaintiffs generically refer to these different products as "yellow CSST"), these products have differing properties that impact their relative performance, including resistance to electrical energy. (Ex. 2, Exponent Report at 2; ████████████████████ ████████)

        In addition, Defendants manufacture and sell other brands of CSST designed to provide an additional measure of protection against the extremely low risk of lightning-induced damage that could occur if the product is not properly installed.[5] (████████████████████████████ ██████) For example, Omega Flex sells its CounterStrike® CSST product, which is encased in a conductive black jacket designed to dissipate electrical charges and thereby mitigate the remote risk of electrical damage. (████████████) Titeflex manufactures a different CSST product called FlashShield®, and Ward manufactures WARDFlex® MAX, each of which is encased in a black conductive jacket that differs materially from other companies' products. (████████ ██████)

―――――――――――――――

Company, which manufactures HOME-FLEX® brand CSST. (████████████████████████)

[5]    Defendants all currently sell their respective TracPipe, Gastite, and WARDFlex CSST products in Europe and other countries around the world, where applicable codes and standards include robust bonding requirements. (*See* Ex. 8, SEFTIM Phase I Report at 4–5; P██████████████████████.)

4

██████████████████████████) For instance, unlike CounterStrike, Titeflex's FlashShield product includes a layer of metallic wire shield between multiple layers of black jacketing to reduce the risk of damage caused by electrical energy. (*See* Ex. 2, Exponent Report at 2–3.)

████████████████████████████████████████████████████████

███████████████████████████████████████

### C. National, State, And Local Code Bodies Have Long Recognized And Approved CSST As Safe.

Since its introduction in the United States, CSST has been approved for use in residential installations by numerous code-developing organizations, including the International Code Council, which develops the International Fuel Gas Code, and the National Fire Protection Association ("NFPA"), which develops hundreds of codes and standards dedicated to public safety, including the National Fuel Gas Code ("NFGC"). (Ex. 9, Lemoff Decl. ¶¶ 6, 7(a), (c), (d) & Report at 2.) These organizations adhere to thorough, detailed processes in developing codes and approving products for use, with safety as the primary goal. (Lemoff Decl. ¶¶ 6, 7(a), (b), (d), (e) & Report at 2–5.) The NFPA, for example, designates technical committees made up of representatives of diverse interest groups to develop its codes, including the NFGC, which is updated every three years through a multistep process that allows opportunities for input and commentary from experts and the public. (Lemoff Report at 2–5.) Through this thorough and open process, the NFPA has consistently approved CSST for residential and business use. (Lemoff Decl. ¶¶ 2, 5, 7(c), (d), (e) & Report at 5–6.) The International Fuel Gas Code has similar requirements and also approves CSST. (Lemoff Decl. ¶ 5 & Report at 6–7.)

These codes have been widely adopted at the state and municipality level. Every state and the overwhelming majority of municipalities in Missouri approve CSST for safe residential and business use, including those where Plaintiffs' homes or former homes are located. (*See* Ex. 10,

5

Cantor Decl. ¶ 58; ███████████████) The Missouri Propane Safety Commission promulgated state-wide regulations incorporating the 2015 edition of the National Fuel Gas Code, which approves CSST and requires proper bonding and grounding. Mo. Code Regs. Ann. tit. 2 § 90-10.020.

## II. THE RISK OF LIGHTNING-INDUCED DAMAGE TO CSST IS EXTREMELY REMOTE, PARTICULARLY WHEN IT IS BONDED AND GROUNDED.

Because CSST is made of steel, it conducts electricity. Like any conductive material in a home or building, CSST can provide a pathway for electrical current, including current from a direct or nearby lightning strike. The chances that lightning energy will enter a structure and damage the CSST inside are extraordinarily remote, however, particularly when the product is bonded to the building's electrical ground, as required by installation instructions and codes.

### A. The Risk Of CSST Sustaining Damage From A Direct Or Nearby Lightning Strike Is Minuscule.

Plaintiffs' claims in this case center on an alleged "risk that if lightning strikes on or near a structure the electrical current can travel through the structure's gas piping system and cause a leak, and in some cases a fire." (SAC ¶ 46 (internal quotation marks omitted).) But contrary to Plaintiffs' claim that this purported danger "present[s] a risk of substantial injury to consumers" (*id.* ¶¶ 92, 110), the risk of a gas fire resulting from lightning-induced damage to CSST is exceedingly remote. Lightning accounts for only a minimal proportion of home fires, and of lightning-induced home fires, only a small fraction involve the ignition of fuel gas. (Ex. 11, Marais Decl. ¶ 21.) Indeed, the average annual incidence of fires where gas is ignited by lightning is just 2.4 per million homes supplied with natural or LP gas—a risk dwarfed by, for example, the risk of fire caused by leaks or breaks in gas piping systems, to which alternative gas piping products such as black iron pipe are much more susceptible. (*Id.* ¶¶ 24–25, 29; *see* Ex. 2, Exponent Report at 4.) Nor are fires in which fuel gas is ignited by lightning unique to homes with CSST; to the

6

contrary, some such fires occur in homes containing black iron pipe. (Ex. 11, Marais Decl. ¶ 26.) And, in fact, the low rate of such fires has not increased since the introduction of CSST, even though CSST has occupied a consistently increasing share of the market for fuel-gas piping since then. (*See id.* ¶ 30.) The purported risk that forms the basis for Plaintiffs' claims is therefore not only exceptionally remote, but also is far outweighed by risks presented by other fuel gas piping products, including black iron pipe.

### B. Bonding and Grounding Significantly Reduces The Already Minimal Risk Of Damage To CSST Due To A Direct Or Nearby Lightning Strike.

Although the odds of CSST sustaining damage from a lightning strike are extremely long to begin with, it is well-established that directly bonding CSST to the building electrical ground dramatically reduces that risk. It is an irrefutable scientific fact that direct bonding and grounding of electrical conductors—like CSST, or any other conductor—reduces the voltage differential between nearby conductors and diverts electrical energy to ground, thereby minimizing the risk of electrical arcing. (*See* Ex. 2, Exponent Report at 15; *see also* Ex. 12, Rakov Decl. ¶ 6.B & Report ¶¶ 38–45.) Consistent with these basic scientific principles, Defendants have, at various times and through differing means, included instructions in their respective Design Guide and Installation Instructions ("D&I Guides") instructing installers to bond CSST to the building ground.[6] (*See* Ex. 2, Exponent Report at 16; Ex. 12, Rakov Report ¶ 46.) Similarly, national codes confirm the propriety of bonding and grounding, including the NFGC, which since 2009 has also required direct bonding.[7]

---

[6]  *See, e.g.,* Exhibit 13, TracPipe Design Guide and Installation Instructions § 3A (October 1999); Exhibit 14, Ward Manufacturing Design and Installation Guide § 4.10 (2000); Exhibit 15, Gastite Design and Installation Guide § 4.10 (March 2001).

[7]  Ex. 9, Lemoff Decl. ¶ 7(c) & Report at 8–9.

7

Plaintiffs' claims—and their motion for class certification—are based on the allegation that "bonding and grounding [is] a worthless 'fix' to the danger" purportedly associated with CSST (SAC ¶ 35), and that Defendants have somehow conspired to misrepresent the efficacy of bonding and grounding to the public. But although Plaintiffs claim that ███████████████████ ████████████████████████████████████████████████ Plaintiffs have identified *no* expert willing to support this far-fetched theory.[8]

Moreover, contrary to Plaintiffs' unsupported assertions, independent expert testing conducted years ago at NFPA's direction unequivocally supports the efficacy of bonding and grounding CSST. Specifically, at the behest of the NFPA Standards Council, certain participants in the CSST industry, including the manufacturers, engaged a team of well-respected, independent organizations to design and conduct a thorough, multi-phased research and testing program to test the efficacy of bonding and grounding CSST. (Ex. 9, Lemoff Decl. ¶¶ 6, 7(d) & Report at 10–17.) The results of this testing were unequivocal:

> [D]irect bonding of CSST to earth ground clearly limits the amount of charge available on the CSST during nearby lightning strikes versus the unbonded condition. Limiting the charge available *was shown to prevent perforation of the CSST in all the simulated and observed cases that made use of a ground bond*… Perforation of the CSST was observed only in those instances where there was no direct bonding whatsoever.

(Ex. 16, 2013 GTI Report at 28 (emphasis added).) This report was peer-reviewed and then submitted to the NFPA code developers, who agreed that "CSST, bonded in accordance with the

---

[8] The purported evidence Plaintiffs cite to support their allegations that bonding and grounding is ineffective is *not* expert testing, or, in fact, expert opinion, at all. Instead, Plaintiffs cite two inadmissible declarations submitted in a different case that performed *no* testing—much less testing confirming that bonding and grounding does not reduce the risk of lighting damage, or that CSST is "unsafe." These inadmissible and inapposite materials should be stricken. *See* Def. Mot. to Strike (filed contemporaneously herewith). Further, the time for Plaintiffs' expert disclosures in this case has come and gone, yet they have identified *no* expert testing or opinion to support their allegation that CSST is unsafe, or that bonding and grounding is ineffective. This fundamental failure alone warrants denial of their motion.

8

requirements of [the NFGC], provides a reasonable level of safety for fuel gas piping systems."[9] (Ex. 9, Lemoff Report at 16.)  As a result of the report's findings, bonding and grounding was affirmed as a requirement of the NFGC, and remains so today.  (Ex. 9, Lemoff Decl. ¶ 7(d) & Report at 16–17.)  That report stands unrebutted on this record.

## III.  DEFENDANTS HAVE MADE NO UNIFORM MISREPRESENTATIONS OR ENGAGED IN ANY UNIFORM MISCONDUCT RELATING TO CSST SAFETY.

### A.  Defendants Are Competitors Who Market And Sell Their CSST Products In Different Ways.

Defendants are competitors and, consequently, their marketing and promotion of their respective CSST products are neither ███████████████████ as Plaintiffs claim.  ███████

███████  To the contrary, Defendants each advertise and promote different products through differing means, including, for example, different websites, technical bulletins, flyers, and press releases, sent at different times to different recipients.  (███████████████████



### B.  Defendants Made No "Uniform" Misrepresentations About CSST Safety.

████████████████████████████████████████████████████

████████████████████████████████████████████████ Plaintiffs'

alleged "evidence" consists of materials Defendants prepared to advertise and promote their ***own***

---

[9]  In reaching this conclusion, the code developers also considered and rejected objections to GTI's report, including objections from N. Scott Carpenter, Plaintiffs' counsel in this case.  (*See* Ex. 9, Lemoff Report at 14–15.)

9

respective CSST products—not each other's.  (█████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████) These statements, intended to promote each Defendant's CSST products over their competitors', can hardly be considered uniform or coordinated.[10]  Worse, Plaintiffs also mischaracterize the evidence they claim demonstrates Defendants' uniform and coordinated safety representations.  ████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████ ██ ████████.

## C. Defendants Have Made No "Uniform" Misrepresentations About The Efficacy Of Bonding And Grounding.

The record also provides no support for Plaintiffs' assertion that Defendants have "uniformly" misrepresented that ████████████████████████████████████ ██ In fact, their own evidence demonstrates that Defendants have each addressed bonding and grounding at different times and in different ways.

---

[10] ████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████

[11] ████████████████████████████████████████████████████
████████████████████████████████████████████████████

### 1. Defendants Have Each Made Different Statements About Bonding and Grounding at Different Times.

Defendants each introduced differing bonding requirements in their respective D&I Guides at various times. Omega Flex added a bonding requirement to its October 1999 TracPipe D&I Guide, instructing that "a bonding clamp must be attached to the brass AutoFlare fitting adapter … or to a black pipe component connected to an AutoFlare fitting."[12] Ward added its own in 2000, instructing installers that "[s]imply stated, WARDFLEX or any gas piping should be connected to or 'bonded' to the ground system."[13] Titeflex added one in 2001, directing that "[w]hen a bonding clamp is required it must be attached to the Gastite brass fitting adapter, a steel manifold, or to a rigid pipe component connected to a Gastite fitting."[14]

Since that time, Defendants have continued to advise installers to bond and ground their respective CSST products in differing ways, including product-specific pamphlets (████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ███████████████████). Plaintiffs' own evidence thus contradicts their claim that Defendants have uniformly promoted bonding and grounding of CSST.

### 2. Certain of Defendants' Statements About Bonding and Grounding Were Expressly Required by Court Order.

In addition, contrary to Plaintiffs' assertions that Defendants' respective efforts to remind installers and distributors of the need to bond and ground CSST products are unlawful, certain of

---

[12] *See* Exhibit 13, TracPipe Design Guide and Installation Instructions § 3A (October 1999).

[13] *See* Ex. 14, Ward Manufacturing Design and Installation Guide § 4.10 (2000).

[14] *See* Ex. 15, Gastite Design and Installation Guide § 4.10 (March 2001).

these instructions were specifically **_endorsed_** by class counsel and, indeed, expressly **_required_** by court order in connection with the class action settlement in *Lovelis, et al. v. Titeflex, et al.*, identified in Plaintiffs' motion. ████████. As Plaintiffs' counsel well knows, the *Lovelis* settlement required Defendants to implement certain "marketing reforms," including efforts to inform installers and distributors of the need to bond and ground CSST. Indeed, the attorneys who represented home and building owners in that class action recognized that bonding and grounding would "**_enhance public safety and protection of property_**" and "make a significant **_economic benefit_** available to Class Members." (Ex. 17, *Lovelis* Pl. Br. i/s/o Jt. Mot. for Final Approval at 16 (emphasis added).) The Arkansas court agreed and approved the marketing reforms, holding:

> [E]ach of the Settling Defendants has undertaken marketing efforts to inform installers and distributors … that CSST must be installed in accordance with applicable codes and manufacturer's instructions, **_including those that pertain to bonding and grounding_** … The Court has reviewed the manufacturer's documents relating to these marketing efforts … and finds that they satisfy the terms of the Agreement and **_adequately warn of the alleged risks to CSST posed by lightning_** … The Court also finds that, because circumstances, technology, and methods of communication … will change over time, Settling Defendants shall have the flexibility to modify their communications concerning CSST as appropriate.

(Ex. 18, *Lovelis* Final Order ¶ 54 (emphasis added).) Defendants' continued efforts to remind installers to comply with codes and properly bond and ground CSST are lockstep with their legal obligations under that order. In filing and seeking certification of their claims here—including claims for injunctive relief—Plaintiffs ask this Court to order Defendants to defy the Arkansas court's order, which that court, and class counsel representing homeowners there, recognized as being in the best interests of, and of economic benefit to, owners of structures with CSST.

## IV. PLAINTIFFS PURCHASED DIFFERENT CSST PRODUCTS UNDER DIFFERENT CIRCUMSTANCES AND WITH DIFFERENT KNOWLEDGE AND EXPECTATIONS ABOUT THE PRODUCTS.

The circumstances surrounding Plaintiffs' (and the putative class members') ownership of and experience with CSST also are far from uniform. Plaintiffs are Missouri homeowners (and

one community church) who have never had a problem with their CSST and who, before they met Plaintiffs' counsel, never thought (or even knew) about their CSST or worried that it posed any risk. The circumstances under which Plaintiffs acquired their CSST differ in numerous respects, including as to: (1) their knowledge and expectations when purchasing the product; (2) their exposure, if any, to statements by any Defendant; and (3) their respective risks of potential lightning-induced damage to their CSST and homes. Indeed, the only things Plaintiffs appear to have in common is that *none* has experienced any lightning-related damage to their CSST, and also that—despite their allegations that they sustained "economic damages" when they acquired their CSST (SAC ¶ 79)—*none* can identify any such monetary losses.

### A. Plaintiffs And Putative Class Members Purchased Their CSST Products From Different Subcontractors At Different Times And With Varying Knowledge And Expectations About The Products.

The circumstances in which Plaintiffs and putative class members acquired their CSST products vary broadly. For example, although multiple Plaintiffs claim that they purchased CSST directly from installers,[15] the record demonstrates that many Plaintiffs did not know they were acquiring the product.[16] Indeed, Plaintiffs admit that they did not know at the time they built or purchased their homes that CSST would be installed, and have conceded that they neither thought about, much less "bargained" for, CSST at the time their homes were built, for example:

> Q. And the type of gas piping in that home, that had nothing to do with your willingness to buy the home; right?
> **A. Right.**
> Q. And yellow CSST was not something you considered when buying the home; right?

---

[15] *See, e.g.,* Ex. 19, Lee Dep. Tr. at 63:9–12 ("Q. You purchased your TracPipe -- did you purchase that TracPipe from the subcontractor, Mr. Palmer, as best you understand? A. Yes.").

[16] For instance, plaintiff Bobbie Lee sold her house to a new owner during the class period but has never disclosed the presence of Omega Flex's TracPipe CSST to the buyers. *See* Ex. 19, Lee Dep. Tr. at 92:5–8 ("Q. In fact, to this day, you have not contacted the Duncans to tell them that there is yellow CSST installed in their home, right? A. Right.")

13

**A. No.**

Q. And yellow CSST wasn't something that you bargained for when purchasing the home; right?

 **A. No.**

(Ex. 20, Volkart Dep. Tr. at 54:23–55:8.)[17]  Further, the record shows that Plaintiffs paid different amounts for their different CSST products,[18] depending on the person who installed it,[19] the type installed,[20] and whether it was bonded and grounded at the time of installation.[21]  Finally, two Plaintiffs no longer own structures in which CSST is installed, each having sold their properties that formed the basis of their claims.[22]

---

[17]  *See also* Ex. 21, Immekus Dep. Tr. at 36:2–4 ("Q. Never gave it a thought, what type of gas piping would be put in the house? A. Absolutely not."); Ex. 19,  Lee Dep. Tr. at 54:5-8 ("Q. And yellow CSST is not something that you bargained for when you were purchasing the home in Sullivan? A. No.") ; Ex. 22 Wasser Dep. Tr. at 43:10–21 ("Q. At the time [of construction], you … didn't know whether [the general contractor] was going to use CSST in the home or not, did you?  A. Correct.  I did not.").

[18]  In fact, plaintiff Cedar Deraps paid ***nothing*** for his CSST, receiving it for free from a family member. Ex. 1, Deraps Dep. Tr. 51:18–55:22.

[19]  *See* Ex. 19, Lee Dep. Tr. at 64:18–65:12 ("18 Q. Is it your understanding that it was Mr. Palmer's decision how much to charge you for the CSST in your home in Sullivan? A. Yes. Q. So the price you paid, that was up to him, right? A. Yes …   Q. You would agree that other CSST installers could charge a different price for CSST than Mr. Palmer charged you, right? A. Yes. Q. You would agree that other putative class members would have engaged CSST installers other than Mr. Palmer, right? A. Yes").

[20]  For instance, plaintiff Brian Immekus' home contains both yellow-jacketed TracPipe and black-jacketed Counterstrike, which cost different amounts.  (*See* Ex. 2, Exponent Report at 35.)

[21]  *Compare* Ex. 19, Lee Dep. Tr. at 146:5–12 ("Q. In fact, you don't know whether there was any specific portion of that installation charge attributable to bonding and grounding, right? A. Correct. Q. Installation might have cost the same whether the product was bonded and grounded or not, right? A. No, I think it's more to bond and ground it."); *with* Ex. 20, Volkart Dep. Tr. at 96:24–97:3 ("Q. Do you have any plans, as you sit here today, to contact a licensed electrician to bond and ground your CSST? A. No.").  *See also* Ex. 22, Wasser Dep. Tr. at 53:17–21 ("Q. Do you know if the CSST in your home is bonded and grounded?  A. I don't know for certain … I don't believe it is."); Ex. 23, George Dep. Tr. at 38:17–25 ("Q.  So you haven't had [the CSST] bonded and grounded[?]  A. No.").

[22]  *See* Ex. 19, Lee Dep. Tr. at 77:18–20; Ex. 24, McKinzie Dep. Tr. at 15:4–10.

14

**B. Plaintiffs' And Class Members' Exposure To Defendants' Representations About Their Respective CSST Products Varies On An Individual Basis.**

Plaintiffs also differ in their knowledge of, or exposure to, Defendants' respective statements about their CSST products. Although Plaintiffs allege that statements made by certain of the Defendants were disseminated to "countless" persons and organizations (SAC ¶ 55), all but one of them have testified that they never saw or heard any statements by any Defendant about any CSST products before joining this action (and the sole Plaintiff who claimed he had is a trained CSST installer who routinely worked with the product professionally).[23] Further, many Plaintiffs testified that before joining this suit, they had never heard of bonding and grounding, much less saw or heard any statements by Defendants about the efficacy of bonding and grounding CSST.

**1. Plaintiffs Never Saw or Heard any Statements by Defendants About CSST.**

Despite their allegation that Defendants have been "actively and concertedly … deceiving the public" about the purported dangers of CSST (SAC ¶ 125), all but one of the Plaintiffs testified that, before joining this case, they never heard or saw any advertisements, marketing materials, or, indeed, any statements at all from any of the Defendants about CSST. (*See* App'x 25, Dep. Testimony Chart Column 1.) In fact, multiple Plaintiffs admitted that before joining this lawsuit, they had never heard of CSST, did not know what it was, and did not know how it was used.[24]

---

[23] *See* Ex. 1, Deraps Dep. Tr. at 19:3–5.

[24] *See, e.g.,* Ex. 20, Volkart Dep. Tr. at 56:24–57:2 ("Q. And at the time that you bought the home, you had actually never heard of CSST; right? A. No."); Ex. 21, Immekus Dep. Tr. at 119:13–16 ("Q. Okay. So you were unaware of any statements by any of the defendants about yellow CSST when you acquired your TracPipe in 2012? A. Correct."); Ex. 23, George Dep. Tr. at 27:5–23 (admitting that she was "unaware of CSST prior to" learning about the lawsuit from attorney); Ex. 22, Wasser Dep. Tr. at 45:18–22 ("Q. At the time your house was being built, it's fair to say that you don't recall any representations that you received from Titeflex. Correct? A. Correct.").

Plaintiffs' deposition testimony also confirms that putative class members similarly would have had no exposure to any of Defendants' statements about their respective products:

> Q. Would you agree with me that a lot of the members of the [putative] class would have no exposure to any statements that the defendants made about yellow CSST?
> **A. Yes.**

(Ex. 20, Volkart Dep. Tr. at 104:21–25.)

> Q. And would you agree with me that Defendants' statements about yellow CSST are not something that's well-known by the general public?
> **A. I would agree.**

(Ex. 19, Lee Dep. Tr. at 125:22–25.)  As this testimony demonstrates, most Plaintiffs and putative class members would have had no exposure to any statement about any of Defendants' CSST products.

### 2. Plaintiffs Never Saw or Heard Any Statements by Any Defendants About Bonding and Grounding.

Equally important, and contrary to Plaintiffs' allegations that Defendants have misled "the public at large" about the efficacy of bonding and grounding (SAC ¶ 48), Plaintiffs testified that they never heard or saw any statements by any Defendant about bonding and grounding before joining this lawsuit.  (*See* Ex. 25, Dep. Testimony Chart, Column 2.)  Many Plaintiffs testified, in fact, that before joining this case they had never heard of bonding and grounding at all and gave no thought to whether any component of their homes was bonded and grounded when they moved in.[25]

---

[25] *See, e.g.,* Ex. 20, Volkart Dep. Tr. at 94:3–15 ("Q. And you didn't question whether your TracPipe CSST was bonded and grounded when it was installed, did you? A. No. Q. It's just not something that was important to you at the time; right? A. I didn't know anything about it.") (objection omitted).

16

Further, despite Plaintiffs' allegations about Defendants' purportedly misleading representations about bonding and grounding, many testified that they do **not** believe that any Defendant should stop instructing installers to bond and ground CSST:

> Q. Do you think that the defendant[s] should stop telling the public to bond and ground yellow CSST?
> **A. No.**

(Ex. 20, Volkart Dep. Tr. at 109:15–18.)

> Q. Do you think that Defendants should stop telling the public to bond and ground yellow CSST?
> **A. No.**

(Ex. 19, Lee Dep. Tr. at 126:17–19.)

> Q. Your opinion would be that installers should be instructed to bond and ground the TracPipe?
> **A. Correct.**

(Ex. 21, Immekus Dep. Tr. at 110:13–15.)[26]  Indeed, recognizing the importance of bonding and grounding, plaintiff Cedar Deraps bonded and grounded his CSST *after* joining this lawsuit and *after* having alleged it was a "worthless fix."  (Ex. 1, Deraps Dep. Tr. at 25:22–26:4.)

## C.    Plaintiffs' Homes And CSST Have Varying Risks Of Lightning-Induced Damage, But None Has Sustained Any Such Damage.

Plaintiffs live in different houses and locations with varying structural and geographical characteristics, which create significant differences among their potential exposure to lightning-related damage to their homes and CSST.  Yet, despite these extensive variations, Plaintiffs do share one common trait:  lightning has never damaged any of their CSST products and they have suffered no injury or harm.

---

[26]    *See also* Ex. 22, Wasser Dep. Tr. at 59:15–21 (Q. "You testified earlier that it's your understanding that bonded and grounded … yellow CSST is safer than unbonded and grounded yellow CSST. Correct? ….  A. Yes.").

17

### 1.    Unique Features of Plaintiffs' Homes and CSST Create Differing Risks of Lightning Damage.

The unique features of Plaintiffs' homes and CSST create innumerable variations in their respective vulnerability to lightning strikes—and, consequently, the extent to which any alleged susceptibility of Plaintiffs' CSST to electrical damage presents an actual risk of loss. In particular, the exposure of Plaintiffs' and class members' homes to a potential lightning strike depends on, among other factors, the location of the home; the design and construction of the building; the presence or absence of a lightning protection system; the electrical conductivity of the soil at each property; and the topographical features at or near each property, including surrounding features such as trees, valleys, buildings, utility poles, and other structures. (Ex. 12, Rakov Decl. ¶¶ 6.B, C; Ex. 12, Rakov Report ¶ 14 ("A small house or other structure surrounded by tall buildings or trees may be essentially 'invisible' to lightning."); *see also id.* ¶¶ 19, 24.) Further, Missouri's topography, soil conductivity, vegetation, and housing density vary significantly across the state. (Ex. 26, Gantzer Decl. ¶¶ 10–79.)

Further, the unique features of Plaintiffs' homes present further varied circumstances affecting their CSST's potential susceptibility to lightning-induced damage, including, among other things, the amount of CSST installed, the number of gas appliances in each home, the number of metal roof penetrations at each home, the type of fuel servicing each home, whether the CSST in each home is bonded and grounded, and the soil conductivity nearby. (Ex. 2, Exponent Report at ███████, 147–49, 157–58; Gantzer Decl. ¶¶ 80–87.) These differences among the Plaintiffs and class members demonstrate the myriad variations in the potential risks each putative class member faces. (████████████████████)

### 2. No Plaintiff Has Ever Experienced Lightning Damage to Their CSST.

Although their homes and CSST face differing risks of lightning-induced damage, no Plaintiff's CSST has ever been damaged as a result of a lightning strike. To be sure, some Plaintiffs have experienced lightning strikes near their property—for instance, plaintiff Ron Metzgar's property sustained lightning damage three times (including damage to his electric fence and his Internet modem), but his CSST remained intact and damage-free each time. (Ex. 27, Metzgar Dep. Tr. at 71:4–73:16; *id.* at 74:25–75:2.) The absence of any such injuries among Plaintiffs is unsurprising given the infinitesimal risk that lightning energy will enter a home, energize the CSST inside, and cause an arcing event sufficient to damage the product. *See supra* at 6–7. Indeed, multiple Plaintiffs have acknowledged how remote a risk this is, candidly admitting that they do ***not*** believe that CSST presents any risk of injury to the occupants of the homes in which it is installed:

> Q. You don't believe that the current occupants of your home are at a real risk of injury due to the presence of TracPipe, do you?
> **A. No.**

(Ex. 20, Volkart Dep. Tr. at 77:12–16 (objection omitted).)

> Q. So you would agree that the Duncans, current occupants of your home in Sullivan, are not at a risk of injury due to the presence of TracPipe in the home?
> **A. Correct.**

(Ex. 19, Lee Dep. Tr. at 92:13–16.) Plaintiffs' allegations that "CSST presents a risk of substantial injury to consumers … including household fires with catastrophic and sometimes fatal results" (SAC ¶ 110) is thus plainly unfounded and unsupported by their actual experiences and beliefs. (*See also* Ex. 11, Marais Decl. ¶¶ 52–58.)

### D. Plaintiffs Have Not Sustained Any Economic Losses.

Having sustained no physical damage or injury as a result of CSST, Plaintiffs base their claims in this case on the theory that "defendants have caused economic harm to plaintiffs and all

19

other consumers who have purchased yellow CSST" because "the product they and other class members purchased was worth less than the product they thought they had purchased." (SAC ¶¶ 79–80.) Yet several Plaintiffs have since conceded that they have*not* sustained any such injuries, admitting that they did*not* in fact overpay for their CSST or otherwise suffer any ascertainable economic losses as result of their purchases of CSST:[27]

> Q: Okay. So you -- so the answer is you haven't suffered any economic damage at this point?
> **A: Correct. To my knowledge.**

(Ex. 22, Wasser Dep. Tr. at 51:5–7.)

> Q: No, you haven't experienced any monetary losses from having TracPipe installed in your home?
> **A: No.**

(Ex. 20, Volkart Dep. Tr. at 73:9–11.)

> Q. Do you agree that you didn't lose any money at all as a result of having TracPipe installed in your home in Sullivan?
> **A. Yes, I would agree.**

(Ex. 19, Lee Dep. Tr. at 97:5–8.)[28] Nevertheless, Plaintiffs continue to pursue their claim on their own behalf and on behalf of a sweeping nationwide class of owners of homes and other structures equipped with CSST, the vast majority of whom, like Plaintiffs, have sustained no loss or injury as a result of their purchases of CSST.

## V. PLAINTIFFS SEEK CERTIFICATION OF CLASSES OF CSST PURCHASERS WHO, LIKE PLAINTIFFS, PURCHASED DIFFERENT PRODUCTS AT DIFFERENT TIMES WITH DIFFERENT KNOWLEDGE.

---

[27] Because this testimony confirms that Plaintiffs cannot satisfy this and other elements of their claims, Defendants are entitled to summary judgment, as will be more fully explained in Defendants' forthcoming motion for summary judgment, to be filed shortly hereafter.

[28] *See also* Ex. 11, Marais Decl. ¶ 56 ("None [of the Plaintiffs] has shown any evidence … of actual financial harm.").

20

Plaintiffs seek certification of two classes of purchasers of any brand of yellow-jacketed CSST or a structure with any such CSST installed within the last twelve years. For their MMPA claims, Plaintiffs seek certification of a Missouri class of purchasers, and for their conspiracy and unjust enrichment claims, they seek certification of a nationwide class. Plaintiffs' proposed classes include millions of members, each of whom may or may not have known about, thought about, cared about, bargained for, or paid for their CSST; may or may not have ever seen or heard any statement by any Defendant about CSST; may or may not still own a home or structure with CSST manufactured by any Defendant; and, indeed, may or may not have **ever** owned any CSST manufactured by any Defendant. Plaintiffs ignore these differences among putative class members and ███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████████████████████████ But this myopic "focus" on Defendants is not only erroneous as a matter of law, it also overlooks myriad individual differences among the three Defendants' marketing and sale of CSST. In light of these differences among Plaintiffs, class members, and Defendants—all of which Plaintiffs' motion ignores—it is clear that Plaintiffs cannot meet their burden to show that a class should be certified; indeed, this case is uniquely ill-suited for class treatment.

## ARGUMENT

Plaintiffs face a high burden in seeking class certification. The Court should certify a class only "if it is satisfied, after a rigorous analysis," that Plaintiffs have satisfied Rule 23. *Ebert v. Gen. Mills, Inc.*, 823 F.3d 472, 477 (8th Cir. 2016). To meet their burden, Plaintiffs must first satisfy all four requirements of Rule 23(a) by showing that: "(1) the putative class is so numerous that it makes joinder of all members impractical; (2) questions of law or fact are common to the class; (3) the class representatives' claims or defenses are typical of the claims or defenses of the

class; and (4) the representative parties will fairly and adequately protect the interests of the class." *In re St. Jude Med., Inc.*, 425 F.3d 1116, 1119 (8th Cir. 2005). Plaintiffs must also satisfy one of the three subsections of Rule 23(b), *id.*, and here have chosen to focus primarily on Rule 23(b)(3),[29] which requires a showing that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

In addition, at the certification stage, "[p]laintiffs bear the burden of demonstrating by a preponderance of the evidence [ ] that a proposed class meets the requirements for class certification." *Jackson v. Crawford*, 2015 WL 2173646, at *2 (W.D. Mo. May 8, 2015) (quoting *Fogarazzo v. Lehman Bros.*, 263 F.R.D. 90, 98 (S.D.N.Y. 2009)). Importantly, "Rule 23 does not set forth a mere pleading standard." *Jackson*, 2015 WL 2173646 at *2 (quoting *Wal–Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (emphasis in original)). Rather, Plaintiffs "must not only be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, typicality of claims or defenses, and adequacy of representation, as required by Rule 23(a)" but also must "satisfy *through evidentiary proof* at least one of the provisions of Rule 23(b)." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (second emphasis added). Here, Plaintiffs' motion, which offers virtually no evidence in support of the Rule 23 requirements, falls well short of satisfying these standards.

## I. PLAINTIFFS' PROPOSED CLASSES ARE NOT ASCERTAINABLE AND ARE FATALLY OVERBROAD.

---

[29] Plaintiffs' motion also includes a cursory request for certification under Rule 23(b)(2), *see* Pl. Br. at 42–44, which requires a showing that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).

**A.  Plaintiffs Offer No Method For Objectively Identifying Putative Class Members.**

Plaintiffs' motion should be denied for the threshold, dispositive reason that the proposed classes are not ascertainable.  As Plaintiffs acknowledge, "to maintain a class action, the class sought to be represented must be adequately defined and clearly ascertainable."  *Sandusky Wellness Ctr., LLC v. Medtox Sci., Inc.*, 821 F.3d 992, 995 (8th Cir. 2016) (cited at Pl. Br. at 21.) To satisfy this requirement, Plaintiffs must show that the class can be defined using objective and definite criteria.  *See Martinez v. Triple S. Props.*, 2019 WL 1646405, at *2 (W.D. Mo. April 16, 2019) (proposed class not ascertainable where plaintiffs' proposed identification records did not provide objective criteria to identify class members).  In *Sandusky*, for example, the objective criteria were the defendant's fax logs showing the recipient of each fax.  *Sandusky*, 821 F.3d at 997.  And in *McKeage v. TMBC, LLC*, "class members were identified by reviewing [defendant's] customer files according to objective criteria."  847 F.3d 992, 999 (8th Cir. 2017) (cited at Pl. Br. at 21–22).

Here, by contrast, Plaintiffs offer no objective method to identify class members through Defendants' records, public records, or any records at all.  As Plaintiffs know, Defendants do not sell CSST directly to building owners ███████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████  Courts have denied class certification for this precise reason.  In *Dumas v. Albers Med., Inc.*, for example, the Court held that a proposed class of counterfeit medication purchasers was not ascertainable, concluding that "[i]dentifying the members of [plaintiff's] proposed class does not involve merely the burdensome task of looking through files or databases … ***no such records exist***.  Rather, there simply is no way to accurately or readily identify the potential members of

23

[plaintiff's] proposed class." 2005 WL 2172030, at *6 (W.D. Mo. Sept. 7, 2005) (emphasis added). Other courts have held the same. *See, e.g.*, *White v. Just Born, Inc*., 2018 WL 3748405, at *3–4 (W.D. Mo. Aug. 7, 2018) (class certification denied where "there is no master list that exists" and "each class member will need to provide individualized evidence that they purchased the candy … and therefore belong to the class"); *True v. Conagra Foods, Inc.,* 2011 WL 176037, at *5 (W.D. Mo. Jan. 4, 2011) (denying certification where "[t]here is no 'master list' of individuals who purchased a pot pie.").

Contrary to Plaintiffs' unsupported suggestion that ███████████████████ ██████████████████████████████████████████████████████and that "██████████████████████████████████████████████████████ ██████████████████, real property and tax records simply do not identify the type of gas piping within a home. (*See* Ex. 28, Marx Decl. ¶ 13.) ████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████) Nor do Plaintiffs offer support for their assertion that "permit documentation" and "Certificates of Occupancy" show whether a structure has CSST and, if so, its manufacturer. Rather, Plaintiffs' own testimony makes clear that confirming the presence of CSST within a home requires individualized inspection; for instance, several Plaintiffs testified that attorneys inspected their homes to confirm the presence of CSST before adding them as plaintiffs in this suit.[30] The need for these individual inspections makes these classes objectively unascertainable.

---

[30]    *See* Ex. 21, Immekus Dep. Tr. at 16:2–6 ("Q. And then the three of you agreed to meet at your home and discuss this lawsuit and whether you'd be interested in joining? A. The three of us agreed to meet at my home and see if CSST was in my home."); Ex. 20, Volkart Dep. Tr. at 31:18–21 ("Q. And why did [Caleb Jones] want to come over to your house? A. He wanted to check and see if we had that pipe -- the TracPipe in our home."); Ex. 1,

24

**B.     Plaintiffs' Proposed Class Definitions Are Overbroad.**

Plaintiffs' proposed class definitions also are fatally overly broad.  *See Mayo v. USB Real Estate Sec., Inc.*, 2012 WL 4361571, at *2–3 (W.D. Mo. Sept. 21, 2012) (denying class certification after finding proposed class "fatally overbroad").  Plaintiffs' proposed classes include all purchasers of "yellow CSST" or structures with "yellow CSST," regardless of which company manufactured it.  Since there are multiple CSST manufacturers in the United States other than Defendants (*supra* at 3 n.4), Plaintiffs' proposed class includes class members who do not, and never have, owned Defendants' CSST, which alone renders Plaintiffs' class definition fatally deficient.  *See, e.g., Mayo*, 2012 WL 4361571, at *2 ("A class should not be certified if it is defined in such a way that it contains a great many persons who have suffered no injury at the hands of the defendant.").  In addition, Plaintiffs' class definitions are overly broad in that they include persons who have sold their homes.  This creates the possibility of duplicative recoveries, because successive owners of a single home or building during the class period would be members of the class based on their ownership of the same parcel of land.  Plaintiffs offer no explanation for why multiple owners of the same home and the same CSST would each be entitled to separate recoveries from Defendants.  (*See* Ex. 10, Cantor Decl. ¶ 85, 90.)  An overbroad class cannot be certified.

**II.     PLAINTIFFS CANNOT DEMONSTRATE COMMONALITY, MUCH LESS PREDOMINANCE.**

---

Deraps Dep. Tr. at 70:12–71:9 (testifying that Caleb Jones told him "he would like to … come out and take a look at [his CSST] to see if it… met the requirements"—and did so— before joining the lawsuit); Ex. 23, George Dep. Tr. at 24:20–25:6 ("Q. How is it that you came to be involved in this case?  A. Well, Caleb [Jones] came to me and asked if I knew what kind of gas pipe I had in my house, which I did not …. [A]nd then he asked if he could come into my house, which I said yes, and he looked in my basement and informed me that we did have the CSST yellow in our house which I was unaware of.").

25

Plaintiffs also have not, and cannot, satisfy Rule 23's commonality and predominance requirements. Commonality "requires the plaintiff to demonstrate that the class members have suffered the same injury." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349–50 (2011); *Smith v. ConocoPhillips Pipe Line Co.*, 801 F.3d 921, 925 (8th Cir. 2015) (same). Here, the varied circumstances in which Plaintiffs and the putative class members acquired their CSST create "[d]issimilarities within the proposed class" precluding a finding of commonality. *Wal-Mart*, 564 U.S. at 350. Further, Plaintiffs certainly cannot satisfy Rule 23(b)(3)'s "far more demanding" requirement that common questions predominate, because they have not shown that their claims are susceptible of common, as opposed to individualized, proof. *Ebert*, 823 F.3d at 478 (8th Cir. 2016) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 624 (1997).

## A. Plaintiffs Cannot Show Commonality Because They Have Not Shown Any Common Injury Or Common Conduct Among Defendants.

To demonstrate commonality, the putative class claims "must depend upon a common contention … that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart* , 564 U.S. at 350. Plaintiffs cannot make this showing here because they cannot demonstrate that putative class members have sustained a common injury—or even ***any*** injury— which the Eighth Circuit has recognized is "pivotal" to commonality. *Webb v. Exxon Mobil Corp.*, 856 F.3d 1150, 1156 (8th Cir. 2017). Although Plaintiffs recognize that their "essential claim" of injury in this case is that they were deprived of the benefit of their bargain (Dkt. No. 86 at 18), this claim is not susceptible to class-wide resolution because significant differences exist among the putative class, including whether they knew about, cared about, bargained for, or paid for CSST when buying their homes or other structures. Several Plaintiffs candidly admit that they did not

26

bargain for CSST when they purchased their homes,[31] others agreed that received a "real bargain" on their homes and CSST,[32] and still others did not pay anything for their CSST at all.[33] Where, as here, "varied circumstances" among the transactions purportedly giving rise to plaintiffs' alleged injuries "prevent 'one stroke' determination," Rule 23(a)(2)'s commonality requirement is not satisfied. *Luiken v. Domino's Pizza, LLC*, 705 F.3d 370, 374, 376 (8th Cir. 2013); *see also In re Bisphenol-A (BPA) Polycarbonate Plastic Prod. Liab. Litig.*, 276 F.R.D. 336, 344–46 (W.D. Mo. 2011) (no commonality because "[o]ne Plaintiff's actions, decisions, knowledge, and thought processes are unique to that Plaintiff").

Indeed, ***not one*** of the purportedly "common" categories of issues Plaintiffs identify in their motion even remotely raises issues common to the class. *See* Pl. Br. at 15–16.

### 1. Plaintiffs' "Common Issues of Fact" Are Not Common.

None of Plaintiffs' alleged "common issues of fact" are common at all:

· There is not, as Plaintiffs suggest, ██████████████████████████ ██████████████████ As expert testimony confirms, TracPipe, Gastite, and WARDFlex are separate products with differing characteristics, including, among other things, certain properties of the jacketing such as dielectric strength. (*See* Ex. 2, Exponent Report at 2.)

---

[31] *See, e.g.,* Ex. 20, Volkart Dep. Tr. at 55:6–8 ("Q. And yellow CSST wasn't something that you bargained for when purchasing the home; right? A. No."); *id.* at 59:7–9 ("Q. And you didn't specifically pay any money specifically for the TracPipe. Is that fair to say? A. No. I did not pay -- no. Sorry."); Ex. 19, Lee Dep. Tr. at 54:5–8 ("Q. And yellow CSST is not something that you bargained for when you were purchasing the home in Sullivan? A. No."); *id.* at 67:23–68:2 ("Q. I'm -- I'm talking specifically about TracPipe. Sitting here, you can't tell me how much you paid for your TracPipe; can you? A. No."); Ex. 23, George Dep. Tr. at 45:9–11 ("Q. Do you know how much you paid for the CSST in your home? A. I do not."); Ex. 22, Wasser Dep. Tr. at 43:4–21 ("Q. At the time [of installation], you … didn't know whether [the general contractor] was going to use CSST in the home or not, did you? A. Correct. I did not.").

[32] *See* Ex. 20, Volkart Dep. Tr. at 54:17–22 ("Q. You would agree that $90,000 was more than a fair price for that home; right? A. Yes. Q. In fact, the $90,000 that you paid for your home, that was a real bargain; right? A. Yes.").

[33] *See* Ex. 1, Deraps Dep. Tr. at 52:19–24 ("Q. So is it fair to say that the company had yellow CSST available at your father's company, he gave you the yellow CSST, said you don't need to pay me for this, but do some work and that's how you're going to pay it off? A. That was the agreement, yes.").

27

- Nor does Defendants' purported ████████████ ████████████████████ raise common issues. Plaintiffs' own evidence confirms that Defendants have made different public statements about separate products at different times, including by publishing differing ████████████[34] *See supra* at 9–10. Further, Plaintiffs fail to present evidence of ████████████ by any Defendant, much less any coordinated or uniform lobbying efforts.

- In addition, the ████████████ ████████████ are not common to the putative class or to Defendants, because, as Plaintiffs' expert admits, Defendants have charged different amounts for different CSST products at different times. (*See* Ex. 32, Hedlund Dep Tr. at 172:9–18, 186:13–17, 192:15–21.) Nor are ████████████ from Defendants' CSST sales even remotely common; ████████████████████████ ████████████████████████ ████████████

- Defendants' alleged ████████████ ████████████████████████ also is not a common issue. Plaintiffs do not say which "testing" to which this refers, but even by Plaintiffs' own account, any such alleged testing was performed by different Defendants on different products.

- Finally, Defendants' alleged ████████████████████does not raise a common issue for the same reasons as their ████████████ ████████████████████are not common issues.

Plaintiffs simply have not identified a ***single*** common factual question.

### 2. Plaintiffs' "Common Questions for Expert Opinion" Are Not Common.

Nor can Plaintiffs' proposed "common questions for expert opinion" be answered on a class-wide basis. The deadline for expert disclosures has passed and Plaintiffs have not designated a ***single*** expert witness to offer any such opinions. For example, Plaintiffs' first two purported common expert issues address the efficacy of bonding and grounding, yet Plaintiffs have not found

---

[34] For instance, csstfacts.org, ████████████████████████ ████████████████████ is an Omega Flex website promoting its CounterStrike CSST product. *See* csstfacts.org (last accessed August 29, 2019) ("CounterStrike is technologically superior to any other product on the market.").

and disclosed any expert who will opine on that subject. Nor have Plaintiffs designated any expert

to opine as to ███████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

██████████████████████████ To the contrary, Plaintiffs' designated "damages" expert expressly

disclaimed his intent to offer opinions on either of these topics, testifying that he is "offering no

opinion of harm" (Ex. 32, Hedlund Dep. Tr. at 207:17) nor opining on the proper remedy to address

the purported dangers of CSST (*id.* at 110:24–111:1, 173:20–25.) Further, as explained below

(*infra* at 32–35, 41–49), these questions cannot be answered on a class-wide basis.

### 3. Plaintiffs' "Common Questions of Law" Are Not Common.

Finally, the "common questions of law" Plaintiffs identify ████████████████████

███████████████████████████████████ are not common to the class because Plaintiffs do

not identify any uniform statements by Defendants. Pl. Br. at 16. Contrary to Plaintiffs' assertion

that ████████████████████████████████████████████████████████████

████████████ their cited materials show no such "coordination."[35] Further, to the extent they

intend to "challenge" statements other than those identified in their motion, Plaintiffs fail to explain

how the legality of such unspecified statements—made by different Defendants at undisclosed

times through unspecified channels to unidentified persons—could ever be assessed on a common

basis. As the federal courts have routinely recognized, "[i]n the absence of any evidence

suggesting that Defendant[s] had a uniform course of conduct, [ ] the Court cannot conclude that

---

[35] As their claimed support for these statements, ████████████████████████████
█████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████ None of these materials supports the notion that any Defendant made any
joint statements about CSST, as necessary to establish a common question.

the commonality requirement has been met." *Rothman v. Gen. Nutrition Corp.*, 2011 WL 6940490, at *6 n.2 (C.D. Cal. Nov. 17, 2011); *McKinnon v. Dollar Thrifty Auto. Grp., Inc.*, 2015 WL 4537957, at *9 (N.D. Cal. July 27, 2015) ("[T]here is no commonality as to Plaintiffs' [consumer fraud] claim because Plaintiffs do not provide any evidence of uniform unlawful conduct."). For these reasons as well, Plaintiffs fail to satisfy commonality, and their motion for class certification should be denied.

## B. Common Issues Do Not Predominate Because Common Evidence Cannot Be Used To Prove The Putative Missouri Class's MMPA Claims.

Plaintiffs also fail to satisfy Rule 23(b)(3)'s "far more demanding" requirement that common issues predominate, which "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Ebert*, 823 F.3d at 478–79. Predominance exists only where Plaintiffs can demonstrate that "the defendant[s'] liability to all plaintiffs may be established with common evidence," as opposed to individualized proof. *Avritt v. Reliastar Life Ins. Co.*, 615 F.3d 1023, 1029 (8th Cir. 2010); *see also Luiken*, 705 F.3d at 377 (reversing class certification where "[c]ommon evidence cannot make out a prima facie case for this class"). Importantly, Plaintiffs bear the burden of affirmatively demonstrating that common questions predominate. *Sample v. Monsanto Co.*, 218 F.R.D. 644, 650 (E.D. Mo. 2003). Here, Plaintiffs have not met this burden with respect to the elements of their MMPA claims; in fact ***none*** of these elements is subject to common proof.[36]

---

[36]   To prevail on a MMPA claim, a consumer must prove that: "(1) he leased or purchased a product or service sold or advertised by defendants for personal use; (2) he suffered an ascertainable loss of money or property; (3) the defendant committed an unfair or deceptive trade practice; (4) in connection with the sale; (5) which caused the plaintiff's loss." *Faltermeier v. FCA US LLC*, 2017 WL 1128467, at *3 (W.D. Mo. Mar. 24, 2017).

### 1. Common Evidence Cannot Show Which Class Members Purchased CSST For "Personal, Family or Household Purposes."

Plaintiffs make no attempt to demonstrate how they will prove with common evidence that class members "purchased [yellow CSST] for personal, family or household purposes." Mo. Ann. Stat. § 407.025. Although Plaintiffs claim that ███████████████████████████ ██████████████████████, they do not explain how the purpose for which any such real property is purchased can be established with common evidence. Nor can they—rather, to satisfy this threshold element of their MMPA claims, class members will need "to provide individualized evidence that they purchased [these structures] for personal or household purposes," rather than for commercial purposes, such as use as rental property. *White*, 2018 WL 3748405, at *3. In fact, not even Plaintiffs can uniformly satisfy this requirement—one Plaintiff is a community church, not a private homeowner, demonstrating that individual inquiry will be necessary to determine class membership.

Courts routinely deny class certification under consumer protection statutes where, as here, there is no way to establish with common proof that a particular product was purchased for personal, not commercial, use. *See id.*; *see also Ticknor v. Rouse's Enters., L.L.C.*, 592 F. App'x 276, 278–79 (5th Cir. 2014) (individualized inquiries as to whether credit card purchases were personal or business-related predominated over common questions); *Loughlin v. Amerisave Mortg. Corp.*, 2018 WL 1887292, at *3 (N.D. Ga. Mar. 19, 2018) (loans); *Gaisser v. Portfolio Recovery Assocs., LLC*, 2009 WL 10666810, at *8 (S.D. Fla. Mar. 2, 2009) ("[I]ndividual inquiries will be required as to whether the [state debt collection statute] even applies because of the personal/business question."). This defect alone bars a finding of predominance.

31

## 2. Common Evidence Cannot Be Used to Prove Ascertainable Loss.

Plaintiffs also cannot establish that class members sustained an ascertainable loss of money or property using common proof. They do not even try. Plaintiffs' theory of ascertainable loss hinges on their allegation that they were "deprived of the benefit of the bargain by purchasing yellow CSST" because the product was "worth less than the product they thought they had purchased." (SAC ¶¶ 79–80.) In fact, this is the *sole* theory that survived Defendants' motion to dismiss:

> Plaintiffs claim they paid more for [CSST] based on the product's alleged safety, but were denied the benefit of the bargain when the product was actually worth less than what was represented, a product with an alleged inherent defect … Plaintiffs allege, for purposes of this motion, that they did not receive the benefit of the bargain in purchasing CSST based on the representations that it was a safe and superior product. Plaintiffs claim the product, as purchased and installed, was less than the value of the product as represented, and this is sufficient to allege a claim for an ascertainable loss.

Dkt. No. 94 at 9. To establish an ascertainable loss under this "benefit of the bargain" theory, Plaintiffs must prove—though common evidence—"the difference between the actual value of the property and what its value would have been if it had been as represented." *Sunset Pools of St. Louis, Inc. v. Schaefer*, 869 S.W.2d 883, 886 (Mo. Ct. App. 1994).

Plaintiffs cannot make this showing, however, because they have not offered any method to determine either the "value of the product as represented" or the "value of the product as purchased and installed" on a class-wide basis. (*See* Ex. 10, Cantor Decl. ¶¶ 27, 28.) Plaintiffs' "damages" expert, for his part, made no attempt to determine the "value" of CSST in any structure. (*See* Ex. 32, Hedlund Dep. Tr. at 207:11–12 ("I am offering no opinion on the economic value of CSST.").) And Plaintiffs' own testimony shows that the prices they paid for their CSST are not uniform and are virtually impossible to ascertain. Some Plaintiffs testified, for example, that the price they paid for CSST was left to the discretion of the installer, and that the only way to

32

determine the amount they paid would be to contact the installer and ask.[37]  Other Plaintiffs were

unaware of what they paid for their CSST because it was bundled with the construction costs of

their homes.[38]  Still others received invoices from their installers which they claimed reflected the

cost of their CSST, but they could neither identify the price they paid based on those documents

nor say whether any such price exceeded the product's true value.[39]  And multiple Plaintiffs

candidly acknowledge that they did ***not*** in fact overpay for their CSST, and that it has provided

the full value they expected by safely transporting fuel gas through their homes.[40]  This testimony

confirms that individual inquiries will be necessary to confirm whether absent class members have

sustained an ascertainable loss—or, like these Plaintiffs, suffered no actual injury.[41]

---

[37]  *See* Ex. 19, Lee Dep. Tr. at 68:8–12 ("Q. Well, if you wanted to figure out specifically how much you paid for the TracPipe specifically, what you would do is reach out to Chris Palmer? A. Yeah. Yes. Sorry.").

[38]  *See e.g.,* Ex. 33, Worstell Dep. Tr. at 139:14-140:2 ("Q. And you've never seen a receipt [for your CSST]? A. Correct.  Q. You've never seen where it was purchased, right? A. Correct.  Q. How do you know you actually paid for it? A. Because I – Q. For that specifically? A. I bought the house. Q. Have you seen any itemized breakdown? A. No."); Ex. 24, McKinzie Dep. Tr. at 71:18-72:6 ("Q. Did you pay for the CSST in the house? A. I did as a part of my build, yes. Q. Do you know how much, specifically, the CSST costs? A. I do not.")

[39]  *See, e.g.,* Ex. 21, Immekus Dep. Tr. at 66:17–67:2 ("Q. Where is the labor cost that shows the installation charge for CSST? A. It doesn't -- it says total labor cost. Q. But specifically for the CSST, you can't tell me sitting here today what you paid to have your CSST installed? A. I cannot. Q And you don't know how much you paid for your TracPipe; right? A. I do not know.")

[40]  *See, e.g.,* Ex. 21, Immekus Dep. Tr. at 67:3–5 ("Q. You're not claiming in this lawsuit that you overpaid for your TracPipe, are you? A No."); *id.* at 94:11–13 ("Q. You would agree that the TracPipe is still providing you with the value that you expected; right? A Yes."); Ex. 20, Volkart Dep. Tr. at 59:20–22 ("Q. You're not claiming in this lawsuit that you overpaid for your TracPipe, are you? A. No."); *id.* at 83:22–84:2 ("Q. You'd agree that your TracPipe CSST is still providing you with the value that you expected when you bought your home; right? A. Yes.") (objection omitted); Ex. 19, Lee Dep. Tr. at 68:17–19 ("Q. You're not claiming in this lawsuit that you overpaid for your TracPipe; are you? A. No."); *id.* at 99:25–100:3 ("Q. You would agree that your TracPipe always provided you with the value that you expected, right? A. Oh, yes."); Ex. 23, George Dep. Tr. at 47:2–23 (conceding she has "no evidence of economic harm"); Ex. 22, Wasser Dep. Tr. at 51:5–7 ("Q.  [Y]ou haven't suffered any economic damage at this point?  A. Correct."). Further, plaintiff Cedar Deraps did not pay anything for his CSST.  *See* Ex. 1, Deraps Dep. Tr. at 52:19–24.

[41]  *See* Ex. 10, Cantor Decl. ¶ 51 ("Plaintiffs have not demonstrated that all or nearly all homeowners who currently have yellow CSST in their residences have incurred or expect any losses from yellow CSST.").

33

Class certification is not appropriate where, as here, establishing the fact or amount of loss implicates individualized inquiries into the transactions at issue. For example, in *In re BPA*, the district court denied certification of a class of consumers of baby bottles made with allegedly hazardous substances, holding that because "[t]he value of the product accepted is not universal" and varied based on the extent of class members' use, the question of whether the class members received the benefit of their bargain was not common to the class. 276 F.R.D. at 345. Similarly, in *True*, the court denied certification of a class of consumers of recalled pot pies linked to a salmonella outbreak, concluding that common factual issues did not predominate because "[t]he recovery for a defective pot pie would depend (at least in part) on the purchase price," which would "vary among members" based on differences among the "different stores, cities, states, or regions" where class members purchased the pies. 2011 WL 176037, at *6; *see also White*, 2018 WL 3748405, at *4 (denying class certification where "the question of whether any MMPA violation injured each class member will require individualized inquiry"); *see also Hartis v. Chicago Title Ins. Co.*, 2010 WL 11545067, at *4 (W.D. Mo. Sept. 20, 2010); *Owner-Operator Indep. Drivers Ass'n, Inc. v. New Prime, Inc.*, 213 F.R.D. 537, 547 (W.D. Mo. 2002). Here too, Plaintiffs' inability to show that either the price they paid for CSST or the actual value of their CSST can be determined on a common, class-wide basis bars any finding of predominance.

Finally, Plaintiffs allege that ███████████████████████████████ suffered an ascertainable loss because ██████████████████████████████ ███████████████████████ Leaving aside that Plaintiffs offer no expert testimony or other evidence suggesting that bonding and grounding is ██████████████████ they certainly offer no common method for determining the "cost" of bonding and grounding, which class members

bonded and grounded their CSST,[42] or the value any putative class member received from bonding and grounding. (Ex. 11, Marais Decl. ¶¶ 68–71.) Plaintiffs' suggestion that an ascertainable loss can be based on an "average cost" lacks support in the law and should be rejected. *See, e.g., In re Fluidmaster, Inc., Water Connector Components Prod. Liab. Litig.*, 2017 WL 1196990, at *58 (N.D. Ill. Mar. 31, 2017) (denying class certification because trying "to prove damages through averages … would overcompensate some class members, while undercompensating others"). Plaintiffs thus have not shown how class members' purported "out-of-pocket" damages based on the cost of bonding and grounding can be proven with common evidence.

### 3. Common Evidence Cannot Be Used to Prove Common "Misrepresentations," Common "Omissions," or a Uniform, Unfair, or Deceptive Trade Practice.

Plaintiffs also have not demonstrated that common issues predominate with respect to any alleged misrepresentations, unfair practices, or omissions by Defendants, because they have not shown that Defendants engaged in any uniform or coordinated conduct. *See supra* at 9–12, 26–28; *see, e.g., Gonzalez v. Corning*, 317 F.R.D. 443, 516 (W.D. Pa. 2016) (no predominance where there was no "evidence in the record probative of plaintiffs' assertion that [defendant] made consistent representations to all (or even most or many) members of the proposed [ ] class"). Because Defendants made different statements with differing content about separate products at different times, Plaintiffs cannot use common evidence to establish a violation of the MMPA on any of their three theories (*see* Pl. Br. at 25–30):

- *Misrepresentation or False Statement.* As previously explained (*supra* at 9–12, 26–28), none of the evidence Plaintiffs cite demonstrates any uniform or coordinated statements or representations by the Defendants. At most, this evidence reflects

---

[42] ████████████████████████████████████

statements separate Defendants have made, at different times and through differing means, about their respective CSST products—not each other's.[43]

- ***Unfair Practice.*** Plaintiffs also offer no evidence of any coordinated business practices among Defendants, relying instead on the conclusory declaration that " █████ ██████ This unsupported assertion cannot satisfy predominance, however, because the absence of any coordinated conduct among Defendants—competitors who each market and sell different products through differing means (*supra* at 9–12)—means that Plaintiffs cannot prove any unfair practice with common evidence.

- ***Concealment or Omission.*** For the same reasons, Plaintiffs cannot satisfy predominance for their omissions-based MMPA claims—they simply have not shown any common course of conduct among Defendants. In addition, Plaintiffs have not shown that common issues would predominate in proving materiality, *see* Mo. Code Regs. Ann. tit. 15, § 60-9.110, because they have not demonstrated that any allegedly concealed facts about CSST would have been material to class members' home-buying decisions. *See, e.g., In re 5-Hour Energy Mktg. & Sales Practices Litig.*, 2017 WL 2559615, at *8 (C.D. Cal. June 7, 2017) ("Courts have refused to certify a consumer protection class where plaintiffs make such a limited showing of class-wide materiality.") In fact, the record confirms that Plaintiffs ***cannot*** make any such showing, since they admit that CSST was "not significant to [them] at the time that [they] purchased [their] homes[.]"[44]

Plaintiffs thus fail to satisfy predominance as to the MMPA's unlawful-practice element.

### 4. Common Evidence Cannot Be Used to Show that Defendants' Statements About CSST Were Made "In Connection With" Class Members' Purchases.

Similarly, Plaintiffs cannot demonstrate with common evidence that Defendants' purported misrepresentations were made "in connection with" class members' purchases. To satisfy this essential element, "evidence of some factual connection between the misrepresentation and the purchase is required." *Faltermeier v. FCA US LLC*, 899 F.3d 617, 622 (8th Cir. 2018); *see also*

---

[43]  For instance, Plaintiffs rely on csstfacts.org as the basis for multiple purportedly "uniform" statements (Pl. Br. at 26), but that website is used solely by Omega Flex to provide information about its CounterStrike CSST product. Plaintiffs also mischaracterize the record evidence, ███████████████████████ █████████—a statement that does ***not*** appear in any of the evidence they cite. Pl. Br. at 26. (alterations and internal quotation marks omitted).

[44]  Ex. 19, Lee Dep. Tr. at 63:5–8; *see also* Ex. 20, Volkart Dep. Tr. at 57:11–14; Ex. 23, George Dep Tr. at 24:20-25:6; Ex. 22, Wasser Dep. Tr. at 47:11-21.

*DePeralta v. Dlorah, Inc.*, 2012 WL 4092191, at *8 (W.D. Mo. Sept. 17, 2012) ("The MMPA

qualifies the prohibition on unfair practices by requiring proof that the unfair practice occurred 'in

connection with' the sale or advertisement of merchandise."). Here, Plaintiffs cannot use common

evidence to make this showing on behalf of the putative class—indeed, they cannot even make it

***for themselves***. Most Plaintiffs were unaware of any Defendant's statements when they acquired

their CSST,[45] and several admit that there was no connection between any such statements and

any purchases they made:

> Q. You would agree with me then that Omega Flex made no statement about TracPipe in connection with your purchase of TracPipe; right?
> **A. Yes.**

Ex. 21, Immekus Dep. Tr. at 119: 21–24.

> Q. So you would agree with me that Omega Flex made no statements about TracPipe in connection with your purchase of the product?
> **A. True.**

Ex. 20, Volkart Dep. Tr. at 103: 16–19.

> Q. Omega Flex made no statements about anything in connection with your purchase of TracPipe, right?
> **A. Correct.**

Ex. 19, Lee Dep. Tr. at 125:16–18. The absence of any such connection is not surprising, given

that no Defendant markets or sells its CSST products to consumers.[46] Indeed, as Plaintiffs admit,

---

[45]  Ex. 34, Rehm Dep. Tr. at 106:7-10 ("Q. When you were making the decision to install yellow CSST back in 2011, had you seen any advertisements for any CSST? A. No."); Ex. 27, Metzgar Dep. Tr. at 138:6-12 ("Q. Okay. Mr. Metzgar, we were speaking earlier about advertisements for CSST. I believe you stated -- let me know if I'm wrong -- that you had not seen ads related to CSST prior to building your house; is that correct? A Yeah. I don't recall seeing them. That's correct."); Ex. 22, Wasser Dep. Tr. at 45:18-22 ("Q. At the time your house was being built, it's fair to say that you don't recall any representations that you received from Titeflex. Correct? A. Correct."); Ex. 23, George Dep. Tr. at 30:23−31:1 ("Q. To your knowledge, [you] never saw any representations or communications from anyone about CSST prior to 2015, correct?  A. Correct."); Ex. 24, McKinzie Dep. Tr. at 47:3-21 (testifying that the first time he had seen advertising material for CSST was the evening prior to his deposition); Ex. 33, Worstell Dep. Tr. at 68:3-17, 87:3-17, 118:21-25 (testifying that any representations he saw about CSST would have been after Caleb Jones's visit to his home).

[46]  In fact, certain purported misrepresentations identified in Plaintiffs' motion were made ***after*** Omega Flex stopped selling TracPipe in the United States in 2011, and after Titeflex stopped selling Gastite in the United States in

because "Defendants' statements about yellow CSST are not something that's well-known by the general public,"[47] it is near certain that "a lot of the members of the [putative] class would have no exposure to any statements that the defendants made about yellow CSST."[48] Moreover, determining whether any class member can demonstrate the requisite connection will require an individualized inquiry into the relationship, if any, between their purchase of CSST and the various alleged misrepresentations at issue ill-suite to class-wide resolution. *See, e.g., In re BPA,* 276 F.R.D. at 346 (denying certification of MMPA class where "there are numerous individual factual issues, including … the extent of each class members' knowledge about [chemical] at the time of the purchase"); *McCall v. Monro Muffler Brake Inc.*, 2013 WL 3418089, at *3 (E.D. Mo. July 8, 2013) ("Because Plaintiffs did not see the alleged misrepresentation, there can be no causal connection and any loss cannot provide the basis of a claim under the MMPA.").

Plaintiffs cannot evade this conclusion by arguing that ██████████ is on statements generally ████████████████████████████████████████████████ ██████ Courts have expressly held that the MMPA's "connection" element is ***not*** satisfied by public statements to which a plaintiff was never exposed. *See Faltermeier v. FCA US LLC,* 2017 WL 1128467, at *2 (W.D. Mo. Mar. 24, 2017) ("The public dissemination of the Press Releases, standing alone***, is insufficient to demonstrate the statements were made in connection with the sale of Plaintiff's Jeep***.") (emphasis added), *aff'd,* 899 F.3d at 622 ("No evidence suggests that either the seller or the buyer was aware of the misrepresentation. Nor was the intermediary seller an unwitting conduit for passing on the substance of the misrepresentation."). Because putative

---

2015. Plaintiffs' motion makes no effort to explain how any such statements could be made "in connection with" TracPipe or Gastite sales.

[47] Ex. 19, Lee Dep. Tr. at 125:22–25.

[48] Ex. 20, Volkart Dep. Tr. at 104:21–25.

class members must present individualized evidence demonstrating some connection between a misrepresentation and their own purchase of CSST, they cannot satisfy predominance.

### 5. Common Evidence Cannot Be Used to Prove Causation.

Plaintiffs also cannot present common evidence demonstrating that Defendants' alleged conduct caused any loss, because the record confirms that homebuyers do not care about the minuscule risk that lightning could potentially damage their CSST. As the Missouri courts have repeatedly recognized, a plaintiff who "did not care" about an alleged MMPA violation cannot, as a matter of law, satisfy the statute's causation element. *See, e.g., White*, 2018 WL 3748405, at *3– 4 ("[T]he Missouri Supreme Court has held that a plaintiff who 'did not care' about an alleged MMPA violation … was not injured by the practice … [i]f the Missouri Consumer Class were certified, the litigation would be dominated by individual inquiries into … causation and knowledge."); *State ex rel. Coca-Cola Co. v. Nixon*, 249 S.W.3d 855, 862 (Mo. 2008) (rejecting class certification where the plaintiff's proposed class included consumers "who did not care if the [diet cola] they purchased contained [sweetener]"). Here, various Plaintiffs have testified they do not in fact "believe that "CSST" present[s] any risk of harm or injury to the occupants of [their] home[s],"[49] and have given no thought to the minimal risk that lightning could damage the product—including, in some instances, even *after* they learned of the product's purported "risks."[50] Proving causation on a class-wide basis, moreover, requires proof of which class members, if any, cared about this remote risk—a highly individualized inquiry.

---

[49] Ex. 19, Lee Dep. Tr. at 81:3–11; *see also* Ex. 20, Volkart Dep. Tr. at 77:12–16 ("Q. You don't believe that the current occupants of your home are at a real risk of injury due to the presence of TracPipe, do you? A. No.") (objection omitted).

[50] For instance, plaintiff Tammy Volkart moved into a new home after she joined this lawsuit, yet never checked or thought about whether her new home contained CSST. Ex. 20, Volkart Dep. Tr at 61:2–14 ("Q. And you filed this lawsuit claiming that the yellow CSST in your home at 500 South Street was dangerous; right? A. Yes. Q. But you never checked to see whether there was yellow CSST in the residence where you live now; right? A. No. Q. Never occurred to you to check, did it? A. No. Q. You didn't really care whether there was yellow CSST in

In addition, because Plaintiffs and putative class members relied on homebuilders to select what type of gas piping to install,[51] establishing a causal link between Defendants' alleged misconduct and any alleged economic injury would require evidence into each homebuilder's decision to install CSST and what to charge for the work. *See, e.g., Campbell v. Purdue Pharma, L.P.*, 2004 WL 5840206, at *6 (E.D. Mo. June 25, 2004) (denying certification in MMPA drug-marketing case because "[t]o determine causation, an inquiry would have to be made into what the prescribing physician learned about [the drug] from what source and what role that information had in his or her decision to prescribe the drug"). This too will require a case-by-case inquiry, because different installers decide to install CSST based on "many variables"[52] which "depend[ ] on the installation,"[53] including the layout of a particular home and the ease of installation associated with CSST's flexibility.[54] Proof of causation will thus vary on an individual basis, precluding a finding of predominance.

### 6. Common Evidence Cannot Be Used to Prove Materiality.

Plaintiffs also cannot use common evidence to prove materiality, a necessary element of their omissions-based MMPA claims. *See* Mo. Code Regs. Ann. tit. 15, § 60-9.110. "A material fact for MMPA liability includes any fact which a reasonable consumer would likely consider to

---

your current residence, did you? A. I just didn't think about it."); *see also* Ex. 19, Lee Dep. Tr. at 71:20–22 ("Q. You never cared whether there was yellow CSST in your current residence, true? A. True.").

[51] Ex. 20, Volkart Dep. Tr. at 55:16–19 ("Q. And the decision to install that product, I think you said, was made by a subcontractor; right? A. Yes."); Ex. 19, Lee Dep. Tr. at 60:23–61:4 ("Q. The subcontractor who made that decision to install TracPipe was named Chris Palmer? A. Yes. Q. And Mr. Palmer, he decided what type of gas piping to use? A. Yes.") Ex. 22, Wasser Dep. Tr. at 43:4–21 ("Q. At the time you … didn't know whether [the general contractor] was going to use CSST in the home or not, did you? A. Correct. I did not."); Ex. 24, McKinzie Dep. Tr. at 56:9-12 (builder made decision).

[52] Ex. 1, Deraps Dep. Tr. at 80:24.

[53] *Id.* at 78:7.

[54] *Id.* at 79:3–8; ██████████████████████████████████.

be important in making a purchasing decision." *In re BPA*, 2011 WL 6740338, at *6 (internal

quotation marks omitted). Here, the importance putative class members place on CSST's purported

"risks" necessarily depends on the nature and extent of any such "risk"—which, in turn, varies

broadly across the class.  For example, the risk of lightning striking a home varies based on the

location of the home, including the topographical features, soil composition, and surrounding

features such as trees, valleys, buildings, utility poles, and other structures. (Ex. 12, Rakov Decl.

¶¶ 6.B, C & Report ¶¶ 14, 19.)  Each of these variables differs across Missouri. (*Id.* Report ¶¶ 13,

22–23; Ex. 26, Gantzer Decl. ¶¶ 10–79.)   In addition, the design of a particular structure also

impacts its susceptibility to lightning-induced damage; for instance, putative class members who

live in high-rise buildings with lightning protection and tall buildings nearby face a virtually

nonexistent threat of sustaining such damage.  (Ex. 12, Rakov Report ¶¶ 14, 52, 54.)  Other features

of a structure also affect the exposure of CSST to lightning-related damage, including the amount

of CSST installed and the presence or absence of proper bonding.  (Ex. 2, Exponent Report at 157–

158, 162.)   Indeed, many class members' and Plaintiffs' CSST "ha[s] effectively zero risk of

[lightning damage] owing to the specific configuration of the [house]." (*Id.* at xvi.)  Yet Plaintiffs'

motion overlooks these differences in risk profiles among putative class members, all of which

bear directly on materiality.  Plaintiffs thus have not shown that they can prove materiality of any

allegedly concealed facts with common evidence.

## III.    PLAINTIFFS HAVE NOT PRESENTED A METHOD OF CALCULATING CLASS-WIDE DAMAGES CONSISTENT WITH COMCAST V. BEHREND.

Plaintiffs' motion for class certification should also be denied because their purported

damages "model" is no model at all, let alone one that demonstrates, through evidentiary proof,

that damages can be established on a class-wide basis.  In *Comcast Corporation v. Behrend*, the

Supreme Court held that, to satisfy Rule 23(b)(3), a plaintiff must provide a model for calculating

41

damages on a class-wide basis that "measure[s] only those damages" that are "consistent with its liability case." 569 U.S. 27, 35 (2013). Federal courts applying *Comcast* in benefit-of-the-bargain cases like this have required plaintiffs to provide a damages model, supported by evidentiary proof, that can calculate the difference in the market value of the products class members purchased as represented and as sold on a class-wide basis. *See, e.g., Brazil v. Dole Packaged Foods, LLC*, 660 F. App'x 531, 534 (9th Cir. 2016) (affirming de-certification where "[t]he district court correctly limited damages to the difference between the prices customers paid and the value of the fruit they bought" but the plaintiff "did not explain how this premium could be calculated with proof common to the class"); *In re Fluidmaster,* 2017 WL 1196990, at *57 (rejecting damages model that failed to measure "the difference in the market price for a product with and without this 'propensity' to fail"); *Caldera v. J.M. Smucker Co.*, 2014 WL 1477400, at *4 (C.D. Cal. Apr. 15, 2014) ("Plaintiff has failed to offer any evidence, let alone expert testimony, that damages can be calculated based on the difference between the market price and true value of the products. Without such evidence, Plaintiff has failed to satisfy her burden of proving that damages may be proven on a classwide basis.").

As this Court recognized in denying Defendants' motion to dismiss (Dkt. Nos. 82–83), Plaintiffs' alleged injury hinges entirely on their allegation that they were "were denied the benefit of the bargain when the product was actually worth less than what was represented." Dkt. No. 94 at 9. Plaintiffs' purported damages "model," however, does not attempt to measure the difference in value of CSST "as purchased and installed" and "as represented" (*id.*), much less show, through affirmative proof, that either of these figures could be calculated on a class-wide basis.[55] Indeed,

---

[55] *See* Ex. 10, Cantor Decl. ¶ 31 ("Dr. Hedlund's proffered methodologies for the calculation of damages proceed by improperly assuming that (a) the economic losses are related in a reliable way to the linear feet of installed yellow CSST, and (b) the quantity demanded of yellow CSST but for the alleged conduct over the Class Period is zero (i.e., yellow CSST is worthless). These assumptions fail to be supported as a matter of economics and the

Plaintiffs' expert, Dr. Hedlund, admits that he did not even attempt to determine the value of a given class member's CSST. (*See* Ex. 32, Hedlund Dep. Tr. at 207:11–12 ("I am offering no opinion on the economic value of CSST.").) Plaintiffs' failure to tie their purported damages model to their theory of the case calls for denial of the motion for class certification. *See, e.g., Brazil*, 660 F. App'x at 534–35; *In re Fluidmaster,* 2017 WL 1196990, at *57; *Caldera*, 2014 WL 1477400, at *4.

Moreover, none of the damages theories that Plaintiffs' class-certification motion ***now*** claims they intend to pursue—(i) refund of the full purchase (*i.e.*, "restitution"); (ii) cost of replacement; or (iii) "disgorgement"—can be established on a class wide basis.[56]

### A. Plaintiffs Offer No Class-Wide Damages Model For Their Refund/Restitution Damages Theory.

Plaintiffs' assertion that ████████████████████████████ and can be calculated on a class-wide basis is incorrect for multiple reasons. Pl. Br. at 38. To begin, Missouri law makes clear that restitution of a product's full purchase price is ***not*** an available remedy in a private MMPA action. In *Sunset Pools of St. Louis, Inc. v. Schaefer*, for example, the Missouri Court of Appeals reversed a trial court's award of the purchase price the claimant paid for a spa, holding that because the benefit-of-the-bargain rule provided the proper measure of damages, "the price purchaser paid for the spa … is not the proper measure of damages." 869 S.W.2d 883, 886 (Mo. Ct. App. 1994); *see also Shiplet v. Copeland*, 450 S.W.3d 433, 442 (Mo. Ct. App. 2014) ("The

---

available information, but even in the case that they are true, Dr. Hedlund fails to explain how his damage calculations can be applied or assigned to individual Class members.")

[56] Ex. 10, Cantor Decl. ¶ 34 ("Given the severe conceptual economic flaws and informational constraints implied by Dr. Hedlund's methodologies, I conclude that his simple aggregate calculations are not adequately based on economics or the facts of this matter.")

price paid for property is not the proper measure of damages under the benefit of the bargain rule.").[57]

Even if restitution were available, courts award it only where a plaintiff can prove that the product received is "worthless." *See, e.g., Brazil*, 660 F. App'x at 534. Here, Plaintiffs' damages expert expressly disclaims making any determination of the value of any owner's CSST, much less that all CSST is worthless.[58] In addition, numerous plaintiffs testified to the contrary, acknowledging that their CSST is functioning precisely as intended and providing them the full value they expect from the product.[59] Further, expert testimony confirms that this and other record evidence "shows that [yellow CSST] is indeed *not* worthless." (Ex. 10, Cantor Decl. ¶ 17 (emphasis added).)[60] As Plaintiffs' own case law shows, where, as here, "the purchased good in question was tangible and had value shown by its intended use," restitution of the purchase price is not an appropriate measure of damages. *Kerr v. Vatterott Educ. Centers, Inc.*, 439 S.W.3d 802,

---

[57] Plaintiffs' reliance on cases addressing the Attorney General's authority to seek restitution under Section 407.100 of the MMPA is misplaced, because, as Plaintiffs' own authority makes clear, "*[c]onsumers have no interest in obtaining restitution* under section 407.100." *State ex rel Nixon v. Am. Tobacco Co.*, 34 S.W.3d 122, 130 (Mo. 2000) (cited at Pl. Br. at 37) (emphasis added).

[58] *See* Ex. 32, Hedlund Dep. Tr. at 97:17-22 ("Q. And the restitution methodology, that has as an assumption that the product is worthless; correct? A. That does not rely on the assumption of worth; that's for the court to determine.") (objection omitted).

[59] Ex. 21, Immekus Dep. Tr. at 94:11–13 ("Q. You would agree that the TracPipe is still providing you with the value that you expected; right? A. Yes."); Ex. 20, Volkart Dep. Tr. at 83:22–84:2 ("Q. You'd agree that your TracPipe CSST is still providing you with the value you expected when you bought your home; right? A. Yes.") (objection omitted); Ex. 19, Lee Dep. Tr. at 99:25–100:3 ("Q. You would agree that your TracPipe always provided you with the value that you expected, right? A. Oh, yes."); *also* Ex. 1, Deraps Dep. Tr. at 91:14–20 ("Q. [H]as the CSST ever failed in its transportation of gas to an appliance in your home? A. Not that I'm aware of. Q. Has it ever leaked gas? A. Not that I'm aware of."); Ex. 23, George Dep. Tr. at 38:12–14 ("Q. The CSST that's in your home, it's never failed, correct? A. No, not to my knowledge."); Ex. 22, Wasser Dep. Tr. at 45:23–46:7 ("Q. The CSST in your home, to your knowledge you've had no problems with it. Correct? A. Correct. To my knowledge."); Ex. 33, Worstell Dep. Tr. at 102:19-103:3, 132:21-133:9, 146:7-8 (plaintiff has not encountered problems with his CSST, uses gas appliances, and CSST is still working); Ex. 24, McKinzie Dep. Tr. at 46:4-11 (same).

[60] As Dr. Robin Cantor explains in her Declaration, in economics, a product is worthless when "the quantity demanded is zero, which would be true only if building codes banned CSST or it was so dangerous that no one would buy it." (Ex. 10, Cantor Decl. ¶ 17.) That is not the case here.

44

813 (Mo. Ct. App. 2014) (cited at Pl. Br. at 36). Plaintiffs' full-refund model therefore lacks the nexus to their liability theory required under *Comcast*. *See, e.g., Ramthun v. Bryan Career Coll. Inc.*, 93 F. Supp. 3d 1011, 1027–28 (W.D. Ark. 2015) (denying class certification where Plaintiffs "provided no model (other than the 100% damages, plus some, sought in their complaint) to demonstrate that determining damages can be done on a common basis"); *Victorino v. FCA US LLC*, 326 F.R.D. 282, 306 (S.D. Cal. 2018) (holding that a "full refund model which does not comport to damages … does not establish that damages can be measured on a classwide basis").

Finally, Dr. Hedlund's damages approach—which he describes as a "black box" equation for performing "simple math"[61]—does not even attempt to measure the actual amount homebuyers paid for CSST. Although Dr. Hedlund claims that this "calculation would simply be the number of feet of yellow CSST sold at the price for which the CSST was sold" (Pl. Ex. 4.1(a) ("Hedlund Decl.") ¶ 11), he overlooks the fact that "the price for which the CSST was sold" by Defendants to wholesalers and distributors is ***not*** equal to the price, if any, class members paid.[62] ( *See* Ex. 10, Cantor Decl. ¶¶ 84, 86 (there is "no methodology to ensure that [the] price paid by distributors is a reasonable proxy for the value perceived by the individual homeowner(s) at the time of purchase")); *see, e.g., Blades v. Monsanto Co.*, 400 F.3d 562, 574–75 (8th Cir. 2005) (no predominance where plaintiffs' damages expert did not account for "economic evidence as to business operations or market transactions"); *see also Lambert v. Nutraceutical Corp.*, 2015 WL 12655392, at *6 (C.D. Cal. June 24, 2015) (rejecting damages model because "the prices wholesalers suggest to its retailers are not the prices at which retailers sell the product"). Dr.

---

[61] *See, e.g.,* Ex. 32, Hedlund Dep. Tr. at 10:17–19; 139:11-17; 150:11-16.

[62] *See* Ex. 32, Hedlund Dep. Tr. at 149:10-13 ("Q. Okay. And you haven't done any work to determine whether a consumer pays the list price; correct? A. I have not.").

45

Hedlund also admits that he did not attempt to determine the price class members paid for their CSST, instead deferring this crucial question to the Court without any hint of how to resolve it.[63] Plaintiffs' purported restitution model fails to satisfy *Comcast* for this reason as well.

### B. Plaintiffs' Replacement-Cost Methodology Is Also Deficient.

Plaintiffs' "cost of repair" approach also cannot be used to calculate class-wide damages. Pl. Br. at 38–39. Under Missouri law, cost of repair is an appropriate measure of benefit of the bargain damages *only* where it is less than any alleged diminution in value. *Wasson v. Schubert*, 964 S.W.2d 520, 525 (Mo. Ct. App. 1998) ("Application of the cost of repair test is clearly limited to situations where repairs are only a small percentage of the diminution in value."); *Farning v. Brendal,* 150 S.W.3d 384, 386 (Mo. Ct. App. 2004) ("[T]he cost of repair test [ ] may be used when the property can be restored to its former condition at a cost less than the diminution in value.") (quotations omitted). As Plaintiffs have acknowledged:

> Under the benefit of the bargain model, plaintiffs and class members are entitled to recover *the lesser amount of* (1) the diminution [*sic*] in value of the homes with yellow CSST, or (2) the cost of repair to bring the yellow CSST into conformance with defendants' representations that yellow CSST can be safely used, or (3) the cost of alternative remedial measures to remove the danger of yellow CSST from the homes, such as *replacing the yellow CSST* with a product that will safely transport fuel gas, installing a lightning protection system that meets code standards, or switching the home from gas to electric utilities.

(SAC ¶ 80) (emphasis added); Dkt. No. 86 at 16 (same)). This is consistent with the proper measure of loss as a matter of economics, which is "the lesser value of the alternative[ ] [remedies] to ensure economic efficiency." (Ex. 10, Cantor Decl. ¶ 16.) Yet Plaintiffs' damages approach makes no effort to determine diminution in value, much less compare it with cost of repair (likely because

---

[63] *See, e.g.,* Ex. 32, Hedlund Dep. Tr. at 144:16–22 ("Q. And have you offered an opinion here on how to determine the price per foot in class member's home? A. I've stated that it could be done, but I have also said that *it is up to the court to decide what value they want to put on that*.") (objection omitted; emphasis added); *id.* at 151:20–22 ("[H]aving an opinion on what [price] ought to be falls outside of the scope of what I'm talking about in the report.").

46

there is none).[64]  Many plaintiffs testified, in fact, that they do ***not*** believe their homes have diminished in value at all as a result of CSST.[65]  Plaintiffs' replacement-cost method therefore cannot satisfy *Comcast* as a matter of law.  *See, e.g., Philips v. Ford Motor Co.,* 2016 WL 7428810, at *22 (N.D. Cal. Dec. 22, 2016) ("The failure of Plaintiffs' [replacement-cost] damages model alone warrants denial of Rule 23(b)(3) class certification.").

Plaintiffs' method for calculating replacement cost also cannot reliably determine the actual cost of replacement on a class-wide basis.  (*See* Ex. 11, Marais Decl. ¶¶ 60–67.)  Dr. Hedlund offers a simplistic calculation for determining "replacement cost," by "tak[ing] the number of feet of yellow CSST in each class member's home and multiply[ing] that number by the cost per foot of the black CSST." (Hedlund Decl. ¶ 9.)  But he offers no opinion as to how either of these figures could be calculated on a class-wide basis, testifying that he "was not asked" to determine how to ascertain the number of feet of CSST in class members' homes,[66] and that the cost of the replacement product would "be for the court to decide."[67]  Instead, Dr. Hedlund offers what he calls a "black box" equation into which these unquantified figures could be inputted, after which "the box spits out the number"[68]—which is neither sufficient to satisfy *Comcast*, nor, in fact, admissible expert opinion at all. *See, e.g., Lee-Bolton v. Koppers Inc.,* 319 F.R.D. 346, 377–78

---

[64]   *See* Ex. 32, Hedlund Dep. Tr. at 98:20-99:3 (admitting he is "not offering any model in [his] declaration relating to diminution of value of the home").

[65]   *See, e.g.,* Ex. 34, Rehm Dep. Tr. at 57:12-14; Ex. 20, Volkart Dep. Tr. at 68:11-15; Ex. 19, Lee Dep. Tr. at 76:25-77:4; Ex. 22, Wasser Dep. Tr. at 50:22–51:2 (home value "should be as it was"); Ex. 24, McKinzie Dep. Tr. at 150:1-8 (plaintiff sold home for more than he paid for it and nothing suggested the value was lowered by CSST's presence).

[66]   *See* Ex. 32, Hedlund Dep. Tr. at 134:11–22.  Moreover, there is no way to determine the number of feet of CSST installed in class members' homes based on Defendants' records.  (███████████████████████ ████████████████████ )

[67]   Ex. 32, Hedlund Dep. Tr. at 137:4–5.

[68]   Ex. 32, Hedlund Dep. Tr. at 150:11–16.

47

(N.D. Fla. 2017) ("[Plaintiffs' expert's] method suffers from the impermissible '*black box*' *syndrome*, where data is fed at one end and … an answer emerges at the other … the analysis is incomplete and scientifically unreliable.") (quotations and alterations omitted; emphasis added). In fact, Plaintiffs' expert disclaimed that it was his role even to offer an "accurate calculation" of class-wide damages,[69] and admitted he has "not suggested how [the calculation] should be done."[70] Plaintiffs' proposed replacement-cost methodology therefore cannot establish damages on a class-wide basis.

### C. Plaintiffs' Disgorgement Methodology Similarly Fails to Satisfy *Comcast*.

Plaintiffs "disgorgement" theory also does not meet *Comcast*'s requirements. As an initial matter, Plaintiffs offer no explanation for their assertion that Defendants' alleged unjust retention of benefits can be equated with profits. Nor can they. As expert testimony makes clear, this assertion is premised on the "implicit assumption that yellow CSST sales and profits are zero but for the alleged conduct," which "is unsupported by the facts and sound economic reasoning." (Ex. 10 Cantor Decl. ¶ 30.) As a result, Plaintiffs' disgorgement model necessarily will "overstate disgorgement damages even if this measure is relevant." (*Id.*)

Equally important, Plaintiffs do not explain how Defendants' profits from their sales of CSST to distributors and wholesalers correspond to Plaintiffs' theories of liability, as is necessary to satisfy *Comcast*. Federal courts have repeatedly rejected disgorgement damages models and denied class certification for this precise reason. *See, e.g., Galitski v. Samsung Telecomms. Am., LLC,* 2015 WL 5319802, at *13 (N.D. Tex. Sept. 11, 2015) (denying certification where "Plaintiffs

---

[69]  Ex. 32, Hedlund Dep. Tr. at 296:16–24 ("Q. You've mentioned now several times you developed what you call your formula, and your job is to take the p and the q and put it into your formula and come up with an accurate calculation; right? A. If by "accurate" you mean doing the multiplication accurately, then, yes. *If you mean "accurate" in some broad or legal or ethical sense, that's not an opinion I'm offering*.") (emphasis added).

[70]  Ex. 32, Hedlund Dep. Tr. at 147:19–24.

have not established that awarding class members the *full amount* by which [defendant] profited from its sale of the [ ] phones correlates, in any way, to the amount necessary to restore to each class member that which [defendant] obtained by its allegedly unfair practices.").[71]

All of Plaintiffs' proposed damages methodologies[72] thus fail to establish predominance under *Comcast*, and Plaintiffs' motion for class certification should be denied.

## IV. PLAINTIFFS ALSO CANNOT SATISFY PREDOMINANCE FOR THE CLAIMS OF THE PUTATIVE NATIONWIDE CLASS.

Plaintiffs also cannot satisfy Rule 23(b)(3)'s predominance requirement for the conspiracy and unjust-enrichment claims of the putative nationwide class. Neither claim is susceptible to proof through common evidence on a state-wide basis, much less nationwide. In addition, material variances among states' laws preclude nationwide class certification.

### A. Individualized Factual Issues Predominate In Any Unjust Enrichment Class.

Plaintiffs do not support their contention that they  for a single state, much less on

---

71  *See also Buckeye Tree Lodge & Sequoia Vill. Inn, LLC v. Expedia, Inc.,* 2019 WL 1170489, at *5 (N.D. Cal. Mar. 13, 2019) (disgorgement model was not a "legitimate theory for how [plaintiffs'] damages would be estimated, let alone disseminated among class members" because it "doesn't have anything to do with [defendant's] alleged conduct in this case"); *Hughes v. The Ester C Co.,* 317 F.R.D. 333, 355 n.31 (E.D.N.Y. 2016) (rejecting disgorgement model under *Comcast* because it "would either or both deprive Defendants of all profits [and so is] contrary to Plaintiffs' legal theory, *i.e.*, that they paid more for [defendant's product] than they would have for another [similar] product"); *In re Dial Complete Mktg. & Sales Practices Litig.,* 312 F.R.D. 36, 77 (D.N.H. 2015) (disgorgement theories do not satisfy *Comcast* because they "ignore the reality that plaintiffs realized value from [defendant's product].").

72  Plaintiffs' expert also proffers a fourth purported method of calculating class-wide damages, stating: "Finally, for those individuals with bonding and grounding, it would also be possible to calculate the costs of bonding and grounding on an average cost basis applicable to the whole class." (Hedlund Decl. ¶ 10.) His declaration sets forth no method for identifying class members, however, and at his deposition he admitted that he knew of no way to do so. Ex. 32, Hedlund Dep. Tr. at 154:19–24. And, as the record shows, identifying class members with bonded and grounded CSST would require detailed, individualized inspections of each class member's home. *See* Ex. 2, Exponent Report at 26–27; *see, e.g.,* Ex. 21, Immekus Dep. Tr. at 92:3–7 ("Q. Your CSST was bonded and grounded when it was installed; right? A. According to my installer, yes. Q. Okay. A. I have no way of verifying that.") Indeed, Plaintiffs apparently recognize the futility of this fourth purported "model"—they do not even mention it in their brief.

a nationwide basis. ███████ Nor could they; using their home-state of Missouri as an example, it is clear no common proof is available. In Missouri, an unjust enrichment claim requires proof of three elements: [1] "a benefit conferred by a plaintiff on a defendant; [2] the defendant's appreciation of the fact of the benefit; and [3] the acceptance and retention of the benefit by the defendant in circumstances that would render that retention inequitable." *Wiles v. Sw. Bell Tel. Co.*, 2010 WL 1463025, at *4 (W.D. Mo. Apr. 13, 2010). None of these elements can be established through common proof.

The first element requires individualized proof because unjust enrichment is "an equitable remedy based on the concept of a quasi-contract," *Affordable Communities of Mo. v. Fed. Nat. Mortg. Ass'n*, 714 F.3d 1069, 1077 (8th Cir. 2013), meaning plaintiffs "must allege that a benefit was conferred on the defendant by that particular plaintiff." *Wiles* , 2010 WL 1463025 at *4 (dismissing unjust enrichment claim where plaintiffs did not allege that they **directly** conferred a benefit on the defendant). Because Defendants do not sell CSST directly to homeowners, however, no proof—common or otherwise—exits to satisfy this element. Several Plaintiffs admit they did not buy their CSST from any Defendant,[73] and plaintiff Cedar Deraps confirmed he did not buy his CSST at all, receiving it for free from a family member.[74]

Nor is there common evidence of the Defendants' appreciation of the benefits, the second element of an unjust enrichment claim. Because the Defendants do not sell directly to consumers, they could not know of any particular transaction, let alone "appreciate" it. *See, e.g., Ferrell*

---

[73] *See* Ex. 21, Immekus Dep. Tr. at 61:13-24 (bought CSST from subcontractor); Ex. 27, Metzgar Dep. Tr. at 41:21-25 (did not directly purchase CSST); Ex. 33, Worstell Dep. Tr. at 139:7-11 (subcontractor bought CSST); Ex. 22 Wasser Dep. Tr. at 43:10–14 (unaware whether subcontractor bought CSST); Ex. 22, McKinzie Dep. Tr. at 53:22-23 (builder bought CSST); Ex. 35, Happel Dep. Tr. at 63:12-22, 94:1-95:10, 104:10-105:21 (CSST was ordered by installer).

[74] *See* Ex. 1, Deraps Dep. Tr. at 52:19–24.

50

*Mobile Homes, Inc. v. Champion Home Builders*, 2018 WL 4961489, at *4 (E.D. Mo. Oct. 15, 2018) (appreciation requires "proof that defendant actually used the [benefit] being conferred" by the particular plaintiff).

The third element ("the acceptance and retention of the benefit by the defendant in circumstances that would render that retention inequitable") also is not capable of class-wide proof. Under Missouri law, "[t]here can be no unjust enrichment if the parties receive what they intended to obtain." *Bratton v. Hershey Co.*, 2018 WL 934899, at *4 (W.D. Mo. Feb. 16, 2018) (quoting *In re Bisphenol-A (BPA) Polycarbonate Plastic Prods. Liab. Litig.*, 2011 WL 6740338, at *4 (W.D. Mo. Dec. 22, 2011)). Here, multiple Plaintiffs testified that their CSST is still functioning precisely as intended, thereby providing the full value they expected from the product.[75] Class certification is therefore inappropriate on even a state-wide basis.

### B. Individual Legal Issues Predominate As To The Claims Of The Putative Nationwide Class Due To Variations In State Laws.

The standard to certify a ***nationwide*** class is even more exacting and also not satisfied. To satisfy this standard, "[t]he party seeking certification of a nationwide class must … provide an extensive analysis of state law variations to reveal whether [the variations] pose insuperable obstacles." *Nobles v. State Farm Mut. Auto. Ins. Co.*, 2013 WL 12153517, at *3 (W.D. Mo. June 5, 2013) (quoting *Cole v. Gen. Motors Corp.*, 484 F.3d 717, 724 (5th Cir. 2007)); *True*, 2011 WL 176037, at *6 (similar). Plaintiffs have not done so. Instead, they merely declare that they ███

████████████████████████████████████████████████████████████████████████

---

[75] Ex. 21, Immekus Dep. Tr. at 94:11–13 (agreeing that TracPipe is "still providing [him] with the value that [he] expected"); Ex. 20, Volkart Dep. Tr. at 83:22–84:2 (same); Ex. 19, Lee Dep. Tr. at 99:25–100:3 (same); Ex. 33, Worstell Dep. Tr. at 102:19-103:3, 132:21-133:9, 146:7-8 (no problems with his CSST); Ex. 24, McKinzie Dep. Tr. at 46:4-11 (no known problems with CSST).

51

██████████████████████████████████ without explaining what this unspecified "common proof" might be or how they will use it to prove any such claims.

Plaintiffs' abject failure to substantiate their request for certification of a nationwide class is unsurprising: contrary to their assertion that state laws of unjust enrichment are "the same throughout the United States" (*id.*), courts "have repeatedly recognized 'that the law of unjust enrichment varies materially from state to state.'" *True*, 2011 WL 176037, at *9 (citation omitted); *In re BPA*, 276 F.R.D. at 340–41 (describing various differences between states' unjust enrichment laws). Neither of the cases Plaintiffs cite for their contrary assertion[76] provides any analysis of the elements of the unjust enrichment laws of different states, and courts that have undertaken this analysis have uniformly concluded that differences among such laws foreclose a finding of predominance. *See, e.g., In re Sears, Roebuck & Co. Tools Mktg. & Sales Practices Litig.*, 2006 WL 3754823, at *1 n.3 (N.D. Ill. Dec. 18, 2006) ("[U]njust enrichment is a tricky type of claim that can have varying interpretations even by courts within the same state, let alone amongst the fifty states."). As a result, the Court should reject Plaintiffs' threadbare request for certification of a fifty-state unjust-enrichment class.

Evidently recognizing the futility of their proposed nationwide class, Plaintiffs propose two multi-state classes which they argue ████████████████████████████████ ██████████████: (1) a "Restatement" multi-state class of ten states[77] and (2) an "appreciation"

---

[76]    *See In re Terazosin Hydrochloride*, 220 F.R.D. 672, 697 n.40 (S.D. Fla. 2004); *Keilholtz v. Lennox Hearth Prods Inc.*, 268 F.R.D. 330, 341 (N.D. Cal. 2010).

[77]    Arkansas, Colorado, Connecticut, District of Columbia, Hawaii, Illinois, Iowa, New York, Oklahoma, and West Virginia.

multi-state class of nineteen states.[78]  Pl. Br. at 32–33.  None of the Plaintiffs—all Missouri residents—are members of the proposed "Restatement" multi-state class (which does not include Missouri as a member state), a fatal defect.  *White*, 2018 WL 3748405, at \*2 (rejecting "Restatement" class because "[Plaintiff] resides in Missouri, and therefore is not a member of the class he seeks to represent … Accordingly, the Unjust Enrichment (Restatement) Multi-State Class is not certifiable").

Nor are the unjust-enrichment laws of the nineteen states in Plaintiffs' proposed "appreciation" multi-state class sufficiently uniform to establish predominance of common legal issues.  Although Plaintiffs contend that these nineteen states each recognize the same four elements of a claim for unjust enrichment—specifically, that (1) the plaintiff conferred a benefit on the defendant, (2) the defendant retained the benefit, (3) the defendant's retention of the benefit would be "unjust," and (4) defendant "appreciated" the benefit ████████ courts in each of these states have interpreted each of these elements differently.  For instance, there is significant variation in what constitutes "unjust" retention of a benefit under these states' laws.  (*See* App'x 1 (summary of state unjust-enrichment laws).)  Likewise, states in the proposed appreciation class apply differing standards in assessing whether a defendant "appreciated" a benefit.[79] (*See id.*)  Further, courts applying the laws of these nineteen states also have reached differing conclusions as to whether an adequate remedy at law bars a claim for unjust enrichment.  (*See id.*)  Plaintiffs'

---

[78]  Alaska, California, Kansas, Kentucky, Maine, Maryland, Massachusetts, Missouri, Nevada, New Mexico, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, Washington, and Wisconsin.

[79]  Although Plaintiffs include Vermont in their appreciation multi-state class, Vermont does not have an "appreciation" element for unjust enrichment. *See, e.g., Johnson v. Harwood*, 945 A.2d 875, 881 (Vt. 2008) ("A claim for unjust enrichment must allege that a benefit was conferred on defendant, that defendant accepted the benefit, and that it would be inequitable to allow defendant to retain the benefit.").

53

proposed appreciation multi-state class fails to account for key material differences among state laws, and Plaintiffs therefore have not, and cannot, demonstrate predominance of legal issues.

### C. Individual Issues Predominate In The Conspiracy Claims Of The Putative Nationwide Class.

Plaintiffs' request for certification of a nationwide conspiracy class fares no better. Again, Plaintiffs do not explain how the elements of conspiracy, including, for example, injury and causation, can be proven with evidence common to the class for a single state, much less on a nationwide basis. As explained, no such proof, common or otherwise, exists. *See supra* at 32–35, 39–40. This precludes predominance for a nationwide conspiracy class, because injury and causation are necessary elements of conspiracy under nearly every potentially applicable state law.[80] And although Plaintiffs insist that they will use common proof ███████████ ████████████████████████████████████████████████████████████████ ███████████████████████████ this is not enough to satisfy predominance, because, as the Eighth Circuit has recognized, "proof of conspiracy *is not proof of common injury*." *Blades*, 400 F.3d at 572 (emphasis added).

In addition, certification of a nationwide conspiracy class is improper because conspiracy is not a standalone claim, and Plaintiffs have not asserted any underlying tort claims under the laws of any state law other than Missouri. *See, e.g.*, *Beck v. Prupis*, 529 U.S. 494, 503 (2000) ("Since liability for civil conspiracy depends on performance of some underlying tortious act, the conspiracy is not independently actionable."). Nor can Plaintiffs rely on their unjust enrichment

---

[80] *See, e.g., Clay v. American Tobacco Co.*, 188 F.R.D. 483, 499 (S.D. Ill. 1999) (summarizing basic elements and denying certification of proposed 47 state conspiracy class); *Oak Bluff Partners, Inc. v. Meyer*, 3 S.W.3d 777, 781 (Mo. 1999) (plaintiff must show he was "damaged" to establish conspiracy claim under Missouri law); *In re Methyl Tertiary Butyl Ether (MBTE) Prods. Liab. Litig.*, 175 F. Supp. 2d 593, 633 (S.D.N.Y. 2001) (same under New York law); *Siegel v. Shell Oil Co.*, 256 F.R.D. 580, 584 n.2 (N.D. Ill. 2008) (denying class certification of nationwide unjust enrichment and conspiracy class in part due to predominance of individual causation issues).

54

claim as the necessary predicate, given the numerous material variations in state unjust-enrichment laws described above.[81]  The Court should therefore deny Plaintiffs' request for certification of a nationwide conspiracy class.

## V.    A CLASS ACTION IS NOT A SUPERIOR METHOD FOR ADJUDICATION.

Plaintiffs also cannot show that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy," Fed. R. Civ. P. 23(b)(3), in light of the predominance of individual issues described above.[82]  Moreover, courts have recognized that a class action is not superior where class members have the ability and incentive to pursue individual claims.  *Hood v. Gilster-Mary Lee Corp.*, 2016 WL 5852866, at *7 (W.D. Mo. Sept. 30, 2016) (Harpool, J.) (denying certification where "some members of the proposed class have either already filed a[n] [individual] claim, or may have that method of relief available to them").  Here, Plaintiffs do not explain why individual suits could not be an appropriate avenue of relief, aside from their conclusory assertion that ███████████████████████████████████ ██████████████████████████████████████████  Plaintiffs offer no support for this contention—indeed, they do not even estimate the cost to replace an individual class member's

---

[81]    Further, many states do not even recognize unjust enrichment as a predicate tort for a conspiracy claim. *See, e.g.*, *Gentry Tech. of S.C., Inc. v. Baptist Health South Fl., Inc.*, 2016 WL 403879, at *6 (D.S.C. Feb. 3, 2016) (under Florida law, unjust enrichment cannot act as underlying tort for conspiracy claim); *Swift v. Pandey*, 2014 WL 3362370, at *3 (D.N.J. July 8, 2014) (New Jersey law does not recognize unjust enrichment as predicate tort).

[82]    *See In re BPA,* 276 F.R.D. at 342 (nationwide class action was not superior where court would have to "predict or ascertain the law in a multitude of jurisdictions"); *Davenport v. Charter Commc'ns, LLC*, 302 F.R.D. 520, 532 (E.D. Mo. 2014) (class action not superior where, due to individual issues, "the litigation would devolve into a series of mini-trials…which contravenes the efficiency goals of class certification"); *In re Actiq Sales and Marketing Practices Litig.*, 307 F.R.D. 150, 173 (E.D. Pa. 2015) (class action "not a superior method for fair and efficient adjudication of this case" where "laws of [class members'] various home states apply and individual questions of fact predominate"); *Henke, v. Arco Midcon, L.L.C.*, 2014 WL 982777, at *20 (E.D. Mo. Mar. 12, 2014) ("[T]here are simply too many individualized inquiries relating to liability and damages to suggest that a class action is the superior method for handling this litigation.").

55

CSST, or explain why pursuing such a claim would be cost-prohibitive. Plaintiffs therefore have not shown that a class action is superior to other methods of adjudication.

## VI. PLAINTIFFS' CLAIMS ARE NOT TYPICAL OF THE CLASS CLAIMS, NOR ARE PLAINTIFFS ADEQUATE CLASS REPRESENTATIVES.

Plaintiffs also have not satisfied either of the "overlap[ping]" Rule 23(a) requirements of typicality or adequacy of representation. *Smith*, 174 F.R.D. at 97. Typicality requires that the named plaintiffs' claims "arise[ ] from the same event, practice, or course of conduct that gives rise to the claims of other class members," and adequacy requires that the named plaintiff "possess the same interest and suffer the same injury as the class members." *O'Shaughnessy v. Cypress Media, L.L.C.*, 2015 WL 4197789, at *4–5 (W.D. Mo. July 13, 2015) (internal quotation marks omitted). Here, Plaintiffs cannot satisfy either requirement due to factual differences among Plaintiffs' claims, including unique defenses applicable to those claims.

Case law confirms that the claims asserted by Plaintiffs—nearly all of whom say that they bought CSST "in connection with building [their] home[s]"[83]—are not typical of those class members who bought homes with CSST already installed. For example, in *Oddo v. Arcoaire Air Conditioning & Heating*, the plaintiffs brought consumer protection claims, including MMPA claims, against a manufacturer of allegedly defective HVAC units. 2019 WL 1460627, at *1, *6 (C.D. Cal. Mar. 22, 2019). The court denied the plaintiffs' motion for class certification because the claims of the named plaintiffs—each of whom bought a unit directly—were not typical of those class members who bought homes with units previously installed:

> The Court finds that the claims of the plaintiffs—who purchased new HVAC units—are not typical of the claims of new homebuyers who may have never been exposed to any [defendant] materials during the homebuying process, much less

---

[83] *See* Pl. Exhibits 1.2 (Rehm), 1.3 (Lee), 1.4 (Immkeus), 1.5 (Metzgar), 1.6 (McKinzie), 1.7 (Worstell), 1.9 (George), 1.11 (Wasser). Named plaintiff Cedar Deraps acquired the product when he personally remodeled his home. *See* Pl. Ex. 1.10.

attached the same level of importance, if any, to a disclosure of the alleged defect as would a purchaser of an HVAC unit.

*Id.* at *8.  Similarly, here, Plaintiffs' claims are not typical of class members who bought existing structures containing CSST because, as in *Oddo*, Plaintiffs "have made no showing that homebuyers would have paid less for their homes, or would have declined to buy their homes, if they had known that that [*sic*] the alleged defect was present."  *Id.* at *7.  In fact, the record shows the opposite: here, putative class members, including some who bought homes from Plaintiffs, "never requested a lower purchase price on account of the yellow CSST installed."[84]

In addition, Plaintiffs' claims are subject to unique defenses, which pose additional obstacles to typicality and adequacy.  *See, e.g., In re Milk Prods. Antitrust Litig.*, 195 F.3d 430, 437 (8th Cir. 1999) ("A proposed class representative is not adequate or typical if it is subject to a unique defense that threatens to play a major role in the litigation.")  For example, nothing in the record suggests that the Amazing Grace Community Church bought CSST for "personal, family or household purposes" as required to maintain a claim under the MMPA, and Defendants can therefore obtain summary judgment against the Church on this unique basis.[85]  *See, e.g., Hallmark Indus., Inc. v. Hallmark Licensing, LLC*, 2018 WL 5828687, at *3 (W.D. Mo. Aug. 14, 2018) (dismissing MMPA claim where "Plaintiff did not state (and cannot show) that it purchased any merchandise from Defendant for personal, family, or household purposes").  Further, the record

---

[84]  Ex. 19, Lee Dep. Tr. at 96:16-21.

[85]  There are additional reasons why the Church is not an adequate class representative, including the membership of Plaintiffs' counsel's former law partner, Patrick Horsefield, on the Church's Board of Directors and his involvement in the Board's decision that the Church join this lawsuit.  *See* Ex. 35, Happel Dep. Tr. at 69:5–8 ("Q. So, I mean, really the people that have controlled this decision exclusively are the members of the Board, including Mr. Horsefield. Right? A. Yes. Yes.").  Courts have found that such relationships render a named plaintiff an inadequate class representative.  *Radner v. IAS Warranty,* 2018 WL 4352692, *1 (E.D. Mich. Sep. 12, 2018) (named plaintiff and class counsel could not be law partners).

57

shows that plaintiff Cedar Deraps received his CSST for free from a family member,[86] which gives rise to a unique defense to his ability to demonstrate an ascertainable loss under the MMPA. *See, e.g., Walsh v. Al W. Chrysler, Inc.,* 211 S.W.3d 673, 675 (Mo. Ct. App. 2007) ("It seems debatable whether plaintiffs had a MMPA claim at all" where he "never purchased the [product].").  Finally, Plaintiffs Bobbie Lee and Ed McKinzie have each sold their former residences with CSST and, unlike other Plaintiffs, no longer have any interest in replacing their CSST with a different product.[87]  *See, e.g., In re Milk Prods.*, 195 F.3d at 437 ("[Plaintiff's] sale of the business cuts against its adequacy and typicality.").  Each of these unique defenses renders Plaintiffs' claims atypical and makes them unable to adequately represent the putative class.[88]

Plaintiffs' motion ignores these differences and asserts, without explanation, that

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████ (citing

---

[86] *See* Ex. 1, Deraps Dep. Tr. at 52:19–24 ("Q. So is it fair to say that the company had yellow CSST available at your father's company, he gave you the yellow CSST, said you don't need to pay me for this, but do some work and that's how you're going to pay it off? A. That was the agreement, yes.").

[87] *Compare, e.g.,* Ex. 21, Immekus Dep. Tr. at 89:11–13 ("I would like to replace the TracPipe.") *with* Ex. 19, Lee Dep. Tr. at 102:4–8 ("Q. Okay. But since you no longer live at the home, it wouldn't do you any good if Omega Flex replaced the yellow CSST in the home in Sullivan with black CSST, right? A. Correct.") ; Ex. 24, McKinzie Dep. Tr. at 148:3-11 ("Q. And then the same thing with respect to replacement.  Would you agree it's not possible for you to replace the CSST in the Bremerton Court home in favor of something else at this point in time, since you don't own the property anymore? A. Not to my knowledge.") (objection omitted).

[88] Plaintiffs also cannot satisfy typicality or adequacy as to the claims of non-Missouri class members because Plaintiffs' common-law claims, each of which are governed by Missouri law,  are not typical of the claims of the class members whose claims are governed by other states' laws. *See, e.g., O'Shaughnessy*, 2015 WL 4197789, at *5 (finding that "Plaintiffs' legal theory may not be typical [where] Plaintiffs reside in Missouri" but where "[a]lmost 45% of subscribers, however, live in other states, so their claims may be governed by those states' law"); *Hallaba v. Worldcom Network Servs. Inc.,* 196 F.R.D. 630, 642 n.6 (N.D. Okla. 2000) ("To the extent that Missouri's law applicable to the case at bar differs from the relevant laws of other states, Plaintiff has no incentive to pursue a claim based on a different legal standard.") (internal citations omitted). Plaintiffs make no effort to explain how they can overcome these material differences in state laws, relying instead on the unsupported assertion that ████████████████████████████████████████████████████████████

SAC ¶¶ 4–14; 32–57).)   But Plaintiffs provide no support for these assertions beyond the allegations in their complaint, which is not sufficient to satisfy their burden at class certification. *See, e.g., Henke v. Arco Midcon, L.L.C.*, 2014 WL 982777, at *9 (E.D. Mo. Mar. 12, 2014) ("A demonstration of typicality requires a plaintiff to demonstrate something more than general conclusory allegations that prospective class members have suffered the same injury as the plaintiff.").   Because Plaintiffs have not satisfied Rule 23(a)'s typicality and adequacy requirements, their motion for class certification should be denied.

## VII.   CERTIFICATION UNDER RULE 23(b)(2) IS NOT WARRANTED.

Having failed to satisfy Rule 23(b)(3)'s requirements, Plaintiffs alternatively seek certification under Rule 23(b)(2), which allows certification where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).  The Court should reject Plaintiffs' last-ditch effort to save their certification bid, for three reasons.  *First*, Rule 23(b)(2) does not authorize certification in cases where, as here, plaintiffs primarily seek money damages.  *Second*, Plaintiffs cannot show that their proposed class is sufficiently cohesive to warrant certification of a (b)(2) class.  *Finally*, the MMPA does not authorize Plaintiffs' requested injunctive relief in private actions like this.

### A.   Certification Of A (b)(2) Class Is Inappropriate Because Plaintiffs Seek Primarily Monetary Relief.

Plaintiffs' request for (b)(2) certification should be rejected because the relief they seek focuses primarily on money damages, not injunctive or declaratory relief. As the Eighth Circuit has explained, "[c]lass certification under Rule 23(b)(2) is proper only when the primary relief sought is declaratory or injunctive." *In re St. Jude*, 425 F.3d at 1121; *see also Wal-Mart*, 564 U.S. at 360 (Rule 23(b)(2) does not authorize certification where "monetary relief is not incidental to

the injunctive or declaratory relief" sought). Further, "Rule 23(b)(2) does not authorize class certification when each class member would be entitled to an individualized award of monetary damages." *Ebert,* 823 F.3d at 480 (quoting *Wal-Mart,* 564 U.S. at 360) (quotes omitted). As such, federal courts routinely reject requests for certification of (b)(2) classes in cases where, as here, plaintiffs seek individualized awards of money damages.[89]

Here, Plaintiffs' own briefing makes clear they seek individual economic damages, not injunctive relief. When opposing Defendants' motion to dismiss, for example, Plaintiffs repeatedly advanced their benefit-of-the-bargain theory as the "essential claim" underlying their complaint. Dkt. No. 86 at 18. Further, while Plaintiffs' class-certification motion lists numerous purported theories of economic damage, including the cost of bonding and grounding CSST ██ ████████████████████████████████████████████████████████████████ ████████████ it does not even specify what kind of injunctive or declaratory relief they are seeking. And while Plaintiffs' complaint includes a cursory request that the Court enjoin Defendants from "propagating any further falsehoods about yellow CSST" and require them to issue "accurate, corrective educational advertising" (SAC ¶¶ 137(vii)–(viii)), multiple Plaintiffs admitted that they would receive no benefit from injunctive relief,[90] and others even ***denied*** that

---

[89]     *See, e.g., Hicks v. Sw. Energy Co.*, 330 F.R.D. 183, 194 (E.D. Ark. 2018) ("The Court agrees that [plaintiff's] request for monetary relief renders the proposed class uncertifiable under Rule 23(b)(2)."); *Brown v. Kerkhoff*, 279 F.R.D. 479, 500 (S.D. Iowa 2012) (denying certification of (b)(2) class where "the primary remedy sought by the named Plaintiffs is purely monetary"); *Henke*, 2014 WL 982777, at *13 (denying certification of (b)(2) class where "[t]he nature of Plaintiffs' requested relief is primarily for damages, not injunctive relief").

[90]     *See, e.g.,* Ex. 21, Immekus Dep. Tr. at 121:22-122:5 ("Q. … If Omega Flex made statements to the public consistent with your belief that TracPipe is not as safe as it could be, what benefit, if any, would you get personally from Omega Flex making a public statement like that? A. I would get no benefit from that other than validation of -- of current opinion."); Ex. 20, Volkart Dep. Tr. at 109:8–14 ("Q. Ms. Volkart, do you believe that the defendants should stop telling the public that yellow CSST is safe? A. I don't know. Q. You wouldn't get any benefit personally if the defendants did that, would you? A. No.").

the corrective advertising requested would be appropriate.[91] Accordingly, because "the primary thrust of the case is about righting the defendant's wrong to the plaintiff via a cash payment," and has nothing to do with injunctive relief, "Rule 23(b)(2) does not provide the proper vehicle for certification." *Barfield v. Sho-Me Power Elec. Co-op.*, 2013 WL 3872181, at *6 (W.D. Mo. July 25, 2013).

### B.    Plaintiffs' Proposed Class Is Not Sufficiently Cohesive To Warrant (b)(2) Certification

The Court should also decline to certify Plaintiffs' proposed (b)(2) class because it is not sufficiently cohesive. As the Eighth Circuit has explained, "the (b)(2) class is distinguished from the (b)(3) class by class cohesiveness," meaning that "[i]njuries remedied through (b)(2) actions are really group, as opposed to individual injuries." *In re St. Jude*, 425 F.3d at 1122. Significantly, Rule 23(b)(2)'s cohesiveness requirement is even "more stringent than the predominance and superiority requirements for maintaining a class action under Rule 23(b)(3)." *Ebert*, 823 F.3d at 480; *see also Avritt v. Reliastar Life Ins. Co.,* 615 F.3d 1023, 1035 (8th Cir. 2010) ("[C]ohesiveness is even more important for a Rule 23(b)(2) class because, unlike Rule 23(b)(3), there is no provision for unnamed class members to opt out of the litigation.").

Here, Plaintiffs' failure to satisfy Rule 23(b)(3)'s predominance standard means they also cannot meet Rule 23(b)(2)'s "more stringent" cohesiveness standard. Federal courts routinely deny certification under Rule 23(b)(2) where, as here, a plaintiff has not shown that common issues predominate sufficient to satisfy Rule 23(b)(3). *See, e.g., White,* 2018 WL 3748405, at *5; *Foster v. St. Jude Med., Inc.*, 229 F.R.D. 599, 607 (D. Minn. 2005). As such, the myriad individualized

---

[91]    *See* Ex. 20, Volkart Dep. Tr. at 109:15–18 ("Q. Do you think that the defendant should stop telling the public to bond and ground yellow CSST? A. No."); Ex. 19, Lee Dep. Tr. at 126:14–19 ("Q. Do you think that the Defendants should stop telling the public that yellow CSST is a safe product? A. No. Q. Do you think that Defendants should stop telling the public to bond and ground yellow CSST? A. No.").

61

issues that predominate in this case and prevent certification of a damages class also foreclose certification of a class under Rule 23(b)(2).

### C.      The MMPA Does Not Authorize Plaintiffs' Requested Injunctive Relief.

The Court should also decline to certify a (b)(2) Missouri class because the MMPA does not authorize Plaintiffs' requested injunctive relief.  Courts in Missouri have held that the MMPA does not create a private right of action for injunctive relief that inures to the benefit of the public rather than to individual named plaintiffs.  *Blake v. Career Educ. Corp.*, 2009 WL 140742, at *4 (E.D. Mo. Jan. 20, 2009) (holding that under the MMPA, "individual plaintiffs are not empowered to seek injunctive relief to protect the public from unlawful acts") (alterations omitted); *Scott v. Blue Springs Ford Sales, Inc.*, 215 S.W.3d 145, 161 (Mo. Ct. App. 2006) (MMPA section authorizing private actions "does not authorize the trial court to grant injunctive relief to protect the general public") (overruled on other grounds by *Badahman v. Catering St. Louis*, 395 S.W.3d 29 (Mo. 2013)).  Here, Plaintiffs acknowledge that their proposed injunctive relief is specifically designed "to protect ***all future consumers*** from the sale, marketing, and/or distribution" of CSST, rather than to benefit themselves.  (SAC ¶ 68(j) (emphasis added).)  This is precisely the type of injunctive relief that is unavailable in MMPA private actions.[92]  Plaintiffs' request for certification under Rule 23(b)(2) should be denied for this reason as well.

## VIII.   ISSUE CERTIFICATION UNDER RULE 23(c)(4) IS NOT APPROPRIATE.

Finally, Plaintiffs' cursory request for issue certification under Rule 23(c)(4) should also be denied.  As a threshold matter, courts within the Eighth Circuit have concluded that where, as

---

[92]   The MMPA does, however, authorize the attorney general to seek such injunctions. Mo. Ann. Stat. § 407.100. Indeed, "[t]he ***principal thrust*** of [the MMPA] is directed toward authorizing the Attorney General to enjoin those who sell or attempt to sell merchandise from using unlawful practices"—not authorizing private citizens to seek such relief. *Anderson v. Bass Pro Outdoor World, LLC,* 355 F. Supp. 3d 830, 835 (W.D. Mo. 2018) (quoting *Jackson v. Charlie's Chevrolet, Inc.* 664 S.W.2d 675, 677 (Mo. Ct. App. 1984) (emphasis added).

here, a claim as a whole does not satisfy Rule 23(b), issue certification under Rule 23(c)(4) "should not be used as a separate avenue for certification." *Henke*, 2014 WL 982777, at *22. And "[e]ven courts that have approved 'issue certification' have declined to certify such classes where the predominance of individual issues is such that limited class certification would do little to increase the efficiency of the litigation." *In re St. Jude Med., Inc.*, 522 F.3d 836, 841 (8th Cir. 2008).[93] Federal courts within the Eighth Circuit therefore routinely deny certification of peripheral, nondispositive issues where significant individualized liability issues would remain unresolved. For instance, in *In re BPA*, the court denied issue certification of an MMPA consumer class after finding that it "would do little to increase the efficiency of this litigation" because "key questions regarding liability, such as consumers' knowledge of [an alleged product hazard] before purchasing products and their extent of using the products, will be left unanswered even after a trial on the four issues" plaintifs identified for certification. 2011 WL 6740338, at *9. Other courts have done the same. *See True,* 2011 WL 176037, at *10 ("Issue certification would implicate the same individualized inquiries identified above, and would hardly be conducive to judicial economy."); *Arnold v. Directv, LLC*, 2017 WL 1251033, at *13 (E.D. Mo. March 31, 2017) (similar).

Here, the issues Plaintiffs identify would not advance this litigation because they would still need to present a vast array of individualized evidence to satisfy the elements of their claims and establish Defendants' liability, for the reasons explained above. *See, e.g., supra* at 30–41. Plaintiffs do not explain how any of the three issues they identify for certification would advance

---

[93]     In light of this binding Eighth Circuit precedent, Plaintiffs' reliance on out-of-circuit case law for their claim that Rule 23(c)(4) requires a showing of predominance only as to particular issues is misplaced.*See* Pl. Br. at 41–42 (citing *In re Deepwater Horizon*, 739 F.3d 790 (5th Cir. 2014) and *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796 (7th Cir. 2013)).

63

this case aside from baldly asserting that these issues are somehow "conclusive." *Id.* They are not—resolution of these purportedly "common" issues "would not resolve any individual plaintiff's claims." *In re Genetically Modified Rice Litig.*, 251 F.R.D. 392, 400 (E.D. Mo. 2008) Plaintiffs' request for certification of an issues class should therefore be rejected.

Equally important, even the three issues Plaintiffs identify for certification are not susceptible of common proof, and therefore issue certification under Rule 23(c)(4) is not appropriate even under the standard Plaintiffs urge. Although Plaintiffs claim that each of these issues relates to ███████████████████████████████████████████████ they have not identified any "uniform conduct" in their motion, relying instead on different statements made by different defendants at different times about different CSST products. *See supra* at 9–12, 26–28. As such, Plaintiffs have not shown how common evidence could be used to answer any of these three questions. For this reason as well, Plaintiffs' request for certification of an issues class under Rule 23(c)(4) should be denied.

## CONCLUSION

For these reasons, Defendants respectfully request that the Court deny Plaintiffs' motion for class certification.

DATED: August 30, 2019          Respectfully submitted,


                                */s/ Robert B. Ellis* (with permission)
                                Robert B. Ellis, P.C. (admitted *pro hac vice*)
                                Benjamin T. Kurtz (admitted *pro hac vice*)
                                Michael S. Biehl (admitted *pro hac vice*)
                                Kelsey Bleiweiss (admitted *pro hac vice*)
                                Claudia Brokish (admitted *pro hac vice*)
                                Kirkland & Ellis LLP
                                300 North LaSalle Street
                                Chicago, IL 60654
                                Telephone: (312) 862-2000

64

Facsimile: (312) 862-2200
robert.ellis@kirkland.com
benjamin.kurtz@kirkland.com
michael.biehl@kirkland.com
kelsey.bleiweiss@kirkland.com
claudia.brokish@kirkland.com

and

Neal F. Perryman, #43057MO
Thomas P. Berra, Jr., #43399MO
Oliver H. Thomas, #60676MO
Lewis Rice LLC
600 Washington Avenue, Suite 2500
St. Louis, MO  63101
Telephone: (314) 444-7661
Facsimile: (314) 612-7661
nperryman@lewisrice.com
tberra@lewisrice.com
othomas@lewisrice.com

*Attorneys for Defendant Omega Flex, Inc.*

*/s/ Kristen A. Page*
Thomas Sullivan (admitted *pro hac vice*)
SHOOK, HARDY & BACON, L.L.P.
Two Commerce Square Building
2001 Market Street, Suite 3000
Philadelphia, PA 19103
Telephone: (215) 278-2555
Facsimile: (215) 278-2594
tsullivan@shb.com

Kristen A. Page, MO Bar No. 50852
Elizabeth Fessler, MO Bar No. 67169
2555 Grand Blvd.
Kansas City, MO 64108
Telephone: (816) 474-6550
Fax: (816) 421-5547
kpage@shb.com
efessler@shb.com

*Attorneys for Defendant Ward Manufacturing LLC*

*/s/ Charles B. Casper* (with permission)
Charles B. Casper (admitted *pro hac vice*)

65

John G. Papianou (admitted *pro hac vice*)
Robert Day (admitted *pro hac vice*)
Montgomery McCracken Walker & Rhoads LLP
1735 Market Street
Philadelphia, PA 19103
Telephone: (215) 772-1500
ccasper@mmwr.com
jpapianou@mmwr.com
rday@mmwr.com

Bruce A. Moothart
Seyferth Blumenthal & Harris LLC
4801 Main Street, Suite 310
Kansas City, MO 64112
Telephone: (816) 756-0700
bruce@sbhlaw.com

*Attorneys for Defendant Titeflex Corporation*

66

**<u>CERTIFICATE OF SERVICE</u>**

      The undersigned hereby certifies that on this 30th day of August, 2019, a true and accurate copy of the foregoing was electronically filed with the CM/ECF system of the United States District Court for the Western District of Missouri, which sends notice to counsel of record via e-mail.

                                          /s/ *Kristen A. Page*
                                          *Attorney for Ward Manufacturing, LLC*