# Vol.Supp. Kytomaa

(Harri K. Kytomaa, Ph.D. Deposition Excerpts)

# In The Matter Of:

*Bonnie George, et al. vs.*
*Omega Flex, Inc., et al.*

---

*Harri Kaarlo Kytomaa, Ph.D.*
*Vol. I*
*September 24, 2019*
*Video Deposition*

---



DORIS O. WONG
ASSOCIATES, INC.

COURT REPORTERS

50 Franklin St., Boston, MA 02110
Phone (617) 426-2432

*Original File Kytomaa_Harri.txt*
*Min-U-Script® with Word Index*

# Notes

Bonnie George, et al. vs.
Omega Flex, Inc., et al.

Video Deposition

Harri Kaarlo Kytomaa, Ph.D. - Vol. I
September 24, 2019

Page 1

Volume I
Pages 1 to 267
Exhibits 1 to 37

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI

- - - - - - - - - - - - - - - -x
BONNIE GEORGE, ED McKINZIE,        :
TIM WORSTEL, CEDAR DERAPS,         :
CASEY WASSER and TAMMY             :
VOLKART,                           : Civil Action No.
          Plaintiff,              : 6:17-cv-03114-
                                   :     MDH
          vs.                      :
                                   :
OMEGA FLEX, INC.; WARD MFG.,       :
LLC; TITEFLEX CORPORATION;         :
POWERCET CORPORATION; and GAS      :
TECHNOLOGY INSTITUTE (GTI),        :
          Defendants.              :
- - - - - - - - - - - - - - - -x

VIDEOTAPED DEPOSITION OF HARRI KAARLO
KYTOMAA, Ph.D., a witness called by the Plaintiffs,
taken pursuant to the Federal Rules of Civil
Procedure, before Alexander K. Loos, Registered
Diplomate Reporter and Notary Public in and for the
Commonwealth of Massachusetts, at the Offices of
Kirkland & Ellis, LLP, 200 Clarendon Street, 47th
Floor, Boston, Massachusetts, on Tuesday, September
24, 2019, commencing at 8:59 a.m.

PRESENT:

     Carpenter & Schumacher, P.C.
          (By Craig M. Schumacher, Esq.)
          E-mail:  Cschumacher@cstriallaw.com
          2701 North Dallas Parkway
          Suite 570
          Plano, TX 75093
          972.403.1133
          for the Plaintiffs.

(Continued on the following page)

Page 2

PRESENT (Continued):

     Kirkland & Ellis, LLP
          (By Benjamin T. Kurtz, Esq.)
          E-mail:  Benjamin.kurtz@kirkland.com
          300 North LaSalle Street
          Chicago, IL 60654
          312.862.7145
          for the Defendant, Omega Flex, Inc.

     Montgomery, McCracken, Walker & Rhoads
          (By Charles Casper, Esq.)
          E-mail:  Ccaster@mmwr.com
          1735 Market Street
          Philadelphia, PA 19103
          215.772.7223
          for the Defendant, Titeflex Corporation.

     Shook, Hardy & Bacon, LLP
          (By Kristen A. Page, Esq.)
          E-mail:  Kpage@shb.com
          2555 Grand Boulevard
          Kansas City, MO 64108-2613
          816.474.6550
          for the Defendant, Ward Mfg, LLC.

ALSO PRESENT:  Garner Willis, Videographer

* * * * *

Page 3

1               I N D E X

2    WITNESS              DIRECT  CROSS   REDIRECT  RECROSS

3

4    HARRI KAARLO
     KYTOMAA, Ph.D.
5
       BY MR. SCHUMACHER        9
6

7

8                    * * * *

9            E X H I B I T S

10   NO.              DESCRIPTION              PAGE

11   Exhibit 1   Subpoena to Produce Documents,    10
                 Information, or Objects or to
12               Permit Inspection of Premises
                 in a Civil Action
13
     Exhibit 2   Plaintiffs' Notice of            19
14               Deposition of Harri Kytomaa

15   Exhibit 3   Expert Declaration of Harri      19
                 Kytomaa and Dr. Kytomaa's
16               report, dated September 20,
                 2019
17
     Exhibit 4   Excerpts from the SEFTIM and     31
18               GTI reports

19   Exhibit 5   Test Report:  Summary of         44
                 Voltage and Current Impulse
20               Tests on Gas Piping Samples,
                 dated 14 August 2008
21
     Exhibit 6   Dielectric Breakdown Voltage     45
22               and Current Conduction Tests of
                 Omega Flex Flexible Gas Piping,
23               dated 9 July 2003, Revised 5
                 September 2003
24

Page 4

1         E X H I B I T S, Continued

2    NO.              DESCRIPTION              PAGE

3
     Exhibit 7   US Patent Application            68
4                Publication, Publication No.:
                 US 2011/0041944 A1
5
     Exhibit 8   E-mail from Mr. Torbin to        96
6                Mr. Goodwin, et al., dated May
                 24, 2007, and related e-mail
7                chain

8    Exhibit 9   E-mail from Mr. Torbin to       115
                 Mr. Goodson, dated August 27,
9                2004, and related e-mail chain

10   Exhibit 10  "Lightening-Caused CSST Hole    131
                 Formation with Concurrent
11               Ignition of Escaping Fuel Gas:
                 Validation of Field
12               Observations by Laboratory
                 Testing"
13
     Exhibit 11  Lightening Safety               135
14               Recommendations for Gas Piping
                 Systems using TracPipe by Omega
15               Flex

16   Exhibit 12  Lightening Safety               140
                 Recommendations for Gas Piping
17               Systems using CounterStrike and
                 TracPipe by Omega Flex
18
     Exhibit 13  "Increase Safety - Reduce Cost" 142
19
     Exhibit 14  US Patent & Trademark Office,   150
20               Patent Application Full Text
                 and Image Database, Application
21               No. 20060254662

22   Exhibit 15  "The Rest of the Story About    159
                 CounterStrike"
23

24

Harri Kaarlo Kytomaa, Ph.D. - Vol. I
September 24, 2019

Video Deposition

Bonnie George, et al. vs.
Omega Flex, Inc., et al.

Page 5

| 1 | | E X H I B I T S, Continued | |
|---|---|---|---|
| 2 | NO. | DESCRIPTION | PAGE |
| 3 | | | |
| 4 | Exhibit 16 | E-mail from Mr. Tharp to Mr. Hadden, et al., dated November 09, 2012 | 162 |
| 5 | | | |
| 6 | Exhibit 17 | Advertisement, "We Won't Take Away Your Yellow" | 167 |
| 7 | Exhibit 18 | Proposed Tentative Interim Amendment NFPA 70-2008 Edition, National Electric Code, dated 15 August 2018 | 168 |
| 8 | | | |
| 9 | Exhibit 19 | NFPA, Standards Council Decision (Final) D#09-18, 6 August 2009 | 171 |
| 10 | | | |
| 11 | Exhibit 20 | NFPA Standards Council Decision D#10-2, dated 23 June 2010 | 186 |
| 12 | | | |
| 13 | Exhibit 21 | Excerpts from Validation of Installation Methods for CSST Gas Piping to Mitigate Lightning Related Damage, Phase 1 | 194 |
| 14 | | | |
| 15 | | | |
| 16 | Exhibit 22 | Validation of Installation Methods for CSST Gas Piping to Mitigate Lightning Related Damage, Part II, Proposal V2, November 2011 | 205 |
| 17 | | | |
| 18 | | | |
| 19 | Exhibit 23 | Letter from Mr. Stanonik to Mr. Crane, dated October 5, 2012 | 207 |
| 20 | | | |
| 21 | Exhibit 24 | NFPA Standards Council Decision (Final): D#12-15, dated 30 August 2012 | 210 |
| 22 | | | |
| 23 | Exhibit 25 | "A Hidden CSST Electrical Danger" | 215 |
| 24 | | | |

Page 6

| 1 | | E X H I B I T S, Continued | |
|---|---|---|---|
| 2 | NO. | DESCRIPTION | PAGE |
| 3 | | | |
| 4 | Exhibit 26 | Validation of Installation Methods for CSST Gas Piping to Mitigate Indirect Lightning Related Damage - Revision A, dated October 12, 2015 | 217 |
| 5 | | | |
| 6 | | | |
| 7 | Exhibit 27 | NFPA public input documents for NFPA 54-2015 | 224 |
| 8 | Exhibit 28 | Press release, "National Association of State Fire Marshals (NASF) Launches Nationwide Yellow CSST Safety Campaign," dated July 18, 2012 | 229 |
| 9 | | | |
| 10 | | | |
| 11 | Exhibit 29 | National Association of State Fire Marshals, "Comparison of Protective-Jacketed CSST Lightning Tests" | 232 |
| 12 | | | |
| 13 | | | |
| 14 | Exhibit 30 | "Five takeaways from the 86th annual Lightning Protection Conference" | 234 |
| 15 | | | |
| 16 | Exhibit 31 | International Association of Fire Chiefs "Protection of Corrugated Stainless Steel Tubing (CSST) from Lightning Strikes" | 236 |
| 17 | | | |
| 18 | | | |
| 19 | Exhibit 32 | "Fire Safety of Grounded Corrugating Stainless Steel Tubing in a Structure Energized by Lightning" | 237 |
| 20 | | | |
| 21 | Exhibit 33 | Transcript from City of Lubbock Texas, Regular City Council Meeting, Thursday May 12, 2016, testimony of Jahan Rasty, Ph.D. and James Dickens, Ph.D., on behalf of Omega Flex, Inc. | 240 |
| 22 | | | |
| 23 | | | |
| 24 | | | |

Page 7

| 1 | | E X H I B I T S, Continued | |
|---|---|---|---|
| 2 | NO. | DESCRIPTION | PAGE |
| 3 | | | |
| 4 | Exhibit 34 | "Variation in Lightning Simulations to Assess Grounding Safety of Corrugated Stainless Steel Tubing (CSST)" | 243 |
| 5 | | | |
| 6 | Exhibit 35 | Letter from Mr. Ellis to Dr. Kytomaa and Dr. Morse, dated November 14, 2018, with multiple signature pages | 257 |
| 7 | | | |
| 8 | Exhibit 36 | Exponent invoices | 259 |
| 9 | Exhibit 37 | Order on Plaintiff's Motion to Exclude Opinion Testimony of Dr. Harri Kytomaa, Circuit Court for the Eighteenth Judicial Circuit, in and for Seminole County, Florida, Case No. 2014-CA-0808 | 261 |
| 10 | | | |
| 11 | | | |
| 12 | | | |
| 13 | | | |
| 14 | | | |
| 15 | | * * * * | |
| 16 | | | |
| 17 | | | |
| 18 | | | |
| 19 | | | |
| 20 | | | |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | | | |

08:59:37-09:00:33
Page 8

P R O C E E D I N G S

1 THE VIDEOGRAPHER: We are now recording and
2 on the record.
3 My name is Garner Willis. I'm a legal
4 video specialist from Stream Productions, in
5 association with Doris O. Wong Associates,
6 Incorporated.
7 Today is September 24th, 2019, and the time
8 is 8:59 a.m. This is the deposition of Harri K.
9 Kytomaa in the matter of Bonnie George, et al.,
10 Plaintiff, vs. Omega Flex, Incorporated, et al.,
11 Defendant, in the US District Court for the Western
12 District of Missouri, Case Number 6:17-cv-03114-MDH.
13 This deposition is being taken at 200
14 Clarendon Street, Boston, Mass. 02116, on behalf of
15 the plaintiff. The court reporter is Alexander Loos
16 of Doris O. Wong and Assciates.
17 Counsel will state their appearances and
18 the court reporter will administer the oath.
19 MR. SCHUMACHER: Craig Schumacher on behalf
20 of plaintiffs.
21 MR. KURTZ: Ben Kurtz on behalf of Omega
22 Flex.
23 MR. CASPER: Charles Casper on behalf of

Bonnie George, et al. vs.
Omega Flex, Inc., et al.

Video Deposition

Harri Kaarlo Kytomaa, Ph.D. - Vol. I
September 24, 2019

1 Titeflex.

2      MS. PAGE: Kristen Page on behalf of Ward

3 Manufacturing.

4          HARRI KAARLO KYTOMAA, Ph.D.

5 a witness called for examination by the Plaintiffs,

6 having been satisfactorily identified by the

7 production of his driver's license and being first

8 duly sworn by the Notary Public, was examined and

9 testified as follows:

10          DIRECT EXAMINATION

11 BY MR. SCHUMACHER:

12 Q.  Good morning.

13 A.  Good morning.

14 Q.  Would you please state your name for the

15 record.

16 A.  My name is Harri, middle name Kaarlo,

17 Kytomaa.  Last name is spelled -- actually, I'll

18 spell all my names.  First name H-a-r-r-i, middle

19 name K-a-a-r-l-o, and last name K-y-t-o-m-a-a.

20 Q.  What nationality is Kytomaa?

21 A.  So my -- my last name is a -- is a -- is a

22 Finnish name.  It's a recognizably Finnish name.

23 Q.  All right.

24      Dr. Kytomaa, we've met before, correct?

1 A.  We have.

2 Q.  And my name is Craig Schumacher on behalf

3 of the plaintiffs in this matter.  And you're here,

4 you understand, for your deposition in the George

5 matter, correct?

6 A.  That's my understanding.

7      MR. SCHUMACHER: All right.

8      And I'm going to show you what has been

9 marked as Exhibit Number 1.  That is a copy of the

10 subpoena for your appearance here today.

11      (Document marked as Kytomaa

12      Exhibit 1 for identification)

13 BY MR. SCHUMACHER:

14 Q.  Do you recognize that?

15 A.  Yes.

16 Q.  All right.

17      And you've seen that document before?

18 A.  I have.

19 Q.  And have you produced the documents that

20 are responsive to the subpoena?

21 A.  I have.

22 Q.  All right.

23      We received on Friday evening a series of

24 14,329 documents.

1      Does that entail the entirety of your file

2 in this matter?

3 A.  I'm not sure I know to answer that

4 question.  I mean, I haven't counted every document.

5 So my counting is different from yours, so I don't

6 know the answer to that question.

7 Q.  All right.

8      You turned over all of your file to defense

9 counsel; is that correct?

10 A.  I have.

11 Q.  And they made the production in this

12 matter?

13 A.  That's my understanding.  You would have to

14 ask them.

15 Q.  Okay.  Fair enough.

16      I'm curious, right off the bat.

17      You have done some SPICE simulations and

18 modeling in this matter to support your opinions; is

19 that correct?

20 A.  That's correct.

21 Q.  Did you turn over, as part of your

22 production, any of the underlying data that went

23 into the SPICE calculations?

24 A.  I expect that we did, but I'm not sure.

1 Q.  All right.

2      Would you agree that that's an important

3 part of your opinions is the SPICE calculations

4 that -- that you've done in this matter?

5 A.  I think the SPICE calculations are part of

6 my report, yes.

7 Q.  All right.

8      Do you believe that we should be entitled

9 to review the number of simulations that you did?

10      MR. KURTZ: Object to form.

11 A.  I -- I can't judge what you think is -- is

12 important to you.

13      I've provided the simulations in my -- in

14 my, let's say, discovery materials.

15 Q.  All right.

16      How many simulations did you perform with

17 regard to your work in the George matter?

18 A.  I performed two.

19 Q.  All right.

20      So you only -- you loaded up the data into

21 SPICE for just the two simulations?

22 A.  Yes.  The two, and the conditions for those

23 two that I spell out in the report.

24 Q.  Okay.

Harri Kaarlo Kytomaa, Ph.D. - Vol. I
September 24, 2019

Video Deposition

Bonnie George, et al. vs.
Omega Flex, Inc., et al.

09:26:30-09:27:17      Page 29

1 upon, or what opinions were you brought in to
2 provide?
3    **A. Opinions as a mechanical engineer.**
4    Q. All right.
5      Let's go down to the second paragraph:
6       "The plaintiffs in this matter have
7      asserted that all structures with TracPipe,
8      WardFlex and Gastite CSST must have the
9      CSST removed due to the potential for
10      perforation of the CSST resulting in a fire
11      during a lightning strike."
12      Did I read that correctly?
13    **A. Yes.**
14    Q. And where did you get that information? Is
15 that from the plaintiffs' complaint in this matter?
16    **A. Yes.**
17    Q. All right.
18       "However, the overall risk of
19      lightning-induced perforation of CSST is
20      quite low."
21      Did I read that correct?
22    **A. Yes.**
23    Q. How do you quantify "quite low"?
24    **A. Well, the risk -- first of all, the risk**

09:27:51-09:28:39      Page 30

1 **of -- of having a fire in your home in association**
2 **with -- with lightning is low, and -- and**
3 **furthermore, the -- the fire being lightning-induced**
4 **in association with a perforation of CSST is much**
5 **lower than that, and that's what I mean by that.**
6    Q. All right.
7      Do you agree that yellow-jacketed CSST is
8 capable of being perforated from the current from a
9 indirect lightning strike?
10    MR. KURTZ: Object to form, vague.
11    MR. CASPER: Titeflex joins in the
12 objection.
13    **A. I'm not sure I can completely answer your**
14 **question. The -- as you've stated it.**
15    Q. All right. Then I'll ask it a different
16 way.
17      Do you agree that there are circumstances
18 that exist where yellow-jacketed CSST can be
19 perforated by the electrical current from a
20 lightning strike?
21    MR. KURTZ: Same objection.
22    MR. CASPER: Join.
23    **A. Same difficulty answering the question.**
24    Q. What is your difficulty with the question?

09:29:01-09:31:07      Page 31

1    **A. I don't know what you mean by**
2 **"yellow-jacketed CSST." There -- there are -- in**
3 **this particular matter, there are three**
4 **manufacturers, all of which manufacture different --**
5 **different products that have different**
6 **characteristics.**
7    MR. SCHUMACHER: All right. Then let's
8 skip to that point.
9      I'm showing you now what I have marked as
10 Exhibit Number 4.
11      (Document marked as Kytomaa
12      Exhibit 4 for identification)
13 **BY MR. SCHUMACHER:**
14    Q. Please take a look at that.
15    MR. SCHUMACHER: It's Number 46 for you,
16 Counsel, in Volume 2.
17    Q. The first page of Exhibit Number 4 is
18 Page 80 of 264 from the SEFTIM I report.
19      Are you familiar with that report?
20    A. I am.
21    Q. All right.
22      So let's talk a little bit about CSST in
23 general.
24       "The manufacturing process for CSST

09:31:29-09:32:28      Page 32

1      seems to be the same worldwide."
2      Do you agree with that statement?
3    A. I don't.
4    Q. What differences do you observe in the
5 manufacturing process?
6    A. I know that the -- various companies
7 that manufacture CSST compete for the same market,
8 and they -- they protect their trade secrets
9 carefully. And I understand that the -- the
10 manufacturing processes differ from one another to
11 the point where some manufacturers believe that
12 their processes are perhaps more efficient or
13 perhaps more cost effective than others. So I think
14 that there are significant differences in -- in the
15 process that actually have an impact on -- on how
16 they succeed in the marketplace, for example.
17    Q. Well, then let's -- let's break that down
18 even further, then.
19      Do you agree that TracPipe, Gastite and
20 Ward yellow-jacketed CSST are all manufactured from
21 302 stainless steel?
22    A. I don't.
23    Q. How do you disagree with that statement?
24    A. I just disagree with that statement. I

Bonnie George, et al. vs.
Omega Flex, Inc., et al.

Video Deposition

Harri Kaarlo Kytomaa, Ph.D. - Vol. I
September 24, 2019

**Page 33**

09:32:48-09:33:45

1  think that's an incorrect statement.
2  Q.  All right.
3       Which manufacturer uses a different
4  stainless steel?
5  A.  They all do.
6  Q.  They all use -- well, they all have
7  different suppliers, I would assume, correct?
8  A.  I would expect so, yes.  But I don't
9  specifically know who the suppliers are.
10  Q.  Have you done any testing to compare the
11  effectiveness of bonding and grounding on Gastite
12  compared to Titeflex -- I mean Gastite compared to
13  TracPipe compared to Ward yellow jacket?
14  A.  I have.
15  Q.  When?
16  A.  I don't remember the date.
17  Q.  What did that testing entail?
18  A.  It entailed, for example, the -- the
19  measurement of the different characteristics of
20  those products, including things like the -- the
21  thickness of the dielectric insulating jacket as
22  well as the dielectric strength of -- of the jackets
23  of the various products.
24  Q.  All right.

**Page 34**

09:34:28-09:35:41

1       So you've done measurements on -- but have
2  you done any lightning testing to determine the --
3  the physical parameters of the CSST and their
4  performance under lightning conditions?
5  A.  I mean, over the -- the course of time I've
6  performed tests on various products that relate
7  to -- to that area, including susceptibility of --
8  or let's say the performance of CSST products made
9  by different manufacturers in the presence of a -- a
10  lightning-induced fire.  I've also performed testing
11  for the propensity for the ignition of -- of gas,
12  fuel gas associated with an electrical arc that
13  is -- that impacts different manufacturers'
14  products.
15       I think those are -- those are the
16  different kinds of tests that I have done that I
17  believe are responsive to your question.
18  Q.  Actually, that's an interesting point.
19       I've seen many of your reports before, and
20  you have always commented on the ability of fugitive
21  gas escaping from an arced hole in CSST, whether or
22  not it will ignite.
23       And that's not contained in this report at
24  all, correct?

**Page 35**

09:36:03-09:36:41

1  A.  The -- the testing is not spelled out in
2  the report, but it may be in the -- in the materials
3  that we have provided, but I have not checked.
4  Q.  All right.
5       You have provided no opinions in this
6  matter with regard to the ability of gas to ignite
7  from -- escaping from an arced hole in CSST,
8  correct?
9  A.  That's correct.  I have not spelled that
10  out in this report.
11  Q.  All right.
12       I would like you to turn to the second page
13  of Exhibit Number 4.
14       If you look at the bottom -- this is
15  actually from the GTI report:
16            "Results:
17            "The laboratory testing established
18       the physical parameters of the CSST samples
19       and that the product from the" four --
20       excuse me -- "from four different
21       manufacturers exhibited substantially
22       uniform parameters."
23       Did I read that correctly?
24  A.  Yes, you did.

**Page 36**

09:37:07-09:37:57

1  Q.  Turn to the next page, please, also from
2  the GTI report.  Number 1:
3            "The physical properties of the CSST
4       product are reasonably repeatable from
5       sample to sample and across manufacturers."
6       Did I read that correctly?
7  A.  You did.
8  Q.  Do you agree with that statement?
9  A.  I don't.  I think that both on the point,
10  the second point there, across manufacturers, I know
11  that the -- you know, in accordance with my own
12  measurements and, you know, that I have spelled out
13  in my -- my report that you have in front of you,
14  they're not the same.  They're not the same from the
15  standpoint of -- of the performance of the
16  corrugated steel, both from the standpoint of its
17  geometry and things like flex -- flexibility and
18  metallurgical treatment.  But also they're not the
19  same from the standpoint of the dielectric strength,
20  thickness of the insulating layer and generally the
21  feel of the -- the dielectric layer, which -- which
22  is important for the purpose of how the -- the
23  product functions in its intended use.
24  Q.  So ultimately that conclusion contained on

Harri Kaarlo Kytomaa, Ph.D. - Vol. I
September 24, 2019

Video Deposition

Bonnie George, et al. vs.
Omega Flex, Inc., et al.

1  Page 10 of the GTI report, Page 3 of Exhibit 4 here,
2  you disagree with GTI with regard to that
3  conclusion?
4      A.  Yeah.  I mean, I disagree.
5          I mean, there's a couple of reasons why I
6  disagree.  One relates to the fact that GTI had a
7  very narrow focus.  And I think, generally speaking,
8  the -- you know, these are certainly different
9  products and mechanically perform differently as
10  well as electrically.
11          MR. SCHUMACHER: Objection, nonresponsive.
12      Q.  Let's turn to the fourth page of Exhibit
13  Number 4, Page 29 of the GTI report.  "Initial" --
14  in highlight:
15          "Initial experimental work measured
16          baseline parameters of CSST samples from
17          several manufacturers and verified that
18          there was little variation from
19          manufacturer to manufacturer."
20          Do you agree with that statement?
21      A.  Well, I'm not sure what they mean by
22  "little variation," but there is quite a bit of
23  variation, and I actually spell some of that
24  variation out in my own report.

1      Q.  So ultimately, "yes" or "no," do you agree
2  with that statement that's contained on Page 29 of
3  the GTI report, Page 4 of Exhibit 4?
4      A.  I mean, I don't really know what they mean
5  by "little variation."  I mean, clearly it
6  recognizes that there is variation.  I agree with
7  that.  And exactly what they mean by "little," I
8  would -- I personally would not use that word.
9      Q.  So therefore the GTI report has certain
10  conclusions that -- that are at least called into
11  question by you?
12          MR. KURTZ: Objection, asked and answered.
13          MR. CASPER: Join in the objection.
14      A.  No.  I think that the -- the -- I'm -- I'm
15  answering the question specific to certain sentences
16  in the GTI report, and I -- and actually I disagree
17  with the representation that you just made.
18      Q.  Okay.  Let's go to -- back to Exhibit
19  Number 3, the table that's contained on the next
20  page, Roman numeral xvii.
21          This is just in chart form to demonstrate
22  some of the factual findings that you found by
23  conducting inspections of the nine plaintiff homes;
24  is that correct?

1      A.  That's correct.
2      Q.  All right.  I want to go to the first one,
3  the "estimate of CSST length."
4          You were able to come up with a number for
5  the number of feet of CSST in each structure; is
6  that correct?
7      A.  Yes.
8      Q.  All right.
9          I want to go down to the "resistance to
10  ground."
11          The -- the first one -- and forgive me on
12  the pronunciation.  Is it Deraps or --
13      A.  That works for me.
14      Q.  You don't know, either?  Okay.  That's
15  fine.
16          There's no resistance to ground on that
17  one?
18      A.  That's correct.
19      Q.  Why is that?
20      A.  The reason is that I don't believe there
21  was ready access to a grounding electrode.
22      Q.  All right.
23          Well, you would agree with me, without that
24  information you could not have performed any

1  accurate SPICE calculations with regard to the
2  Deraps' house?
3      A.  One could have performed SPICE
4  calculations, but one would have then -- we would
5  have had to -- to bracket, if you will, sort of do
6  calculations for assumed values, or multiple values.
7      Q.  All right.
8          So either you have to assume a value,
9  correct, a specific value, or you would have to run
10  it a number of times with various resistance numbers
11  for the ground?
12      A.  Within a range of, you know, what are
13  reasonable values, yes.
14      Q.  All right.
15          The same question for the -- the Rehm --
16  R-e-h-m -- there is -- again, there's no ground,
17  resistance-to-ground calculation there, either.
18          Do you have a reason for that?
19      A.  The -- the reason for not performing that
20  calculation is that the gas systems or the
21  measurement in the Rehm house is the gas system was
22  not directly bonded to a grounding electrode.
23          The -- in the -- just in contrast, the
24  Deraps, in the Deraps matter there was a bonding

Harri Kaarlo Kytomaa, Ph.D. - Vol. I
September 24, 2019

Video Deposition

Bonnie George, et al. vs.
Omega Flex, Inc., et al.

1     MR. CASPER: Object to the form of the
2  question.
3     Q.  And by that I'll just say that type of
4  report.  Let's start with that.
5        MR. CASPER: Same objection.
6     A.  I'm not sure I can make any representation
7  regarding the type of report that Exhibit 5 is,
8  other than to say that I have seen one or more LTI
9  reports in the past.
10        MR. SCHUMACHER: I'm going to show you now
11  what I have marked as Exhibit Number 6.
12            (Document marked as Kytomaa
13            Exhibit 6 for identification)
14        THE WITNESS: Thank you.
15  BY MR. SCHUMACHER:
16     Q.  Have you seen that document before?
17     A.  I -- I may have seen this, this document
18  before.
19     Q.  Well, I would hope so, because that's
20  EXPONENT 10623.  That was a document that was
21  produced by you, or by your attorneys in this
22  matter.
23     A.  Yes.
24     Q.  So is that something you reviewed or not?

1     A.  I've reviewed parts of this document.
2     Q.  Okay.  Let's go back to Exhibit Number 5,
3  then, please.
4        This is -- Exhibit Number 5 is an
5  August 14th of 2008 LTI test report for work done on
6  behalf of Gastite corporation, or Gastite --
7  Titeflex Corporation, correct?
8     A.  Yes.
9     Q.  Have you had testing performed by LTI in
10  the past?
11     A.  I have.
12     Q.  Do you believe LTI is a reputable
13  laboratory?
14     A.  I think they have their strengths and
15  weaknesses.
16     Q.  Have you relied upon data that you've
17  received from LTI in the past?
18     A.  They have unique capabilities that I have
19  relied upon, but -- but I've had to oversee the
20  testing that was performed at LTI.
21     Q.  Have you ever received data from LTI that
22  you did not concur with?
23     A.  Yes.
24     Q.  Can you give me an example?

1     A.  Yes.
2        I've taken issue with some of the -- the
3  approaches and measurement approaches that they've
4  utilized and -- and the -- the way, for example,
5  that they would puncture, or pre-puncture CSST and
6  introduce a -- an ignition wire into the -- into
7  the -- the puncture that they created.
8        That's just one example.
9     Q.  All right.
10        Well, let's go to Exhibit Number 6, then,
11  please.
12     A.  Yes.
13     Q.  On the bottom, it's the abstract, EXPONENT
14  10625.
15     A.  Yep.
16     Q.  Well, first of all, you would agree with me
17  that it's common in the industry to pinprick the
18  yellow jacket when conducting testing?
19     A.  Yes.  That has been done.  I mean, that's
20  been done in a variety of ways, and -- and that's
21  one of the issues that I have.  And also exactly
22  what way it is done seems to have varied, and -- and
23  little attention has been given to that.
24     Q.  Let's go to the bottom paragraph of Exhibit

1  Number 6, EXPONENT 10625.
2        "The simulated lightning testing
3     included preparing the sample by breaching
4     the jacket only.  Based on the field
5     failures reviewed by Omega Flex, the jacket
6     can easily and is usually breached during
7     installation; although for the testing, the
8     breach was required to assist in the
9     discharge."
10        Well, first of all, did I read that
11  correctly?
12     A.  Yes, you did.
13     Q.  So you would agree with me that, at least
14  from Omega Flex's perspective, they have seen
15  situations where the yellow jacket is damaged or
16  perforated as a result of installation?
17        MR. KURTZ: Object to form.
18        MR. CASPER: Join.
19     A.  So it's difficult -- difficult for me to
20  really comment on this.  This is a report that is
21  issued by LTI making representations of -- of Omega
22  Flex's.  So, I mean, I think that you would have to
23  talk to the people at LTI as to exactly how they
24  came to that conclusion, or talk to the people that

Bonnie George, et al. vs.
Omega Flex, Inc., et al.

Video Deposition

Harri Kaarlo Kytomaa, Ph.D. - Vol. I
September 24, 2019

10:04:06-10:05:08                                                Page 49

1    the LTI people talked to who are at Omega Flex that
2    made those representations if those are true.
3       Q.   You would agree with me, though, if there
4    is a perforation in the yellow jacket, that would
5    essentially defeat the dielectric strength with
6    regard to electrical current?
7       A.   It depends, because the -- the question
8    really is, is whether the perforation is at a
9    location where there may be an electrical insult or
10   not.  And so I think that if -- if there is a --
11   let's say a perforation that is -- that is caused
12   during installation, as EXPONENT 10625 states,
13   the -- the breach in the electrical insulation is
14   not really a breach if that location is never
15   electrically challenged.
16      Q.   If that area of a breach is electrically
17   challenged, it will have effectively defeated the
18   dielectric strength of the yellow jacket, correct?
19      A.   If you specifically, let's say, create a
20   sufficiently high voltage to create the electrical
21   breakdown of the air surrounding that particular
22   breach, then yes.
23          MR. SCHUMACHER: All right.
24          Tell you what.  We've been going about an

10:19:58-10:20:31                                                Page 50

1    hour.  Why don't we go ahead and take a quick break.
2          THE WITNESS: Okay.  Thank you.
3          THE VIDEOGRAPHER: The time is now 10:05,
4    and we're off the record.
5          (Recess taken)
6          THE VIDEOGRAPHER: The time is now 10:19,
7    and we're back on the record.
8          MR. SCHUMACHER: And Craig Schumacher.
9          For the record, I have agreed that an
10   objection by one defendant is an objection for all,
11   so that they do not need to join in.
12      Q.   All right.
13          Dr. Kytomaa, let's go back to Exhibit
14   Number 5, please.
15      A.   Yes.  Titeflex.
16      Q.   So again, this was a LTI report for work
17   done on behalf of Titeflex, correct?  August 14th of
18   2008.
19      A.   That is my understanding, yes.
20      Q.   All right.
21          I would like you to turn to page, the lower
22   right-hand corner, Bates number 528.
23          And, for the record, it's 120528, but --
24   all right.

10:20:59-10:21:32                                                Page 51

1          There's a table, 7 1-4 at the top.
2          Do you see that?
3       A.   7 1?
4       Q.   7.1-4.
5       A.   Yes, I do see that.
6       Q.   And on the bottom, "7.2.1, 15 February
7    2008."
8          Do you see that?
9       A.   Yes.
10      Q.   All right.
11          I just want to confirm, again.  So about
12   the halfway-down sentence begins, "Since the
13   sample..."
14          Do you see where I'm reading?
15      A.   Yes.
16      Q.   "Since the sample had a relatively thin
17      jacket, it was decided to pre-puncture the
18      dielectric jackets to provide a more
19      consistent method of applying the test
20      currents."
21          Did I read that correctly?
22      A.   Yeah.
23          If you can give me a minute just to read
24   this paragraph so I understand the context.

10:22:10-10:22:56                                                Page 52

1       Q.   That's fine.
2       A.   Thank you.
3          Yes, I've read it.
4       Q.   All right.
5          And again, I was really just reading that
6    for the proposition that it's fairly common during
7    LTI testing to puncture the yellow dielectric
8    jacket, correct?
9       A.   Well, I mean, this paragraph explains in
10   the middle of the paragraph -- if you look just a
11   sentence before, it says:
12          "During Test 8, the jacket" had
13      "flashed" -- "the jacket flashed over the
14      surface of the dielectric to the end of the
15      tube."
16          So basically what -- if you impose, let's
17   say, a high voltage in the proximity of the -- of
18   the -- this particular product, Gastite product, it
19   won't easily, let's say, breach the dielectric of --
20   of the product.  And in that particular case, the
21   current actually went all the way to the end of the
22   tube where it found sort of a cut metal, metal end.
23   And so it really speaks to the -- the fact that the
24   dielectric makes it difficult for -- for an arc

Case 6:17-cv-03114-MDH   Document 296-1   Filed 10/23/19   Page 11 of 45

Bonnie George, et al. vs.
Omega Flex, Inc., et al.

Video Deposition

Harri Kaarlo Kytomaa, Ph.D. - Vol. I
September 24, 2019

1    Q.   Gastite with jacket removed, no
2   melt-through at 3.9 coulombs.
3         Do you see that?
4    A.   I see that.
5    Q.   All right.
6         And actually there was a series of tests --
7   40, 41, 42, 43 and 44 were all conducted with
8   Gastite CSST with the jacket removed, correct?
9    A.   Yes.
10   Q.   All right.
11        Would you agree that in tests 40 through 44
12  the Gastite CSST was exposed to the same waveform as
13  in Test Number 15?
14   A.   No, they weren't.
15   Q.   What waveform were 40 through 44 exposed to
16  that -- and how was it different than in Test 15?
17   A.   The -- the waveforms in 40 through 44 were
18  different in magnitude.
19   Q.   How?
20   A.   They were of larger magnitude.
21   Q.   The peak current was higher?
22   A.   Yes.
23   Q.   All right.
24        So even with a higher peak current, in

1   Tests 30 -- excuse me, Test 40, 42 and 44, without
2   the yellow jacket, the CSST, the actual stainless
3   steel in that case was able to withstand 3.9, 4.4
4   and 4.4 coulombs respectively without having a
5   melt-through, correct?
6    A.   For those specific tests, that's correct.
7    Q.   All right.
8         But the -- in Test 15, the Gastite CSST
9   with a yellow jacket, at only 120 kA, it did suffer
10  a melt-through, correct, at .17 coulombs?
11   A.   So, I mean, the -- the -- you're singling
12  out Test Number 15, but if you look at, for example,
13  Test 9 to --
14   Q.   Just answer my specific question.
15   A.   Okay.  So with respect to your -- those
16  specific lines in the table, that's correct.
17   Q.   All right.
18        So let's go back to Exhibit Number 3,
19  please, your report.  And let's go to Page 166 of
20  your report.
21   A.   Yes.
22   Q.   I would like you to go to the last
23  paragraph.
24   A.   Yes.

1    Q.   "The plaintiffs further claim that
2         unjacketed CSST is as much as 25 times more
3         resistant to puncture from exposure to
4         electrical energy than yellow-jacketed
5         CSST."
6         Did I read that correctly?
7    A.   Yes.
8    Q.   "No document or reference is provided in
9         support of this assertion, and I am not
10        aware of any testing performed that
11        supports this claim."
12        Did I read that correctly?
13   A.   Yes.
14   Q.   It's your position that the testing done
15  that's shown in Exhibit Number 5 does not support
16  that statement at all?
17   A.   Well, my -- what I say in my report is
18  that:
19           "No document or reference is provided
20        to support this assertion..."
21        That's what I said.  So that's probably
22  accurate, that I did not see a reference that was
23  provided in support of that assertion.
24   Q.   Does Exhibit Number 5 seem -- support the

1   contention that unjacketed CSST is capable of
2   withstanding significantly more -- I won't even use
3   the word "significantly"; I'll use the exact
4   number -- 3.9 or 4.4 coulombs, whereas the
5   yellow-jacketed CSST failed at -- or punctured at
6   0.17 coulombs?
7         MR. KURTZ:  Object to form.
8    A.   And the -- the lines that you were
9   referencing were Test Number 15?
10   Q.   Yes.
11   A.   And what was the other test?
12   Q.   The other tests are 40 through 44.
13   A.   Yeah.  So in Test 40 to 44 there was no
14  melt-through with the jacket removed in Tests 40, 42
15  and 44 that had change transfers of 3.9, 4.4 and
16  4.4, and there was melt-through in -- with Test 41
17  and 43, with charge transfers of 4.9 and 4.4
18  respectively.
19        So what that speaks to is the fact that
20  it's -- let's say there's variability in the
21  testing.
22        And those charge transfers are higher than
23  the 0.17 of Test Number 15 that has a melt-through,
24  although the tests that were performed of Gastite

Harri Kaarlo Kytomaa, Ph.D. - Vol. I
September 24, 2019

Video Deposition

Bonnie George, et al. vs.
Omega Flex, Inc., et al.

1 with pinhole also has variability in it, in the
2 sense that the conditions that result in
3 melt-through varied. If you look through Tests 12
4 to 15, that's what -- what that shows.
5 Q. But ultimately -- I mean, the document
6 speaks for itself -- the testing speaks for
7 itself -- that without a jacket, Gastite was able to
8 withstand 3.9 coulombs at a 10 x 1,000 waveform,
9 with more peak current than in Test Number 15 with a
10 jacket where it melted through at .17 coulombs.
11 MR. KURTZ: Objection.
12 Q. Correct?
13 MR. KURTZ: Asked and answered.
14 A. So -- so that is correct.
15 But recognize that the -- the -- I mean,
16 you're comparing two somewhat artificial conditions.
17 One is a -- Test 15 is Gastite with -- with a
18 pinhole -- and putting the pinhole onto the -- onto
19 the jacket actually will change its performance
20 electrically -- to a Gastite with a jacket removed.
21 But -- but I think that -- I agree that
22 the -- the tests in this report speak for
23 themselves. These are the results that they
24 obtained of the tests.

1 MR. SCHUMACHER: Objection, nonresponsive
2 after "that is correct."
3 Q. All right. Let us go back to your report,
4 then.
5 Let's go back to Roman numeral xviii.
6 You have pointed out, under the "CSST
7 Background" -- I'm going to paraphrase here without
8 reading -- that CSST has certain advantages over
9 black iron pipe, flexibility being one, correct?
10 A. Yes.
11 Q. Which may mean that it is less susceptible
12 to damage during an earthquake, correct?
13 A. And -- and other situations, yes. Correct.
14 Q. All right.
15 In any of the nine plaintiffs' homes that
16 were inspected, did you observe any damage due to
17 earthquake or flooding?
18 A. In our inspections to the -- of the nine
19 named plaintiffs' houses, we didn't observe any
20 damage to the CSST.
21 But Missouri is susceptible to both
22 earthquakes and flooding.
23 Q. That wasn't my question.
24 I asked if you observed any evidence -- did

1 you see any evidence of damage to the CSST in any of
2 the homes?
3 A. Based upon --
4 MR. KURTZ: Just object. That wasn't the
5 question. The witness answered the question.
6 A. Based on my inspection of the nine
7 plaintiffs' homes, I observed no damage to the CSST
8 that we inspected.
9 But Missouri is susceptible to flooding and
10 earthquakes.
11 Q. All right.
12 Did you observe any evidence of damage to
13 the black iron pipe in any of the nine plaintiffs'
14 homes --
15 MR. KURTZ: Object to form.
16 Q. -- that you would associate earthquakes or
17 flooding?
18 A. Based on our -- our inspections of the nine
19 homes that we inspected in Missouri, we observed no
20 damage to the black iron pipe that was installed in
21 those homes, although Missouri is susceptible to
22 flooding and earthquakes.
23 Q. Did you observe any damage due to corrosion
24 of any of the black iron pipe in any of the nine

1 plaintiffs' homes? Or church. I should add that.
2 A. The -- in our inspections of nine homes
3 and -- and the church, we did not see any corrosion
4 of the black iron pipe that would constitute, let's
5 say, a precursor to a leak of the black iron pipe.
6 Q. All right.
7 You would agree with me that CSST is more
8 susceptible to crushing damage than black iron pipe?
9 A. Yeah. I mean, I think that depends.
10 I mean, one would have to look at what the
11 circumstance is associated with the force that sort
12 of delivers the crushing, because significant forces
13 on CSST can be accommodated by simply the CSST
14 deflecting in some fashion, whether it is the
15 diameter itself deforming, but still containing the
16 gas, or simply the movement of the -- of the
17 flexible CSST.
18 That, in general, is not true for black
19 iron pipe. Black iron pipe, if subjected to
20 significant forces, can fail, and can fail
21 dramatically.
22 MR. SCHUMACHER: Objection, nonresponsive.
23 Q. What about nail strike damage? Which would
24 be more susceptible to nail strike damage, CSST or

Case 6:17-cv-03114-MDH   Document 296-1   Filed 10/23/19   Page 13 of 45

Bonnie George, et al. vs.
Omega Flex, Inc., et al.

Video Deposition

Harri Kaarlo Kytomaa, Ph.D. - Vol. I
September 24, 2019

1  black iron pipe?
2     A.  So if CSST is installed property --
3  properly, it should be installed in a manner to have
4  some protection against nail strikes.
5        But -- but in answer to your question, if
6  one were to perform a test outside of a home, and
7  simply, you know, quantify, for example, what is the
8  force required to penetrate black iron pipe with a
9  nail or what is the force required to penetrate CSST
10 with a nail, the force required to penetrate CSST
11 with a nail would be smaller.
12    Q.  And you would agree with me that black iron
13 pipe is capable of withstanding more electrical
14 current than CSST without perforating?
15       MR. KURTZ: Object to form.
16    A.  I have difficulty with your question
17 because in a home CSST -- I'm sorry, black iron pipe
18 is typically installed in the context of appliances
19 and things like this.  And to the extent that one is
20 delivering significant current to the black iron
21 pipe that is then connected to, for example, a
22 flexible gas connector, that combination may be
23 problematic.
24    Q.  Well, let me ask it this way, then:

1        In your years of experience, have you ever
2  observed a section of black iron pipe that had a
3  perforation mid-run due to exposure to lightning?
4     A.  I have.
5     Q.  When was that?
6     A.  It was associated with a lightning event
7  where an underground gas line was perforated by --
8  by the lightning event.
9     Q.  When was that?
10    A.  Some years back.  I don't -- I don't
11 specifically remember the year.
12    Q.  Where was that?
13    A.  I think it was in Pennsylvania.
14    Q.  Do you have any more details than that?
15 Where?  Was it a home?  Was it a residence?  Was it
16 a commercial building?
17    A.  No, it was not a home.  It was a
18 underground black iron pipe that was associated with
19 distribution of gas, and it was proximate to, or
20 near a utility pole.
21    Q.  Were you with Exponent when you were doing
22 that investigation?
23    A.  Yes.
24    Q.  How many investigations have you conducted

1  involving CSST where there was an allegation that it
2  perforated due to exposure to lightning?
3     A.  I don't have an exact number, but it's
4  probably of the order of 100 or more.
5     Q.  When is the first time you did a CSST
6  investigation?  And we can use that term broadly.
7  Hopefully you'll give me that.
8     A.  I first became involved with work related
9  to CS -- CSST in -- in the early 2000s, so more than
10 15 years ago.
11    Q.  All right.
12       Let's get back to Exhibit 3, Roman numeral
13 xviii.
14       You're drawing a comparison between black
15 iron pipe and its ability to -- I'm sorry, the third
16 paragraph of "CSST Background" and let's just go to
17 the second-to-last sentence.  "In addition, the
18 yellow jacket..."
19       Do you see where I am?
20    A.  I do.
21    Q.  "In addition, the yellow jacket on CSST
22 (for TracPipe, WardFlex and Gastite) has
23 electrically insulating properties."
24       Did I read that correctly?

1     A.  You did.
2     Q.  "This makes electrical arcing less likely
3        to occur for CSST than for black iron
4        pipe."
5        Did I read that correctly?
6     A.  That's correct.
7     Q.  So that's just saying that if there's an
8  opposing charge in the same proximity to the
9  insulative jacket of CSST versus black iron pipe,
10 it's more likely to -- to arc off to the black iron
11 pipe, correct?
12    A.  Yes.
13       I mean, a very good example was what we
14 looked at in the -- in one of the LTI reports a
15 little bit ago where -- where the insulating
16 characteristics of the CSST prevented the arc from
17 attacking the metal and instead traveled some
18 distance to the end of the CSST where the metal is
19 bare.
20       MR. SCHUMACHER: Objection, nonresponsive.
21       Let us go to what I'm marking as Exhibit
22 Number 7.
23       (Document marked as Kytomaa
24       Exhibit 7 for identification)

Harri Kaarlo Kytomaa, Ph.D. - Vol. I
September 24, 2019

Video Deposition

Bonnie George, et al. vs.
Omega Flex, Inc., et al.

1      **THE WITNESS:** Thank you.
2  **BY MR. SCHUMACHER:**
3    Q.  Have you seen that document before?
4      **MR. SCHUMACHER:** Tab 14, Counsel.
5      **MR. KURTZ:** All right.
6    **A.  I have.**
7    Q.  All right.
8      This is a United States patent application
9  dated February 24th of 2011 issued by -- or for the
10  inventors Scott Duquette and Brian Coppola; is that
11  correct?
12    **A.  Yes.**
13    Q.  And this is basically the patent
14  application for Flashshield, Gastite's enhanced CSST
15  product, correct?
16      **MR. CASPER:** Object to the form of the
17  question.
18    **A.  Patent applications are not specific to**
19  **commercial products, and so I would say that it may**
20  **be that -- that Titeflex practices the invention as**
21  **identified in the claims in the back of this patent**
22  **application, or it may be that Flashshield practices**
23  **this Patent Application Number 0041944 A1.**
24      **But I would have to, you know, essentially**

1  **perform a claims analysis to answer that question,**
2  **which I haven't done.**
3    Q.  Okay.  Well, can you at least agree that it
4  is a United States patent application publication?
5    **A.  It is.**
6    Q.  And it's dated February 24th of 2011?
7    **A.  It is.**
8    Q.  All right.  If nothing else, just for
9  documentary purposes for our record.
10      Okay?
11    **A.  Very good.**
12    Q.  If you will then turn -- there's a series
13  of diagrams.  When you're done with the diagrams,
14  you actually come up to a Page 1.
15    **A.  I see that.**
16    Q.  All right.
17      And I'm going to go down under "Background
18  of the Invention."
19    **A.  Yes.**
20    Q.  Do you see where I am?
21    **A.  I do.**
22    Q.  All right.
23      "Gas and liquid piping systems
24  utilizing corrugated stainless steel

1  tubing ('CSST')" --
2    A.  Yes.
3    Q.  -- "and fittings are known."
4      Correct?  Or did I read that correctly?
5    A.  You did.
6    Q.  All right.
7      "Such piping systems can be designed
8  for use in combination with elevated
9  pressures of up to 25 PSI or more and
10  provide advantages over traditional rigid
11  black iron piping systems in terms of ease
12  and speed of installation, elimination of
13  onsite measuring, and reduction in the need
14  for certain fittings, such as elbows, tees,
15  and couplings."
16      Did I read that correctly?
17    A.  Yes.
18    Q.  Next sentence:
19      "Undesirably, the thin metal walls are
20  vulnerable to failure when exposed to
21  physical or electrical forces, such as
22  lightning or fault currents."
23      First, did I read that correctly?
24    A.  You did.

1    Q.  Do you agree with that statement?
2    A.  I mean, I think it depends on the specific
3  installation.
4      And so generally, I would not agree with --
5  with that statement.
6    Q.  All right.
7      Let's go down to a little bit further.  The
8  next one is paragraph 006 -- or 0006.
9      Do you see that?
10    A.  Yes.
11    Q.  The -- towards the bottom of that
12  paragraph:
13      "While both direct and indirect
14  currents..."
15    A.  Yes.  I see that.
16    Q.  Okay.
17      "While both direct and indirect
18  currents may enter a structure through a
19  particular system" --
20    A.  Actually, hang on.
21      Yeah.  I see that, yeah.
22    Q.  Okay.
23      -- "voltage can be induced in other
24  systems in the structure, especially those

Bonnie George, et al. vs.
Omega Flex, Inc., et al.

Video Deposition

Harri Kaarlo Kytomaa, Ph.D. - Vol. I
September 24, 2019

10:53:25-10:54:09          Page 73

1        in close proximity to piping systems."
2        Did I read that correctly?
3    A.   Yes.
4    Q.   "This can often result in an electrical
5        flashover or arc between the adjacent
6        systems."
7        Did I read that correctly?
8    A.   You did.
9    Q.   Do you agree with that statement?
10    A.   I think that if a -- if a Gastite product,
11 the yellow Gastite product were installed in
12 accordance with the manufacturer's instructions,
13 then -- then I would not agree with that statement.
14 I think that the statement is a little
15 bit -- let's say it's -- it's misleading because
16 there are specific things that actually protect
17 against this very line.
18        And if you go, for example, six lines down
19 to the paragraph that starts 0007, it's -- the line
20 there is:
21        "It usually takes a very large voltage
22        differential to create a flashover through
23        a good dielectric material."
24        That's an example of why that would not

10:54:33-10:55:15          Page 74

1 happen. If -- if the voltage is not high enough,
2 then the insulation will protect the CSST and a
3 flashover will not occur.
4        So there are many instances where I think
5 this -- this sentence, or the sentence:
6        "This can often result in an
7        electrical flashover, or arc, between the
8        adjacent systems" would not occur.
9    Q.   All right.
10        Well, let's break that down, then.
11        There are circumstances where if you have
12 an energized metallic system in close proximity to
13 even bonded and grounded Gastite you can still have
14 a flashover between the two systems, correct?
15    A.   So my experience is that that would be very
16 unlikely.
17    Q.   Not my question.
18        My question was is it possible.
19    A.   Yes. Under extreme conditions, it -- it is
20 possible.
21    Q.   And, in fact, you have investigated fires
22 where you had a properly bonded and grounded CSST
23 system where you still had a perforation and an
24 arcing event, correct?

10:55:45-10:56:26          Page 75

1    A.   I want you to refresh my memory on -- on
2 that particular investigation.
3    Q.   Let's talk about the Rushing investigation
4 in Lubbock.
5        That was yellow-jacket Gastite CSST,
6 correct?
7    A.   Yes.
8    Q.   Installed in the Rushing home?
9    A.   That's correct.
10    Q.   And there was a direct bond to the CSST gas
11 delivery system in the Rushing residence, correct?
12    A.   I've not reviewed the details of the
13 Rushing case. It's been a while, as you know.
14        I mean, that's -- it's possible. I'm not
15 saying that it's not. I just don't remember that
16 detail.
17    Q.   All right.
18        Well, if -- you would agree with me that
19 there was an arc perforation in the CSST in the
20 Rushing residence, correct?
21    A.   Yes.
22    Q.   And if it was properly bonded and grounded
23 with a direct bond in compliance with the Titeflex
24 D&I guide, you would agree that would be one of

10:56:51-10:57:33          Page 76

1 those circumstances where you can still have a
2 perforation even though it is bonded and grounded?
3    A.   Yes.
4        In specific circumstances where, for
5 example, there is a direct attachment to a house by
6 lightning, it is possible for that to occur.
7    Q.   Well, let's even break that down further.
8        You would agree with me that if lightning
9 attaches to a home, it's going to -- the current is
10 going to follow basically any path to ground that it
11 can follow, correct?
12    A.   It will follow multiple paths to ground,
13 yes.
14    Q.   Let's -- let's go with that, multiple paths
15 to ground. Okay.
16        Generally speaking, lightning, or
17 electrical current, will find the path of least
18 resistance in an attempt to get to ground, correct?
19    A.   It will find -- lightning will find all
20 paths of least resistance. It will -- it will go
21 along multiple paths. Some of those paths will have
22 higher resistance than others. And for those paths
23 of higher resistance, the currents will be lower,
24 but it will follow multiple paths.

Case 6:17-cv-03114-MDH   Document 296-1   Filed 10/23/19   Page 16 of 45

Harri Kaarlo Kytomaa, Ph.D. -  Vol. I
September 24, 2019

Video Deposition

Bonnie George, et al. vs.
Omega Flex, Inc., et al.

1    Q.   So I want to build a scenario here for you.
2  All right?
3         Let's say you have a metal flue chimney
4  pipe for a fireplace, okay?  Start with that.
5    **A.   Okay.**
6    Q.   And there is -- that is installed in a
7  chimney chase.
8         Have you seen that sort of installation in
9  residences before?
10   **A.   I'm not sure what you mean by "that."  What**
11 **is "that"?**
12   Q.   Well, "that" being a double-wall flue metal
13 pipe installed for a fireplace in a chimney chase.
14   **A.   Yes, I have.**
15   Q.   All right.
16        Now, I want you to imagine that a run of
17 CSST is installed within -- in contact with that
18 double-walled metal flue pipe.
19        Okay?
20        If the double-walled flue pipe becomes
21 energized from a lightning strike, is it a
22 possibility that it could still arc off to
23 yellow-jacketed CSST under the circumstance that I
24 just gave you?

1         **MR. KURTZ:** Object to form.
2    **A.   So it depends a great deal on exactly, you**
3  **know, what's connected to what.**
4         **But in that particular scenario, the**
5  **bonding, for example, would help in that scenario --**
6  **if the flue pipe were attached directly to the flue**
7  **pipe -- and perhaps alleviate, or minimize, or**
8  **prevent the formation of an arc between the flue**
9  **pipe and CSST.  But it is possible for an arc to**
10 **occur between the flue pipe and the CSST in that**
11 **scenario, that specific scenario.**
12   Q.   Okay.  And even if the yellow-jacketed CSST
13 was properly bonded and grounded in that same
14 condition, could you still have an arcing event?
15        **MR. KURTZ:** Object to form, incomplete
16 hypothetical.
17   **A.   So in the scenario that you've painted,**
18 **the -- again, the -- exactly how the CSST performs**
19 **depends on -- on what it is connected to, where it**
20 **comes from and where it goes to.  And -- and in that**
21 **particular scenario, actually, the bonding of the**
22 **CSST can minimize and reduce the -- let's say the**
23 **likelihood of an arcing event.  But -- but if the**
24 **direct lightning event to the house is sufficiently**

1  **aggressive, it can cause damage, including an arc to**
2  **the CSST.**
3    Q.   Which is ultimately the -- the -- one of
4  the issues in this case, which is the manufacturers
5  are indicating that bonding and grounding makes a
6  yellow-jacketed CSST system safe.
7         You would agree with me that proper bonding
8  and grounding pursuant to the D&I guide of any of
9  the manufacturers does not render that CSST system
10 safe from all lightning strikes, correct?
11        **MR. KURTZ:** Object to form.
12   **A.   No, I disagree with that representation.**
13        **I believe that for each of the products on**
14 **the market -- so the WardFlex, the TracPipe and the**
15 **Titeflex products -- if those are installed in**
16 **accordance with the manufacturers' instructions,**
17 **including their bonding requirement, bonding and**
18 **grounding requirement, these products are safe.**
19   Q.   I understand that's your opinion.
20   **A.   Yes.**
21   Q.   However, I just gave you a scenario where
22 you admitted that if the conditions are correct,
23 even though the yellow-jacketed CSST is still direct
24 bonded pursuant to the D&I guide, you could still

1  have an arcing event.
2         Where is that information being
3  disseminated to the public?
4         **MR. KURTZ:** Objection, misstates testimony.
5    **A.   I'm not sure I understand the question.**
6         **What do you mean by "where is that**
7  **information disseminated to the public?"  I -- I**
8  **don't understand the relationship between the first**
9  **part of your question and the second part of your**
10 **question.**
11   Q.   All right.  Well, then we'll break it down.
12        You've admitted under the hypothetical that
13 I gave you that there are conditions where you could
14 still have an arcing event between a -- a metallic
15 system and yellow-jacketed CSST, even though the
16 yellow-jacketed CSST was direct bonded pursuant to
17 the D&I guide, correct?
18        **MR. KURTZ:** Same objection.
19   **A.   I mean, I just want to be clear here**
20 **that -- that I think that we've moved away from**
21 **the -- the Rushing case, and so -- so I'll make the**
22 **assumption here that, you know, that -- well, it's**
23 **not clear to me exactly what the condition is that**
24 **you're asking me to think about, whether it is the**

Harri Kaarlo Kytomaa, Ph.D. - Vol. I
September 24, 2019

Video Deposition

Bonnie George, et al. vs.
Omega Flex, Inc., et al.

11:07:22-11:08:05      Page 85

1    **A. That's my understanding.**
2    Q. Okay.
3    **A. Yeah.**
4    Q. All right.
5      Let's go over to Paragraph 8 of Exhibit 7.
6    **A. Yes.**
7    Q. "Metals are electrically..."
8      Do you see where I am?
9    **A. I do.**
10   Q. "Metals are electrically conductive
11      materials, making CSST a very good pathway
12      for electrical currents. This leads to the
13      potential for a flashover if the CSST is
14      installed in close proximity to another
15      conductor within a structure and either one
16      becomes energized."
17      Did I read that correctly?
18   **A. Yes.**
19   Q. So can you conceive of a situation where
20 yellow-jacketed CSST is bonded and grounded with a
21 direct bond pursuant to the installation guide and a
22 nearby metallic system -- pick one, a flue pipe or
23 something of that nature -- becomes energized by a
24 lightning strike, can you still have a flashover, or

11:08:36-11:09:18      Page 86

1 an arcing event between that metal object and the
2 bonded and grounded CSST?
3    **A. So my experience is that that's very**
4 **unusual. That -- that the only time that I've seen**
5 **it is in the context of a direct strike to a house.**
6   Q. All right.
7      But that -- okay.
8      So my question, is, though, it can happen
9 where you have an arcing event to yellow-jacketed
10 CSST, even though bonded and grounded, when -- in
11 close proximity to another metallic system that
12 became energized from a lightning strike?
13   **A. So it's extremely rare, and in the -- you**
14 **know, the -- the over ten years that I've worked in**
15 **this area, I've hardly ever seen it. So there is**
16 **a -- sort of a miniscule possibility that that**
17 **occur, but it's highly unlikely.**
18   Q. Is the answer to my question yes, it can
19 happen?
20      MR. KURTZ: Objection, asked and answered.
21   **A. I'll repeat my answer.**
22      **Highly unlikely.**
23   Q. Let's go down a little bit further.
24      "It is possible that a flash like..."

11:09:50-11:10:40      Page 87

1      Do you see where I am? Under Paragraph 8.
2   **A. I do.**
3   Q. "It is possible that a flash like this can
4      cause enough heat generation to melt a hole
5      in the CSST, allowing fuel gas to escape."
6      Do you agree with that statement?
7   **A. It is highly unlikely if the system is**
8 **installed in accordance with the guidance for -- for**
9 **that to ever occur.**
10   Q. It is possible, however, correct?
11   **A. There's a -- there's a miniscule**
12 **possibility. And, you know, in the over ten years**
13 **that I've worked in this area, I've hardly ever seen**
14 **it.**
15   Q. Have you done any testing to quantify your
16 statement regarding how rare it would be?
17   **A. No. And I -- I haven't needed to.**
18   Q. Are you aware of any -- any testing in the
19 industry to quantify the limits of bonding and
20 grounding and its effectiveness?
21      MR. KURTZ: Object to form.
22   **A. I don't understand the question.**
23   Q. Well, let's go back to the earlier testing.
24 Let's talk about the Gastite, that one specific

11:11:01-11:11:41      Page 88

1 example where it was -- we had a melt-through at .17
2 coulombs.
3      Do you recall that? We can get -- it was
4 Test 15 in Exhibit 5, I believe.
5   **A. Yes, I remember that.**
6   Q. Okay. Are you aware of any testing that
7 has ever put a number of coulombs that bonded CSST
8 is capable of withstanding prior to it melting
9 through due to an arcing event?
10      MR. KURTZ: Object to form.
11   **A. I don't -- I don't understand what you're**
12 **asking.**
13      **It sounds like you're asking the very**
14 **things that are, for example, in the Titeflex report**
15 **that we talked about. So I'm not sure -- I'm**
16 **confused.**
17   Q. Well, that's what I'm trying to get to.
18   **A. Yeah.**
19   Q. All right.
20 They hit yellow-jacketed CSST with varying
21 amounts of current.
22   **A. Yes.**
23   Q. They determined that .17 in this one was --
24 was capable of causing a melt-through.

Bonnie George, et al. vs.
Omega Flex, Inc., et al.

Video Deposition

Harri Kaarlo Kytomaa, Ph.D. - Vol. I
September 24, 2019

1          Okay?
2      A.   Yes.
3      Q.   They hit black iron pipe with up to 480
4   coulombs and they didn't get a melt-through,
5   correct, at least in that testing?
6      A.   In that testing.  The testing speaks for
7   itself, yep.  Yep.
8      Q.   I'm just trying to get apples to apples.
9      A.   Yeah.
10      Q.   Are you aware of any testing similar to
11   that to test the limits or put a -- a level of
12   coulombs, given a certain waveform, that bonded CSST
13   is capable of withstanding before having an arcing
14   event?
15          MR. KURTZ: Object to form.
16      A.   So I think you're asking me about, you
17   know, what has been done in the industry to quantify
18   the performance of bonded systems installed in
19   accordance with -- with manufacturers'
20   recommendations.  And what's been done on that has
21   been documented through a number of publications,
22   including work that has been done by SEFTIM, as well
23   as Torbin and -- and the GTI report.  And that body
24   of work has been a combination of -- of testing

1   and -- and analysis.
2          And -- and I would also add that -- that
3   the -- I have performed analysis, and my team has
4   performed analysis, to address that question, very
5   specific configurations in the context of this case
6   as I represent in -- in the report where I showed
7   the circuits that we analyzed and the conclusions
8   that we have come to.
9          MR. SCHUMACHER: All right.
10          We're going to have a lot more conversation
11   about all of the above, but why don't we go ahead
12   and take a quick break.
13          THE WITNESS: Good.  Thank you.
14          THE VIDEOGRAPHER: The time is now 11:13,
15   and we're off the record.
16          (Recess taken)
17          THE VIDEOGRAPHER: The time is now 11:28,
18   and we're back on the record.
19   BY MR. SCHUMACHER:
20      Q.   All right.
21          Dr. Kytomaa, we are back on the record
22   looking at Exhibit Number 7, still back to
23   Paragraph 8.
24      A.   Yes.

1      Q.   We had just talked about the sentence:
2          "It is possible that a flash like this
3   can cause enough heat generation to melt a
4   hole in the CSST, allowing fuel gas to
5   escape."
6   I'm going to keep reading, though:
7          "This scenario is worsened by the
8   dielectric jacket that often surrounds
9   CSST.  This jacket only" typical --
10   "typically breaks down in a very small
11   area, creating a pinhole as a result of the
12   flashover.  This phenomenon focuses the
13   flash and concentrates heating of the
14   stainless steel inside.  The result is a
15   reduced capability of the CSST to resist
16   puncture from flashover compared to
17   un-jacketed pipe."
18   First of all, did I read all that
19   correctly?
20      A.   You did.
21      Q.   Do you agree that the yellow jacket focuses
22   the flash and concentrates the heating of the -- on
23   the stainless steel?
24          MR. KURTZ: Object to form.

1      A.   Not really.
2      Q.   What testing have you done to validate your
3   opinion?
4      A.   Years ago we performed some testing in
5   which we looked at different waveforms and to learn
6   that if -- if you use a relatively fast waveform, it
7   has a tendency of pressurizing the jacket and sort
8   of causing it to peel away from the -- the metal
9   itself.  And in that situation, essentially, the --
10   the -- the -- the jacket rolls up, literally like
11   you roll up your socks, and away from the -- the
12   location of the -- the arcing.
13          And so that situation, which is a rapid --
14   rapid current rise, moves the jacket away and
15   doesn't perform in the way that we just read in --
16   in this particular patent.
17          And similarly, if the rate of rise is slow
18   for the current, then in those situations the
19   voltages will be correspondingly lower, and the
20   insulating characteristics of the jacket will reduce
21   the likelihood of an arc forming in the first place,
22   because of the insulating characteristics that we've
23   talked about already before.
24          MR. SCHUMACHER: All right.  Objection,

Harri Kaarlo Kytomaa, Ph.D. - Vol. I
September 24, 2019

Video Deposition

Bonnie George, et al. vs.
Omega Flex, Inc., et al.

1  nonresponsive.
2      Q.  I want to go back to Exhibit 3, Page 166.
3      A.  Yes.
4      Q.  7.1.2, "Claims regarding the yellow
5  jacket."
6              "In Paragraph 30 of the plaintiffs'
7          second amended complaint, plaintiffs state
8          that the 'insulative yellow'" --
9      A.  I'm sorry.  Where are you?  I'm sorry.  I
10 was a little slow catching up.
11          Right here?
12     Q.  Right there.
13     A.  Okay.  Thank you.
14     Q.  In Paragraph 30?
15     A.  Yep.  All right.
16     Q.  I'll just actually skip to the paren:
17              "... 'insulative yellow jacketing is
18          unnecessary and heightens the danger so
19          much that expert testing has concluded that
20          unjacketed CSST would be better than having
21          the yellow" jack -- "yellow CSST."
22          Did I read that correctly?
23     A.  Yes.
24     Q.  All right.

1              And your statement is, "This is incorrect"?
2      A.  Yes.
3      Q.  All right.
4              Would you agree that the patent application
5  is some evidence, or an opinion that would
6  demonstrate that the yellow jacket can create a
7  further issue by focusing the energy from a
8  lightning strike?
9      A.  Yeah.  I don't think it's really
10 representative of what happens in the field, but
11 it's -- you know, it's what -- what the patent says.
12     Q.  All right.
13          And down to Paragraph -- I apologize.
14 Let's go back to Exhibit Number 7, Paragraph 9.
15     A.  Yes.
16     Q.  "Accordingly, it would be desirable to
17          provide corrugated tubing and sealing
18          devices having an increased resistance to
19          physical and electrical forces that
20          approaches that of conventional black iron
21          pipe."
22          Did I read that correctly?
23     A.  Yes.
24     Q.  Can one -- I'm going to say can you read

1  that to mean that black iron pipe has a better
2  ability to withstand electrical current than CSST?
3      MR. KURTZ:  Object to form.
4      A.  So this talks about:
5              "... increased resistance to physical
6          and electrical forces that approaches that
7          of conventional black iron pipe."
8          And I would say that, you know, I think
9  that the -- the context of this patent is very
10 narrow.  It doesn't really look at the field
11 application, on the one hand, or doesn't even take
12 into considerations the many downsides associated
13 with black iron pipe that I talk about in my report,
14 and I think we've touched on those already.
15          And so I -- you know, if your question is
16 do I generally agree with the statement, I think
17 that it's -- it's -- that the patent writers have
18 a -- clearly a very narrow view of -- of these
19 applications; don't take into considerations all
20 sorts of other factors that are important.
21     MR. SCHUMACHER:  All right.  Objection,
22 nonresponsive.
23          I would like to show you what I am marking
24 as Exhibit Number 8.

1              (Document marked as Kytomaa
2              Exhibit 8 for identification)
3      MR. SCHUMACHER:  It's Tab 3, Counsel.
4      THE WITNESS:  Shall I put this one away, 7?
5      MR. SCHUMACHER:  Yes.  That would be great.
6      Q.  All right.
7          Showing you what I've marked as Exhibit
8  Number 8.
9      A.  I'm trying to keep them in order here.  I
10 don't know whether that matters or not, but I think
11 that's 4, 5, 7, 8.
12          There we go.
13     Q.  All right.
14          Have you seen this series of e-mails
15 before?
16     A.  I may have seen these, but I -- but I don't
17 have a -- certainly not memorized them.
18     Q.  Okay.  Well, let's go to the second page,
19 which is Titeflex George 7589.
20     A.  7589.  Yep.
21     Q.  And the Friday, May 18th of 2007 e-mail
22 from John Hibner, who is a code specialist in
23 Indiana.
24     A.  Yes.

Bonnie George, et al. vs.
Omega Flex, Inc., et al.

Video Deposition

Harri Kaarlo Kytomaa, Ph.D. -  Vol. I
September 24, 2019

1    Q.  All right.
2        I would like to go to the third paragraph.
3    A.  Yes.
4    Q.  "The area under discussion" --
5    A.  Yep.
6    Q.  -- "(and greatly in need of further
7    research) is the combination of an
8    electrical surge created by a lightning
9    strike and CSST."
10       Do you believe that all research has been
11   completed on the effectiveness of bonding and
12   grounding of yellow-jacketed CSST?
13       MR. KURTZ: Object to form.
14   A.  I don't know.
15   I mean, I don't understand the question,
16   first of all, but I -- I mean, I cannot foretell the
17   future as to whether more work will be done in the
18   future.
19   Q.  All right.
20       Would you agree that the full extent -- or
21   the spectrum, if you will -- of the effectiveness of
22   bonding and grounding has not yet been completely
23   quantified by the CSST industry?
24       MR. KURTZ: Object to form.

1    A.  I think the work that has been done, and
2    the purpose of the work, is clear, and I think that
3    the -- it's a -- in this case, I'm here to provide
4    opinions about a scope that I've already described.
5    And I think that I have all that I need to give
6    those opinions, so that's just me.
7        And -- and -- and with respect to the
8    industry, itself, I mean, I can't really speak for
9    the industry and what the leaders in the industry
10   intend to do or -- you know, for example, whether
11   they want to develop new patents and those sorts of
12   things, I -- I can't speak to that.
13   Q.  Well, let me ask you it this way:
14       You would agree with me that the spectrum,
15   if you will, of the effectiveness of bonding and
16   grounding of yellow-jacketed CSST has not yet been
17   fully quantified by the available research as of
18   today?
19       MR. KURTZ: Object to form, misstates
20   testimony.
21   A.  I think it has.  And I think that, not only
22   that, but also the tools to quantify it are well
23   understood, and -- and I think that the -- the --
24   the opportunities therefore to analyze different

1    kinds of house configurations -- because the details
2    are actually very important.  Because the details
3    are important, and the tools are known, the tools
4    are available to look at conditions related to what
5    we think houses will look like today and in the
6    future.
7    Q.  If that spectrum of the effectiveness of
8    bonding and grounding has been quantified, as you
9    have put forth, do you believe or do you -- that the
10   public has a right to know the extent of that
11   spectrum and when the CSST is effective when
12   properly bonded and grounded pursuant to a D&I
13   guide?
14       MR. KURTZ: Object to form.
15   A.  I -- I believe that the GTI report, for
16   example, is a public document.  And so I -- so I
17   don't believe, as your question suggests, for
18   example, that the public does not have access to the
19   information that is available that I believe is
20   quite complete.
21   Q.  You're aware that the manufacturers engaged
22   in a national yellow safety campaign, correct?
23       MR. KURTZ: Object to form.
24   A.  I'm not sure exactly what you mean.

1    Q.  Well, were you aware the manufacturers of
2    CSST -- Gastite, or Titeflex, Omega Flex and Ward
3    Manufacturing -- all engaged in a national safety
4    campaign -- campaign touting the effectiveness of
5    bonding and grounding of yellow-jacketed CSST?
6        MR. KURTZ: Same objection.
7    A.  I don't -- I mean, that may be the case.  I
8    don't specifically know, and that's certainly not
9    been the focus on my investigation.
10   Q.  If yellow-jacketed CSST -- well, strike
11   that.  I'll ask you a different way.
12       Do you believe that unbonded
13   yellow-jacketed CSST is a safe product?
14       MR. KURTZ: Object to form.
15   A.  In certain very specific circumstances,
16   a -- I would say the product manufactured by, for
17   example, Gastite may be installed in a manner
18   where -- where it's not bonded and it's perfectly
19   safe.
20       So that -- that situation can occur.
21   Q.  For an extremely low amount of current?
22   A.  I don't understand your question.
23   Q.  Okay.  I'll ask it a different way, then.
24       You've seen the testing that Gastite was --

Harri Kaarlo Kytomaa, Ph.D. - Vol. I
September 24, 2019

Video Deposition

Bonnie George, et al. vs.
Omega Flex, Inc., et al.

1  had a melt-through at .17 coulombs in the testing
2  from LTI, correct?  You've seen that testing?
3      A.  We've talked about that document, yes.
4  That's correct.
5      Q.  Okay.  Can you even quantify for me the
6  amount of current, the amount of coulombs that
7  bonded Gastite CSST can withstand without having a
8  melt-through?
9      A.  So that's a very different question from
10 what you had asked me before, but I believe that
11 tests have been performed to quantify, by
12 pre-pricking the jacket, what -- what sorts of
13 electrical insult in the form of current CSST,
14 specifically Gastite CSST, can take and not create a
15 perforation, or under what current conditions a
16 perforation is formed.
17         And that work has already been done -- I'm
18 sorry, also been done for other manufacturers, as I
19 understand it, including Omega Flex.
20     Q.  By whom?
21     A.  I believe that some of the testing has been
22 carried out by LTI.
23     Q.  In what context?  For submission with the
24 GTI report or for individual manufacturers?

1  I'm just trying to figure out what test you
2  are referring to.
3      A.  For example, Exhibit 6.
4      Q.  Okay.  I'm going to jump to some code
5  standards, so I just want to give you that heads up.
6  All right?
7          ANSI LC 1, are you familiar with that?
8      A.  Yes.
9      Q.  Okay.  Originally ANSI LC 1 did not require
10 any sort of lightning testing; is that correct?
11     A.  That may be true.  I have not looked at the
12 chronology --
13     Q.  That's okay.
14     A.  -- of LC 1.
15     Q.  Well, ANSI LC 1 today, as of 2019, requires
16 CSST to be able to withstand 4.5 coulombs, correct?
17     A.  That -- that may be.
18     Q.  Okay.  So there's testing that can be done
19 to demonstrate that yellow-jacketed CSST -- well,
20 that's actually a bad -- yellow-jacketed CSST
21 unbonded cannot withstand 4.5 coulombs, correct?
22     A.  Under certain circumstances, it can,
23 actually.
24     Q.  Which product can withstand that much?

1      A.  So did -- the -- the best way I can answer
2  that actually is that -- to say that, under rapid
3  waveforms consistent with lightning, the -- it is
4  much more difficult to form a perforation in a CSST.
5  And in those with very rapid waveforms, you can --
6  you can have much higher coulombs without a
7  perforation.
8      Q.  All right.
9      A.  And so that is -- that would be true to
10 different degrees, because the products are
11 different for the different manufacturers of the
12 yellow product.
13     Q.  All right.
14         Well, let's use a 10 x 350 waveform, which
15 you would submit is a standardized waveform,
16 correct?
17     A.  That's a -- a waveform that is commonly
18 used for partial, or indirect --
19     Q.  Okay.
20     A.  -- indirect insults on houses.
21     Q.  Would you expect yellow-jacketed CSST to be
22 able to withstand 4.5 coulombs with -- using a 10 x
23 350 waveform?
24         MR. KURTZ: Object to form.

1      A.  If a -- section of CSST is used in that
2  very, very specific protocol not in the house,
3  the -- the -- and -- and 10 x 350 waveform is
4  imposed to the levels, or a sufficiently high peak
5  current to deliver 4.5 coulombs, I think the data
6  shows that -- that the odds are that -- although
7  there is some variability in testing, the odds are
8  that there may be a perforation.
9      Q.  All right.
10         I don't know that you can answer this
11 question, but I'm going to ask it anyways.  Let's
12 assume a 10 x 350 waveform.  Let's
13 assume yellow-jacketed CSST, bonded and grounded.
14         How many coulombs can it withstand?
15     A.  So the difficulty associated with your
16 question is that ultimately you have to go to the
17 specifics of the house in question.  And -- and --
18 and so if the -- as you say, if the CSST is bonded,
19 one has to do the analysis of the -- you know, the
20 bonded circuit, just as I do in the report for --
21 for two -- two homes.  And -- and what you see is
22 that when you deliver, you know, in many instances
23 much more than 4.5 coulombs, you may still not have
24 any damage to the -- to the CSST and no arc

Bonnie George, et al. vs.
Omega Flex, Inc., et al.

Video Deposition

Harri Kaarlo Kytomaa, Ph.D. - Vol. I
September 24, 2019

11:47:27-11:48:08                                    Page 105

1  formation.
2      Q.  But the representations by the CSST
3  manufacturers is that bonded and grounded
4  yellow-jacketed CSST is a safe product, correct?
5          MR. KURTZ: Object to form.
6      A.  The -- so what I believe -- so two things:
7          One is that, you know, exactly what the
8  representations are by the industry I think speak
9  for themselves.  I believe that -- that a
10 properly-installed yellow-jacketed product for each
11 of the -- the three manufacturers in this matter is
12 safe if installed in accordance with their
13 instructions, and according to code.
14     Q.  But the information that there are
15 situations where bonding and grounding will not be
16 effective is not being disseminated to the public.
17         Do you agree with that?
18     A.  No, I don't agree with that at all.
19         I think that the GTI report is actually
20 very clear in -- in talking about essentially all of
21 the situations that are relevant to homes.
22     Q.  And the GTI report warns consumers that
23 there are circumstances where the bonding and
24 grounding in their home, of the CSST in their home,

11:48:32-11:49:29                                    Page 106

1  will not be effective?
2          MR. CASPER: Object to the form of the
3  question.
4      A.  I'm not -- I'm not sure what you're
5  referring to.  I'll be happy to review that
6  particular section of the report.
7      Q.  All right.
8          Let's get back to Exhibit 8.
9          And that second page -- all right.  Let's
10 go again down to that May 18th of 2007 John Hibner
11 e-mail.
12     A.  Yes.
13     Q.  Back to the same paragraph.
14         "Obviously, a lot of damage can be
15 done as lightning speeds through a house to
16 ground.  But no other system seems to be as
17 vulnerable as the CSST which becomes a" --
18 quote, unquote -- "'flame thrower' when
19 lightning creates a pinhole from arcing
20 from the CSST to other metal."
21         Did I read that correctly?
22     A.  You did.
23     Q.  You agree that since CSST is transmitting
24 gas, which is a flammable item, through a house,

11:49:58-11:51:01                                    Page 107

1  that great care should be given to put the best,
2  safest products out on the market?
3      A.  Yeah.  I do believe that -- that care
4  should be given when products are put out on the
5  market.
6      Q.  Do you believe that consumers should be
7  warned of all potential issues or problems with
8  products?
9          MR. KURTZ: Object to form.
10     A.  So product manufacturers have -- have
11 certainly an obligation to minimize the risk
12 associated with their products in light of the
13 benefits that the products provide.  They have an
14 obligation to design, certainly, those risks that --
15 that are significant, either by designing them --
16 the risks out of the product, preventing --
17 protective means, barriers, and other different
18 kinds of protective means that one can -- can come
19 up for consumer products.  Or, in those situations
20 where neither designing the product -- the risk out
21 or the -- the provision of protections are
22 available, the -- the product manufacturer should,
23 and regularly do, provide warnings associated with
24 what those risks are.

11:51:40-11:52:32                                    Page 108

1      Q.  Are you aware of any warnings issued by the
2  CSST manufacturers with regard to -- that reach
3  consumers with regard to the effectiveness of
4  bonding and grounding?
5      A.  The -- well, first of all, the -- really
6  the documentation associated with, for example --
7  and probably other things as well -- the GTI report
8  is available to consumers.  And then the --
9      Q.  If they go and find it?
10     A.  If -- that's right.  If they -- if they
11 look for it, it's available to them.  It's in the
12 public domain.
13         Also, the -- the product is typically
14 installed -- installed by professionals who, you
15 know, have training in -- in the installation of
16 these products, and they're the agents of the owners
17 in -- in performing that function.  And they're the
18 ones who not only have the training but also are
19 provided with the documentation associated with each
20 of the distinct products from WardFlex, Titeflex,
21 and -- and Omega Flex, both in the form of
22 documentation, D&I guides, as well as warnings.
23     Q.  Does the -- the code -- local code
24 person -- I'm going to call him the "AHJ," the

Bonnie George, et al. vs.
Omega Flex, Inc., et al.

Video Deposition

Harri Kaarlo Kytomaa, Ph.D. - Vol. I
September 24, 2019

1      That is not my definition of "design," so I
2  would differ on that.
3      Q.  Well, then can you answer my question
4  first?
5      A.  I'll try to answer your question.
6          So the -- the object themselves may -- may
7  have evolved and changed.  The -- all manufacturers
8  would -- certainly it's true of CSST
9  manufacturers -- develop over time.  Oftentimes they
10  will change suppliers for different parts of their
11  products.  They may -- they may make improvements to
12  the manufacturing processes.  And I'm sure Ward,
13  Gastite, Omega Flex do -- do this.  And so, as a
14  result, the -- I would completely expect that the
15  products would change over time.
16      You know, whether it is because of slight
17  changes to the design that make the -- the process
18  more efficient or improvements to the -- the
19  product, those sort of things.
20      Q.  Those are great generalities, but I'm going
21  to ask you the very specific question:
22          Are you aware of any changes between the
23  2000 piece of TracPipe and the 2011 piece of
24  TracPipe?

1      A.  So I don't specifically know, but I would
2  expect that -- that the jacket material may -- may
3  change over time.  I have not analyzed that.
4          But -- but -- but this goes to a point I
5  just made a moment ago where -- where you -- you're
6  looking carefully at your suppliers and making sure
7  that -- that, you know, you're getting the product
8  that you want from your suppliers.  And you may be
9  changing suppliers and resulting in -- in certain
10  changes to the composition that may still meet the
11  intended specification for the jacket.
12          And likewise, the, you know, metallurgical
13  specifications, the -- the suppliers of the metal
14  and the specific composition of the metal that is
15  provided, as long as it is within the specification
16  that is -- that is intended is something that
17  manufacturers -- manufacturers will continually
18  review, and therefore the products may change over
19  time in the market.
20      MR. SCHUMACHER:  Objection, nonresponsive
21  after, "I don't specifically know."
22      Q.  All right.
23          For Titeflex, the same basic question.  Are
24  you aware of any specific changes between a piece of

1  Gastite in 2000 and 2015 when they stopped selling
2  it in the US market?
3      MR. CASPER:  Object to the form.
4      A.  So I don't -- I haven't reviewed exactly
5  the years that they started to -- to deliver the
6  product to the market, but I would expect the same
7  to be true for Titeflex as Omega Flex where they
8  would be looking at the material formulations and
9  specifications and -- and suppliers and -- and, over
10  time, changing these.  And I would expect that that
11  would be reflected, then, in -- in the products
12  being a little bit different from the beginning of
13  the time frame that you've stated to the end of it,
14  if those are correct.
15      Q.  All right.
16          Do you know when Ward Manufacturing stopped
17  selling -- if they've stopped selling their yellow
18  WardFlex product?
19      A.  I don't know, either.
20      MR. SCHUMACHER:  All right.
21          I'm showing you now what I have marked as
22  Exhibit Number 9.
23          (Document marked as Kytomaa
24          Exhibit 9 for identification)

1      THE WITNESS:  Thank you.
2  BY MR. SCHUMACHER:
3      Q.  I'm assuming you've seen this e-mail at one
4  point or another, e-mail exchange between Mark
5  Goodson and Robert Torbin.
6      A.  I may have, but I've certainly not
7  committed this to memory.
8      Q.  I'm shocked, Harri.  All right.
9          Exhibit Number 9 -- granted, this is
10  August 27th of 2004 --
11          First of all, who is Bob Torbin?
12      A.  He at the time was working for
13  Foster-Miller.
14      Q.  He's an engineer, correct?
15      A.  That's my understanding, yes.
16      Q.  All right.
17          And I'm going to use this term -- he's been
18  called this before -- is Bob Torbin kind of known as
19  the "godfather of CSST"?
20      MR. CASPER:  Object to form.
21      A.  Yeah.  I don't know.  I don't know.  I
22  actually don't have an opinion one way or another on
23  that.
24      Q.  Okay.  Well, you would agree with me that

Harri Kaarlo Kytomaa, Ph.D. - Vol. I
September 24, 2019

Video Deposition

Bonnie George, et al. vs.
Omega Flex, Inc., et al.

1  the lightning strike sort of, as -- as I described
2  already, will find multiple paths to ground, and --
3  and a part of the total energy associated with that
4  discharge now impacts the home.  And so that can be
5  something that is either induced by -- by inductive
6  phenomena, inductive electric phenomena associated
7  with a lightning discharge that induces voltages in
8  the home, or a point of attachment that is
9  sufficiently remote so that only a part of that
10  total energy impacts the home.
11     Q.  So what is the charge transfer onto a
12  bonded yellow-jacketed CSST system in a direct
13  strike?
14        MR. KURTZ: Object to form, incomplete
15  hypothetical.
16     A.  So in -- in the situation that you've sort
17  of constructed there, the -- the -- that situation
18  will be a situation where the full energy of a
19  return stroke is injected into the -- the fuel gas
20  system.
21     Q.  Well, on the fuel gas system, on any other
22  metallic system in the house, correct?  The -- the
23  stroke would find any path to ground in a home it
24  could, would it not?

1     A.  I don't understand that question.
2     Q.  Well, the entire charge from a direct
3  strike is not only going to go onto the CSST; it's
4  going to be spread amongst any other metallic path,
5  or any other path to ground, correct?
6     A.  I think generally the lightning discharge
7  will find multiple paths to ground.  That's correct.
8     Q.  So I was really asking a wide-open
9  question --
10     A.  Yeah.
11     Q.  -- which was, when I said what is the
12  charge transfer onto the CSST from a direct strike,
13  the answer is you don't know, because it depends;
14  there's many variables, correct?
15     A.  Well, I do know that it cannot exceed the
16  total charge associated with the return stroke, so I
17  think that I don't know -- I mean, of course there
18  are many parameters.  Each situation is unique.
19  There's no question about that.  And each situation,
20  the charge difference -- the charge distribution and
21  what the destination and what each multiple -- each
22  of the multiple paths is is different.  There's no
23  question.
24        And so, you know, you've asked me a

1  question where you don't offer me that information,
2  and so, of course, there are many different
3  situations.  I've tried to answer the question as
4  best I understood it.  But you're right.  There are
5  multiple paths to ground, and there are many
6  different configurations, and each configuration is
7  different.
8     Q.  And each lightning stroke is a little
9  different, different waveform, different voltage,
10  correct?
11     A.  I think that the -- the lightning, the
12  lightning waveforms and voltages tend to be well
13  characterized with respect to what the range of
14  likelihoods are for, let's say, different peak
15  currents, or whether -- what the rise and fall time
16  are for first negative discharge, for example, or
17  subsequent negative discharge.  So I think that
18  there's a good understanding of those things.
19     Q.  That's the point I'm trying to get to:
20        There are many variables out there.
21  However, there is one representation by the CSST
22  manufacturers, and that is, "Bonding and grounding
23  of yellow-jacketed CSST makes it a safe product."
24        That is not true under all lightning

1  conditions, correct?
2        MR. KURTZ: Object to form, misstates
3  evidence.
4     A.  I don't -- I don't think that's correct.
5  I mean, I think that in performing the
6  analyses that Torbin and SEFTIM and -- and GTI have
7  carried out, they've taken into consideration the
8  breadth of possibilities and specifically looked at
9  different types of -- of events that occur out there
10  to then -- and lightning events that can impact
11  homes.
12        And so I don't think it's a fair
13  representation to say that there's only one
14  representation from the industry, and there are many
15  variables that they somehow have not taken into
16  consideration.  I think that -- I think that they
17  have.
18     Q.  Has that information been disseminated to
19  the public, though, those disclaimers, if you will,
20  of the conditions under which bonding and grounding
21  will not effectively protect the CSST system?
22        MR. KURTZ: Object to form and foundation.
23     A.  Well, I -- I didn't -- I don't know what
24  you mean by "disclaimer" specifically.  I didn't

Case 6:17-cv-03114-MDH   Document 296-1   Filed 10/23/19   Page 25 of 45

Bonnie George, et al. vs.
Omega Flex, Inc., et al.

Video Deposition

Harri Kaarlo Kytomaa, Ph.D. - Vol. I
September 24, 2019

1   talk about disclaimers.
2          But the information certainly is available
3   in the public through the GTI report, through
4   documentation associated with, for example, Fuel Gas
5   Code, NFPA 54 deliberations.  Those are open to the
6   public.  As well as the GTI report.
7          I may -- may be repeating myself.
8          So the -- so all of that information is in
9   the public domain.  And the way that the public can
10  access that information in a manner that it is
11  digestible, if you will, is as one does when one
12  needs any work done by a professional.
13         So, you know, I'm having work done on
14  plumbing at home.  I hire a plumber, and -- and I
15  expect the plumber to be a responsible plumber who
16  understands code regulations, as well as what the
17  expectations of the authority having jurisdiction,
18  so that he or she can relay that information to me,
19  if necessary.
20         MR. SCHUMACHER: Objection, nonresponsive.
21  I'll tell you what.  Let's go ahead and
22  take a break.
23         THE WITNESS: Thank you.
24         THE VIDEOGRAPHER: The time is now 12:18,

1   and we're off the record.
2          (Luncheon recess taken
3          at 12:18 p.m. to 12:59 p.m.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

1               AFTERNOON SESSION
2          THE VIDEOGRAPHER: The time is now 12:59,
3   and we're back on the record.
4   BY MR. SCHUMACHER:
5    Q.  All right.
6          I think we can move Number 9 off to the
7   side.
8    A.  The pile.
9          MR. SCHUMACHER: I'm going to show you what
10  I've marked as Exhibit Number 10.
11         (Document marked as Kytomaa
12         Exhibit 10 for identification)
13         THE WITNESS: Thank you.
14  BY MR. SCHUMACHER:
15   Q.  Have you seen that report before, that
16  article before?
17   A.  This document is not dated, so I'm not
18  sure -- so I -- I may have seen this document, but
19  I'm not sure it's the exact one that I've seen.
20   Q.  All right.
21         Well, let me just ask you, in general
22  terms -- because I'm not going to go into detail on
23  this -- you've generally seen this article before,
24  though?  This is regarding ignition testing done by

1   Integrity Forensics.
2    A.  So I have seen work from them.  And it may
3   be this document, but I'm not sure.
4    Q.  Okay.
5    A.  Yeah.
6    Q.  We can clarify this one very quickly as
7   far -- I know in other matters you have provided
8   testimony about testing you've done about the
9   ability of fugitive gas escaping from a arced hole
10  to ignite.
11         In this matter, however, you have not
12  formed any opinions or intend to provide any
13  opinions regarding the ability of gas to ignite when
14  escaping from a arced hole in CSST?
15   A.  So I've not provided specific opinions on
16  this, but if there are representations that are made
17  by the plaintiffs, that have not yet been made on
18  this subject, I may then respond to those
19  representations.
20   Q.  All right.
21         The only question I'm going to ask is this:
22         There are circumstances under which
23  fugitive gas escaping from an arced hole in CSST can
24  ignite and sustain ignition, correct?

Harri Kaarlo Kytomaa, Ph.D. - Vol. I
September 24, 2019

Video Deposition

Bonnie George, et al. vs.
Omega Flex, Inc., et al.

---

**13:02:14-13:03:21**           Page 133

1        MR. KURTZ: Object to form.
2     A.   So in the -- the -- in those situations --
3  like, for example, situations where the CSST was
4  improperly installed, and a house now is impacted by
5  lightning that then causes a perforation. In
6  instances like this, which I have -- I have seen,
7  what often happens is that a fire is started. So a
8  fire is either started elsewhere by the lightning
9  event and then, over time, the -- well, fire started
10  elsewhere; the gas coming out of the small
11  perforation that is created does not ignite
12  initially, and then ultimately the fire spreads and
13  the gas is ignited and does -- does burn.
14        So -- so that is one manifestation that I
15  think is a fairly common one, because the likelihood
16  of the gas igniting in the event of -- of an
17  electrical insult on the -- on the CSST is very low.
18  Is very low.
19     Q.   Okay.
20     A.   And I've performed testing that
21  specifically shows this.
22        There are -- and so if there is any
23  significant separation between -- between the CSST
24  and -- and the -- the other metallic object, then

---

**13:03:50-13:04:42**           Page 134

1  it's very difficult for the gas to ignite. And all
2  of the testing that I've done like that actually has
3  resulted in no ignition.
4        There are circumstances where, if you place
5  the -- the electrode, the opposing metal object
6  right in contact with the CSST, and now in the same
7  situation, a situation where the CSST is improperly
8  installed, is not bonded, and now there is a -- a
9  direct, or indirect, event that causes an arc to
10  form between a metal object that is in contact with
11  the CSST, there is a -- rare occasions in which --
12  in which it is possible for the -- for the gas to
13  ignite.
14        But -- but none of the tests that I've done
15  have been able to duplicate that.
16        MR. SCHUMACHER: All right. Objection,
17  nonresponsive.
18     Q.   Are you aware of testing, like what has
19  been done here by Integrity, that does seem to
20  demonstrate that once there's an ignition -- the
21  initiation of an arc hole, the fugitive gas can
22  ignite?
23        Are you aware of at least testing by others
24  that has demonstrated that that scenario does exist?

---

**13:05:08-13:06:26**           Page 135

1     A.   So I'm aware of the work that's been done
2  by Spruiell, Hergenrether and Colwell of Integrity
3  Forensics out of -- I think they're out of Sanger,
4  Texas.
5     Q.   Yes.
6     A.   I'm aware of the work that they have done,
7  and I would be happy to -- to discuss that in, you
8  know, more specifically if that's what is something
9  that you wish to do.
10        MR. SCHUMACHER: No.
11        Moving on, I'll show you now what I have
12  marked as Exhibit Number 11.
13          (Document marked as Kytoma
14          Exhibit 11 for identification)
15        THE WITNESS: Thank you.
16  BY MR. SCHUMACHER:
17     Q.   Have you seen that document before?
18     A.   It's a poor copy of -- of a document that
19  is entitled Omega Flex CounterStrike.
20        And, I mean, I have not seen this exact
21  copy. I have not seen anything as poor as this.
22  But I've seen -- I believe I've seen a -- a copy of
23  this elsewhere.
24     Q.   This one is actually dated -- the last

---

**13:07:24-13:08:02**           Page 136

1  page, it says revised as of June of 2004, and I
2  would like you to turn to the fifth page.
3     A.   Yes.
4     Q.   There is a chart at the bottom. On the
5  vertical axis it says "energy measured in coulomb
6  level."
7        Do you see that?
8     A.   I do.
9     Q.   All right.
10        I would submit to you this is actually an
11  advertisement for CounterStrike I, the first
12  generation of CounterStrike.
13        Have you -- are you aware of the two
14  different models, CounterStrike I and then
15  CounterStrike II?
16     A.   I'm -- I'm aware that there was more than
17  one incarnation of CounterStrike.
18     Q.   Okay. On the right-hand side, where it
19  says "CounterStrike .010 wall," it has a coulomb of
20  0.99.
21        Do you see that?
22     A.   In the far right?
23     Q.   Far right, yes.
24     A.   In the -- yes. I mean, there's a -- what

---

Bonnie George, et al. vs.
Omega Flex, Inc., et al.

Video Deposition

Harri Kaarlo Kytomaa, Ph.D. - Vol. I
September 24, 2019

1    looks like a sort of a graphical representation at
2    the bottom of the page with, on the far right,
3    saying -- it says "ratio." So just next to that is,
4    I think, where you're looking.
5        Q. Yes.
6            So the column just to the left of that,
7    says "TracPipe," 0.10 (sic) "wall," and coulomb of
8    0.12.
9            Do you see that?
10       A. I do.
11       Q. All right.
12           This is essentially an advertisement
13   indicating that CounterStrike can withstand
14   .99 coulombs as opposed to TracPipe, which can
15   withstand .12 coulombs, representing a 725 percent
16   increase.
17           MR. KURTZ: Object to form.
18       Q. Do you see that? Or do you agree with my
19   representation?
20       A. Yes. I mean, that's what the document
21   says.
22       Q. All right.
23           Do you know whether or not the 0.12 coulomb
24   for TracPipe, if that represented a bonded or

1    unbonded piece of TracPipe?
2        A. I -- I don't think that's a question I know
3    how to answer.
4        Q. Okay. What more information would you need
5    to answer that question?
6        A. I think the concepts you're presenting to
7    me are what I think is a -- is represented as --
8    as -- and I'll quote from this document. And I'm
9    just reading what the document says:
10           "The electrical energy levels in
11           coulombs ... which were known to cause
12           failures were then used as a baseline..."
13           So I believe that the horizontal numbers
14   there, at the bottom, are electrical energy levels
15   in coulombs known to cause failures.
16       Q. Okay.
17       A. And so if you do a test of what is the --
18   what I call the coulomb withstand of a specific
19   manufacturer's product, the concept of whether it's
20   installed properly in a house is like -- it's like
21   apples and oranges. It's, like, totally unrelated
22   to what you're talking about, so I don't -- I don't
23   know how to answer that question.
24       Q. All right.

1            Well, next to it, just to the left of
2    TracPipe, it says "competitive CSST brand"?
3        A. Yes.
4        Q. 0.10 (sic) wall.
5        A. Yes.
6        Q. That also is 0.12?
7        A. That's what that says, yes.
8        Q. That's what that says.
9            Do you have any idea which manufacturer of
10   CSST that was?
11       A. I -- I do not know. It may be that they're
12   using their own number. I don't -- I have no idea.
13       Q. All right.
14           Well, I think it's trying to draw a
15   comparison here between various products.
16           The last one, on the left-hand side,
17   "competitive CSST brand, .008 wall," and that has a
18   coulomb level of 0.015.
19           Do you see that as well?
20       A. Yes, I see that.
21       Q. All right.
22           Do you know whose CSST that is?
23       A. I don't know whether the -- what the
24   foundation of that is, whose product it is, or

1    whether it's an accurate representation.
2        Q. Okay. But this is an advertisement from
3    Omega Flex, correct?
4            MR. KURTZ: Objection to form.
5        A. Yes, this is an advertisement from Omega
6    Flex, specifically for -- advertising the
7    CounterStrike product.
8            MR. SCHUMACHER: I'll show you now what I
9    have marked as Exhibit Number 12.
10           (Document marked as Kytomaa
11           Exhibit 12 for identification)
12           THE WITNESS: Thank you.
13   BY MR. SCHUMACHER:
14       Q. All right.
15           Do you recognize this document? Or have
16   you seen this document before?
17       A. Yes. I -- I'm -- I believe I have seen
18   this document.
19       Q. All right.
20           And so this is a similar document to
21   Exhibit Number 11. This is now just updated for
22   CounterStrike II.
23           Do you agree with that?
24           MR. KURTZ: Object to form.

Bonnie George, et al. vs.
Omega Flex, Inc., et al.

Video Deposition

Harri Kaarlo Kytomaa, Ph.D. - Vol. I
September 24, 2019

13:19:53-13:20:35          Page 145

1  determinations as of -- or determinations of whether
2  the bonding is effective in certain circumstances,
3  and how much electrical charge needs to be imparted
4  to the whole system before the CSST itself might
5  become perforated.
6        And so, you know, that's the nature of the
7  analyses that I've done.  So the tools exist for
8  that analysis.  I have not seen a specific analysis
9  that compares a specific house on the one hand with
10  TracPipe and on the other with CounterStrike.
11  Q.  All right.
12        Let's go one bullet above that, the third
13  bullet.
14        "Testing by a leading US lightning
15        laboratory; resistance to damage from
16        transient electrical arcing caused by
17        lightning exceeds performance of
18        conventional TracPipe CSST by
19        5,000 percent."
20        Would you agree with me, then,
21  CounterStrike is a safer product than TracPipe?
22      MR. KURTZ: Object to form.
23  A.  So I do not agree with that.  I mean, I
24  think that that particular statement right there

13:21:05-13:21:51          Page 146

1  focuses on a very narrow point and takes out of
2  context, specifically out of the context of a
3  household gas system, or distribution system, and
4  makes a point associated with essentially this
5  resistance to damage point.  And the -- if you were
6  to perform a more thorough comparison, you should
7  take into consideration the fact that TracPipe, the
8  yellow-jacketed Omega Flex product, has an
9  insulating jacket, and that the likelihood of
10  actually forming an arc that overcomes the
11  dielectric strength of the jacket itself is much
12  less likely because it is an insulated product -- as
13  opposed to CounterStrike not being insulated -- and
14  furthermore, there is another level of protection
15  associated with TracPipe that CounterStrike does not
16  have, and that is the requirement for it to be
17  bonded.
18        And so if you take all of these things into
19  consideration, you're really looking at a different
20  product that is safe if installed in accordance with
21  the manufacturer's instructions.
22        And the same would be true for this
23  different product, called CounterStrike, that is
24  also safe if installed in accordance with the

13:22:15-13:22:59          Page 147

1  manufacturer's instructions.
2  Q.  This is an advertisement from Omega Flex,
3  correct?
4  A.  This is actually an advertisement
5  specifically for CounterStrike.
6  Q.  For CounterStrike.  Okay.
7  A.  Yes.
8  Q.  What's the first two words at the top --
9  the top left?
10  A.  "Increase Safety - Reduce Cost."
11  Q.  All right.
12        So in the earlier document we looked at --
13  I can find for the exhibit number -- we had
14  CounterStrike I at one coulomb.  Then we have
15  another advertisement, CounterStrike with -- able to
16  withstand six coulombs.
17        Is there any advertisement that Omega Flex
18  could put forward, or any of the CSST manufacturers,
19  to say "yellow-jacketed bonded and grounded CSST,
20  capable of withstanding" X "number of coulombs"?
21      MR. KURTZ: Object to form.
22  A.  If I understand your question correctly,
23  you're asking me is there some kind of advertisement
24  that one -- that Omega Flex could put out about

13:23:36-13:24:28          Page 148

1  TracPipe, for example, regarding -- regarding what
2  the coulomb withstand is associated with the
3  TracPipe -- pipe yellow product?
4        And the answer to that question is yes.
5  In -- so the way to address something like this
6  would be to show a specific house configuration and
7  to show that bonding quantitatively is very
8  effective, as has been demonstrated by -- by Torbin
9  and Kraft, as well as the GTI report, as well as
10  SEFTIM, that -- that shows that -- that with a
11  significant -- let's say with a lightning discharge
12  to the point of entry of the gas, the -- the bonding
13  redirects a lot of that energy in such a way as to
14  prevent, in many instances, the formation of an arc
15  on the yellow product.
16        So that is -- that is -- those are the
17  benefits associated with the yellow product that I
18  think the industry does represent through the very
19  documents that I've just mentioned to you.
20      MR. SCHUMACHER: Objection, nonresponsive.
21  Q.  But all TracPipe, according to their
22  advertisement, was -- was capable of being damaged
23  at .12 coulombs.  All CSS -- CounterStrike II is
24  susceptible at six coulombs.  All yellow-jacketed

Harri Kaarlo Kytomaa, Ph.D. - Vol. I
September 24, 2019
Video Deposition
Bonnie George, et al. vs.
Omega Flex, Inc., et al.

1   CSST bonded and grounded is capable of withstanding
2   a specific number of coulombs.
3        Does such a number exist?
4        MR. KURTZ: Object to form. Asked and
5   answered.
6        A. I think in a specific house geometry, yes.
7        Q. But not across the board for every single
8   house?
9        MR. KURTZ: Same objection.
10       A. Every house is different, and so you would
11   have to perform the analysis and arrive at that
12   number for each house configuration. And you can do
13   that if you -- if you so choose.
14       Q. But you've come up with an opinion that
15   says that yellow-jacketed CSST is always safe when
16   properly bonded and grounded.
17       That's simply not true, is it?
18       MR. KURTZ: Object to form.
19       A. I -- I think it is. I mean, I think that
20   the yellow product is safe. Specifically, for
21   example, the Gastite yellow product is safe is -- if
22   installed in accordance with the manufacturer's
23   recommendations.
24       Q. In every circumstance? Every lightning

1   strike?
2        A. Yes. I think it's -- it is safe. And as
3   long as it is -- it is installed in accordance with
4   manufacturers' recommendations.
5        Q. But you testified earlier that you've seen
6   situations where CSST, yellow CSST was properly
7   bonded and grounded and was still perforated by a
8   lightning strike.
9        MR. KURTZ: Object to form.
10       Q. Correct?
11       A. So my testimony earlier was that there
12   is -- there are circumstances that have a miniscule
13   probability and are incredibly rare in which a house
14   may be directly struck by lightning, and if the CSST
15   is not bonded, it may be possible for the CSST to be
16   perforated by the lightning insult.
17       MR. SCHUMACHER: I'm showing you now what I
18   have marked as Exhibit Number 14.
19       (Document marked as Kytomaa
20       Exhibit 14 for identification)
21       THE WITNESS: Thank you.
22       MR. SCHUMACHER: It's actually 15 in your
23   book.
24       Q. All right.

1        I would like you to turn to the third page
2   of Exhibit 14.
3        A. Third page. Yep.
4        Q. Specifically Paragraph 0004.
5        MR. KURTZ: Oh, geez.
6        THE WITNESS: What are you doing?
7        MR. KURTZ: Let's go off the record.
8        THE REPORTER: Off the record.
9        THE VIDEOGRAPHER: The time is now 1:27,
10   and we're off the record.
11       (Recess taken)
12       THE VIDEOGRAPHER: The time is now 1:31,
13   and we're back on the record.
14   BY MR. SCHUMACHER:
15       Q. All right.
16       Doctor, I've put before you Exhibit
17   Number 14. This is another US Patent and Trademark
18   Office application. This one is to Omega Flex.
19       Are you familiar with this document?
20       A. Yes, I think I've seen this document
21   before.
22       Q. All right.
23       I would like to go to the third page,
24   Paragraph 0004.

1        A. Yeah.
2        Q. "Another drawback to existing tubing is
3        that the tubing is often contained within a
4        jacket. Typically, the jacket is made from
5        an insulative material. In the event
6        that the piping is introduced to an
7        electrical charge (e.g. from direct or
8        indirect lightning), charge accumulates on
9        the jacket and can burn through the jacket
10       to the tubing resulting in a breach of the
11       tubing."
12       First, did I read that correctly?
13       A. You did.
14       Q. How is that statement any different than
15   what is contained in the Gastite Flashshield patent
16   application with regard to the effects of the
17   insulative material?
18       A. I mean, clearly this is a different
19   document, different statement.
20       Let me take just a couple of minutes, if I
21   may, to read this section that you're quoting from.
22       So this description really refers to tubing
23   that is a braided tubing. It talks about, if you
24   look at 0003, second line:

Bonnie George, et al. vs.
Omega Flex, Inc., et al.

Video Deposition

Harri Kaarlo Kytomaa, Ph.D. - Vol. I
September 24, 2019

1    "The braid is fixed at opposite ends
2  of the corrugated tubing.  The braid
3  reinforces the corrugated tube structure
4  thereby resisting the expansion of
5  corrugations when the internal pressure is
6  increased.  The braid is effective in the
7  function of resisting the expansion of the
8  corrugated tubing, thereby increasing
9  operational pressure capability.  However,
10  the braid covering the corrugated tubing
11  outer diameter is subject to relative
12  motion with the corrugated tubing that it
13  covers.  The tubing and the braid move
14  relative to each other along the length of
15  the corrugated tubing.  In applications
16  that plumb the corrugated tubing to
17  mechanical equipment that create vibration
18  translated to the tubing, the relative"
19  motions "causes" -- sorry -- "the relative
20  motion causes abrasion between the inside
21  of the braid and the outer surface of the
22  tubing.  The abrasion between the tubing
23  outer surface and the braid inner surface
24  creates failure mechanisms that compromise

1  the integrity of the corrugated tubing
2  structure.  The braid saws and rubs off the
3  outer surface material of the corrugated
4  tubing until the tubing pressure boundary
5  fails and subsequently leaks the working
6  fluid."
7    So I think -- I think that this document
8  relates to a different kind of tubing that has a
9  braid.
10    Q.  That's nice, except Paragraph 4 is dealing
11  with the jacket and the jacket being of an
12  insulative material and that it accumulates the
13  charge.  That has nothing to do with the --
14  braiding, as you've pointed out.  But the document
15  will speak for itself on that issue.
16    *My question is, is do -- do you foresee
17  that, or do you have an opinion as to whether or not
18  the yellow jacket actually helps to accumulate the
19  charge and focus it onto a point, which can result
20  in perforation of the CSST?
21    THE VIDEOGRAPHER:  The time is now 1:34 and
22  we're off the record.
23    (Discussion off the record)
24    THE VIDEOGRAPHER:  The time is now 1:37,

1  and we're back on the record.
2    *(Record read)
3    MR. KURTZ:  Object to form.
4    A.  I've already answered this question,
5  actually.  You've asked me whether the -- the
6  insulation of -- I think you asked me about the
7  Gastite, and I assumed that you're asking me about
8  the Omega Flex yellow product now --
9    Q.  Yes.
10    A.  -- focuses the energy, and I -- and my
11  opinion about that is that there are instances --
12  there are many instances where I expect that not to
13  be the case, and those are situations where the rate
14  of rise of the current associated with the lightning
15  insult to the tube is -- is such that it causes
16  pressure to build up in the insulation and to
17  separate the insulation from the corrugated steel
18  part of the CSST, and then ultimately to -- to be
19  blown away.
20    And in that situation, the -- the -- the
21  insulating jacket does not focus the energy.  And in
22  that -- in that situation, the -- it is also true
23  that the amount of charge acquired to breach the
24  CSST is -- is not lower, but higher than -- than --

1  than you would expect.
2    Q.  What if there's a breach in the yellow
3  jacket from installation or some other purpose?
4  Does that then cause the energy to be focused at
5  that breach of the yellow jacket for the Omega Flex
6  TracPipe product?
7    A.  As I -- first of all, the -- the vast
8  majority of CSST that is installed in -- in homes is
9  not breached, and -- and there are circumstances in
10  which -- so if the rate of rise of the current is
11  now lower than the example that I just provided,
12  then the insulation of the -- of the jacket actually
13  can prevent the formation of an arc in the first
14  place.  And so -- so in those two examples, I've
15  given you examples that I think -- I know are
16  representative of things that can occur in the field
17  where -- where focusing -- focusing does not occur.
18    The -- in the event that the -- in the
19  unlikely event that you have an alignment of both
20  a -- this hypothetical perforation in the insulation
21  and a -- an opposing metal electrode that becomes
22  now energized such that there is a potential
23  difference between the opposing metal electrode and
24  the CSST, then, in those situations, the -- the

Harri Kaarlo Kytomaa, Ph.D. - Vol. I
September 24, 2019

Video Deposition

Bonnie George, et al. vs.
Omega Flex, Inc., et al.

13:41:02-13:41:40 | Page 157

1 voltage that is required to form an arc is lower,
2 because you no longer have the -- in this
3 hypothetical situation, the insulating
4 characteristics of the jacket, since the jacket has
5 been perforated in the hypothetical. And so an arc
6 can form at lower -- lower voltages.
7 But generally that would not be
8 representative of what would happen in the field.
9 MR. SCHUMACHER: Objection, nonresponsive.
10 Q. But let's go back, if we need to, to
11 Exhibit Number 6, the LTI report and statement from
12 Omega Flex that:
13 "Based on field failures reviewed by
14 Omega Flex..."
15 So Omega Flex was seeing it in the field.
16 It's not hypothetical, having breaches in the -- in
17 the yellow jacket.
18 MR. KURTZ: Object to form.
19 Q. I would be happy to show it to you again.
20 A. Yeah. Exhibit 6?
21 Q. Exhibit 6 --
22 A. This is --
23 Q. -- EXPONENT 10625.
24 It's actually -- for you it would be 47.

13:42:13-13:42:41 | Page 158

1 A. Got it. 10625?
2 Q. Yes.
3 A. If you could point me to the --
4 Q. The second line of the last paragraph.
5 A. Okay.
6 Q. Go ahead and read that for the jury.
7 A. Yes.
8 So that paragraph starts -- I'll start at
9 the top of the paragraph, the last paragraph:
10 "The simulated lightning testing
11 included preparing the sample by breaching
12 the jacket only. Based on the field
13 failures reviewed by Omega Flex, the jacket
14 can easily and is usually breached during
15 installation, although for testing the
16 breach was required to assist in the -- of
17 discharge."
18 Q. All right. That's sufficient.
19 So it's not just merely a hypothetical
20 situation. This is happening in the field, where
21 Omega Flex is telling LTI that the jacket can easily
22 and usually is breached during installation.
23 MR. KURTZ: Object to form.
24 A. Sorry.

13:43:04-13:44:02 | Page 159

1 No. I think it is a hypothetical,
2 because -- the reason why it's a hypothetical is
3 that it can happen, but it doesn't always happen,
4 first of all. And secondly, that the breach must
5 align now with an opposing metal object. And if
6 you -- if they don't align, then the breach is
7 actually not -- no longer effective at assisting in
8 the discharge, as it says in Line 4 of the last
9 paragraph of 10625.
10 So that's why I think it's a hypothetical.
11 MR. SCHUMACHER: All right.
12 Let's go to what I've now marked as Exhibit
13 Number 15.
14 (Document marked as Kytoma
15 Exhibit 15 for identification)
16 THE WITNESS: Shall I put 14 away?
17 MR. SCHUMACHER: You may.
18 THE WITNESS: The pile. The pile grows.
19 Thank you.
20 BY MR. SCHUMACHER:
21 Q. All right.
22 Exhibit Number 15, this is an advertisement
23 by Gastite, Titeflex Corporation, about
24 CounterStrike.

13:44:34-13:45:13 | Page 160

1 Do you agree with that?
2 A. Yes.
3 So this is a document by Gastite talking
4 about CounterStrike, yes.
5 Q. All right.
6 I would like you to go down to the third
7 paragraph, "The Rest of the Story."
8 Do you see that?
9 A. I do.
10 Q. "Studies have shown that more than
11 50 percent of lightning flashes have charge
12 levels in excess of six coulombs."
13 Did I read that correctly?
14 A. Yes.
15 Q. So if CounterStrike is rated, from their
16 own advertisements, up to six coulombs before it
17 would perforate, and 50 percent of lightning flashes
18 are in excess of six coulombs, it would be fair to
19 say that the CounterStrike product would only be
20 safe for half of the -- of lightning flashes?
21 A. I don't think your statistics are correct.
22 Q. Where am I wrong?
23 A. I -- I think your representation of half of
24 the lightning strikes being greater than six

Case 6:17-cv-03114-MDH   Document 296-1   Filed 10/23/19   Page 32 of 45

Bonnie George, et al. vs.
Omega Flex, Inc., et al.

Video Deposition

Harri Kaarlo Kytomaa, Ph.D. - Vol. I
September 24, 2019

13:45:32-13:46:25                                                      Page 161

1    coulombs --
2      Q.  Well, let me ask you this:
3      A.  -- is not correct.
4      Q.  Do you agree with that statement that:
5                "Studies have shown that more than
6            50 percent of lightning flashes have
7            charge levels in excess of six coulombs"?
8      A.  I don't think that's correct, based on my
9    review of the scientific data.
10     Q.  All right.  Then we move on.
11     A.  Actually, sorry.  Let me -- let me -- let
12   me clarify what I mean.
13             The -- here there's a confusion that is
14   introduced by -- by this document between "flashes"
15   of lightning, which is the sum of all of the
16   current -- the charges associated with return
17   strokes, and return strokes.  And when Omega Flex
18   makes representations of six coulombs, they
19   specifically mean a return stroke, not multiple
20   return strokes that constitute a flash.  Okay?
21             And so that's -- I think that this document
22   certainly is misleading in that way.
23     Q.  Okay.  Well -- so if you have multiple
24   flashes in a brief time, is there a cumulative

13:46:25-13:48:17                                                      Page 162

1    effect of the charge transfer?
2      A.  Typically not.
3      Q.  Can there be?
4      A.  Not that I've seen.
5          MR. SCHUMACHER:  All right.
6          I'll show you what I've marked as Exhibit
7    Number 16.
8             (Document marked as Kytomaa
9             Exhibit 16 for identification.)
10         THE WITNESS:  Thank you.
11   BY MR. SCHUMACHER:
12     Q.  I'll ask you to turn to the second page.
13             And this is an e-mail Friday, November 9th
14   of 2012, from a Mike Peters at Morrison Supply.
15             I'm just trying to get an understanding of
16   what was -- what information was available in the
17   industry.  Second page.
18     A.  I think you misrepresented the -- who's
19   sending and who's receiving.
20     Q.  Did I?
21     A.  Yeah.
22     Q.  I apologize if I did.
23             Forgive me.  Mark Kirby is sending it to
24   Michael Peters?

13:48:32-13:49:38                                                      Page 163

1      A.  Yes.
2      Q.  Okay.  Forgive me.  I did not --
3    unintentional.
4          All right.
5        The second sentence after "Mike":
6                "Yellow product is safe as long as it
7            is installed correctly (bonded) but many
8            installers do not do this and some areas do
9            not require bonding."
10           That kind of goes back to that question I
11   had earlier about the AHJ.
12           If the AHJ approves a gas delivery system,
13   does that mean that it has been installed according
14   to code?
15     A.  If the AHJ approves an installation, it
16   means that the AHJ has approved the installation.
17           If the installation has been done in
18   accordance with code, it has been performed in
19   accordance with code.
20           Those are two different things, and
21   oftentimes they overlap, and it's possible for them
22   not to overlap.
23     Q.  All right.
24           The next sentence:

13:49:58-13:50:33                                                      Page 164

1                "Since the black products are safer
2            when they haven't been bonded, we believe
3            it is in the best interest of our customers
4            to only offer black CSST product."
5          So again, that comes down to that
6    quantification issue.
7             Is there any quantification to demonstrate
8    that black products are safer when they haven't been
9    bonded as compared to yellow CSST when it has been
10   bonded and grounded pursuant to a D&I guide?
11           MR. KURTZ:  Object to form.
12     A.  And what is your question?
13     Q.  Have there -- has there been any students
14   to support or quantify that relationship?
15           MR. KURTZ:  Object to form, asked and
16   answered.
17     A.  There have been studies associated with
18   specific individual products -- so from one of the
19   three manufacturers, if not more -- that quantify
20   the amount of electrical insult the gas systems can
21   take before a perforation occurs to their -- the --
22   the specific yellow product, for example TracPipe.
23           And the -- I have not seen a direct
24   comparison for the same configuration of a house and

Bonnie George, et al. vs.
Omega Flex, Inc., et al.

Video Deposition

Harri Kaarlo Kytomaa, Ph.D. - Vol. I
September 24, 2019

13:57:00-13:57:48                                                    Page 169

1   National Electric Code dealing with CSST.
2        Do you agree with that?
3   A.  As to your description of what the document
4   is?  Yes.
5   Q.  All right.
6        I would like you to turn to the third page.
7   On the bottom it would be George -- TITE_GEORGE
8   11645.
9   A.  Yes.
10  Q.  "Emergency Nature.
11        "There have been numerous accounts of
12       damage to corrugated stainless steel tubing
13       from both direct and indirect lightning
14       strikes on or near residential structures
15       containing this type of gas piping system."
16       Do you agree with that statement?
17  A.  I -- you know, I don't have independent
18  information to -- to agree or disagree with it.  I
19  mean, this is the representation of Mr. Torbin, I
20  believe, and -- and I don't -- I --
21  Q.  All right.
22  A.  I don't have the capacity to agree or
23  disagree with it.
24  Q.  Fair enough.

13:58:04-13:58:48                                                    Page 170

1        "The damage is consistent:  An
2   arc-induced perforation is created through
3   the tubing wall from a voltage imbalance
4   between the CSST and another electrically
5   conductive system in close proximity (see
6   Attachment E)."
7        Now, there is no differentiation in this
8   document between yellow-jacketed CSST from Omega
9   Flex, Titeflex or Ward Manufacturing.
10       Would you agree with that?
11  A.  Let me take a look at the --
12  Q.  Please do.
13  A.  I'm on Page 3 here.  Let me look at the
14  beginning of this one second.
15  Q.  Okay.  I'll tell you what.  I'll strike
16  that, and I'll make it a little bit easier.  All
17  right?
18       Just this -- those two paragraphs under
19  "emergency nature," do you agree, in those two
20  paragraphs, with regard to what's going on, the
21  description of the damage as per Robert Torbin,
22  there is no differentiation between TracPipe,
23  Gastite or WardFlex CSST?
24  MR. KURTZ:  Object to form.

13:59:43-14:00:31                                                    Page 171

1   A.  I agree that the words do not include the
2   names of the manufacturers in -- in the paragraph
3   and one or two lines that you have identified.
4   MR. SCHUMACHER:  Okay.  I'm going to show
5   you now what I've marked as Exhibit Number 19.
6        (Document marked as Kytomaa
7        Exhibit 19 for identification)
8   THE WITNESS:  Thank you.
9   BY MR. SCHUMACHER:
10  Q.  So you raised this point in your report,
11  that Robert Torbin attempted to -- the TIA 941 in an
12  effort to change the National Electric Code to
13  include a direct bonding requirement, correct?
14       You reference that in your report.
15  A.  I think my reference is much more broad
16  than what you just said, but I have a reference
17  associated with Torbin and the National Electrical
18  Code, yes.
19  Q.  All right.
20       The National Electric Code, back in 2009 --
21  and even today -- has refused to make that change.
22  They have refused to add a direct bonding
23  requirement for CSST, correct?
24  A.  My understanding is that the -- the

14:01:20-14:02:13                                                   Page 172

1   National Fire Protection Association that oversees
2   both NFPA 54 and NFPA 70 -- so 54 is the National
3   Fuel Gas Code, and 70 is the National Electrical
4   Code -- work hard towards harmonization of the
5   various standards.  And, to that end, they pay a
6   great deal of attention to the scope of each of
7   these standards.
8        And the way I understand -- I understand
9   what occurred here is that there was a -- a
10  recognition of this proposal, first of all, and --
11  and a -- a procedure within the NFPA to make a
12  determination as to whether this question falls
13  under the scope of the National Electrical Code or
14  the National Fuel Gas Code.
15       And I think that the determination was made
16  between these three entities -- so essentially the
17  two working committees, and the National Fire
18  Protection Association -- that it really falls under
19  the scope of the -- the fuel, National Fuel Gas
20  Code, or NFPA 54.
21       I'm not quite sure I would answer the
22  question the way you suggest.  I mean, I don't think
23  that there was a refusal or that sort of thing.  It
24  is more of a -- an exercise of a body working

Harri Kaarlo Kytomaa, Ph.D. - Vol. I
September 24, 2019

Video Deposition

Bonnie George, et al. vs.
Omega Flex, Inc., et al.

1 together and recognizing, you know, what makes the
2 most sense and coming to a conclusion in that
3 particular way.
4   Q. Well, then let's turn to Page 2 of 3 of
5 Exhibit 19.
6   A. Yes.
7   Q. Let's go down to the third full paragraph
8 where it starts "Secondly..."
9   A. Yep.
10   Q. "... the council notes that, in addition to
11      jurisdictional/scope concerns, the
12      balloting on the TIA raised questions
13      regarding whether the proposed bonding
14      requirements for CSST have been adequately
15      substantiated."
16      So as of 2009, August 6th, NFPA, this
17 technical committee, still has questions as to
18 whether or not the effectiveness of bonding and
19 grounding of CSST has been adequately substantiated,
20 agreed?
21   A. So if I understand this document correctly,
22 this is a document, a document that reflects the
23 deliberations of members of the working committees
24 associated with the National Electrical Code.

1     And -- and those members, according to the paragraph
2 that you just cited, seem to have raised questions
3 of scope.
4     So those are the jurisdiction --
5 jurisdiction and scope, those are the questions that
6 I raised to you a moment ago. So -- so those
7 were -- that's what I was referring to. And -- and
8 then additional questions were -- were raised
9 regarding the effectiveness or the adequacy of -- of
10 bonding. And, you know, and -- and I think that
11 the -- it may well be that the NEC did, indeed, have
12 such a question. I -- I don't have information to
13 corroborate or -- or show that that's not correct.
14 But -- but what I do know is ultimately that this
15 fell under the umbrella of the NFPA 54, and so the
16 question really is what did -- what occurred under
17 NFPA 54, the National Fuel Gas Code, and what did --
18 what did the NFPA ultimately do about all of this.
19     And, you know -- and I think the story
20 there is that -- is that efforts were taken, with
21 funding from the Fire Protection Research
22 Foundation, to -- to perform two studies:
23     The first study was the study that was
24 carried out by SEFTIM, that was -- that provided

1 guidance for what I would call Phase II, which was
2 the work that GTI carried out.
3   *Q. Do you know if the CSST manufacturers ever
4 pointed out to the public or revealed to the public
5 that there were still questions about the
6 sufficiency or adequacy of bonding and grounding as
7 an effective means of protecting CSST in the
8 2009/2010 time frame?
9     MR. KURTZ: Object to form.
10     THE WITNESS: Could you read that question
11 back to me, please.
12     *(Record read)
13   A. Yes, I -- I believe they -- they did.
14   Q. Through what means?
15   A. Through the D&I guide, which -- which talks
16 about the requirements associated with bonding, and
17 why, and -- and furthermore, there was
18 substantiation at that time, already --
19   Q. From where?
20   A. From work that was performed by Kraft and
21 Torbin that demonstrated that -- that, indeed,
22 bonding and grounding was effective.
23   Q. Did Kraft and Torbin have any actual
24 lightning insult testing done at LTI to support

1 their bonding and grounding?
2   A. I know they had -- they performed analysis,
3 and -- and part of that analysis may have also
4 included some testing, but I don't remember exactly.
5   Q. All right.
6     So when we say "analysis," what does that
7 mean? Does that just mean they're -- they're doing
8 SPICE computations, or -- or similar type of circuit
9 analysis?
10   A. Yes. What I mean by analysis is the SPICE
11 type of analysis that then uses electrical
12 characteristics of various components in question.
13   Q. Okay. So the Kraft-Torbin paper, though,
14 that was released in about -- in the 2007 time
15 frame, correct?
16   A. I don't remember the exact year, but it was
17 around then.
18   Q. But that's the point. Here we're in 2009
19 and we still have the NFPA technical committee
20 questioning the validity of the bonding and
21 grounding as an effective means of protecting CSST.
22     MR. KURTZ: Object to form.
23   A. Yeah. I don't exactly know.
24     I mean, my understanding of this document

Harri Kaarlo Kytomaa, Ph.D. -  Vol. I
September 24, 2019

Video Deposition

Bonnie George, et al. vs.
Omega Flex, Inc., et al.

1    Q.   All right.
2         All right.  Let's go -- I'm just going to
3    go to the last paragraph:  "Some of the evidence
4    provided..."
5    A.   Yes.
6    Q.   "Some of the evidence provided indicated
7         that some incidents from lightning
8         energized other metal, such as a metallic
9         chimney liner, that was in close proximity
10        to the CSST and therefore became the source
11        of the arc to the CSST."
12        Now, we did test that earlier, correct,
13   that potential hypothetical?
14   A.   We have, yes.
15   Q.   All right.
16        "It was not clear that when such metal
17        (such as structural metal, ventilation
18        ducting, flashings, roof vents and other
19        piping determined not likely to become
20        energized from the electrical system and
21        therefore not bonded)..."
22        And that's the issue I have with you; that
23   under the NEC, which talked about systems that had a
24   likelihood of becoming energized, if you have a flue

1    pipe from a fireplace with no electrical connection,
2    there is no bonding requirement because it's not
3    likely to become energized except by lightning,
4    correct?
5         MR. KURTZ:  Object to form.
6    A.   I'm sorry.
7         If it's a flue pipe that is connected to an
8    energized fireplace, for example, it will be
9    grounded through the appliance.
10   Q.   I agree.  But I said -- I said no
11   electrical connection.
12   A.   Okay.  No electrical connection.
13        So in that situation it is possible for the
14   flue pipe not to be grounded, yes.
15   Q.   Right.  And that creates a difference of
16   potential if it becomes energized when it's in close
17   proximity to yellow-jacketed CSST if it's bonded and
18   grounded, correct?
19   A.   You're giving me insufficient information
20   to completely get the picture here.
21   Q.   Okay.  Can you conceive of a situation
22   where you would have a flue pipe, not bonded and
23   grounded, being in close proximity to a piece of
24   yellow-jacketed CSST that is bonded and grounded?

1    Okay?  That -- I just want to start with that
2    scenario.  All right?
3         If that flue pipe becomes energized, it's
4    going to be seeking a path to ground.  Would it not
5    still have the potential for arcing over to the
6    bonded CSST?
7    A.   So if the CSST is actually connected
8    directly to the fireplace, which is often the case,
9    so they actually have a intermetallc connection,
10   then there would be no arc --
11   Q.   Okay.  And --
12   A.   -- in that situation.
13   Q.   A different scenario.
14   A.   Okay.
15   Q.   I'm not talking about, like, the actual run
16   for the fireplace.  Just another -- a run to another
17   device that is to be in close proximity in the metal
18   flue pipe.
19   A.   Uh-huh.
20   Q.   If the metal flue pipe becomes energized,
21   and it's close enough to that yellow-jacketed CSST,
22   even though bonded and grounded, there still would
23   be a difference in potential, correct, between the
24   energized flue pipe and the yellow -- bonded yellow

1    CSST?
2         There would be a difference in potential?
3    A.   So in that very unusual scenario that is --
4    that is remotely possible, yes.
5    Q.   Okay.  And, in fact, since the
6    yellow-jacketed CSST is bonded and grounded, it has
7    a very low resistance; it's actually a very good
8    path for -- to ground for the energy from that
9    energized flue pipe?
10        MR. KURTZ:  Object to form.
11   A.   So in that unique scenario that you've just
12   described -- which, I mean, there may be many other
13   paths that actually are better paths for -- for
14   the lightning energy to take, because lightning
15   energy follows all the possible paths that are
16   available to it -- that there is a remote
17   possibility, albeit highly unlikely, that that can
18   occur.
19   Q.   And we're going to discuss it a little bit
20   more later, but the -- you referenced the 2016
21   article from Tom Eagar, Dr. Eagar, who talks about
22   that exact scenario and says you could actually --
23   by having it bonded and grounded, you could actually
24   increase the possibility of an arcing event because

Case 6:17-cv-03114-MDH   Document 296-1   Filed 10/23/19   Page 36 of 45

Bonnie George, et al. vs.
Omega Flex, Inc., et al.

Video Deposition

Harri Kaarlo Kytomaa, Ph.D. -  Vol. I
September 24, 2019

1   of the -- you've lowered the resistance for the
2   CSST, creating a bigger difference in potential.
3   You can actually attract an arc.
4       A.  I mean, you can identify, you know, sort of
5   the -- you can look for unique and unusual
6   configurations, and -- and the probability of the
7   more you look, the lower the probability of those
8   particular occurrences would be.  But there are
9   unusual, and so let's say rare, configurations where
10  that can occur, where you can have an energized flue
11  pipe arc over to CSST in that situation.
12      Q.  But that's the point.  There are scenarios
13  out there where bonding and grounding of the
14  yellow-jacketed CSST does not prevent an arcing
15  event.
16          MR. KURTZ:  Object to form, and asked and
17  answered.
18      A.  Well, my point is that in the vast majority
19  of cases it is beneficial.  And you're looking for
20  the -- sort of the miniscule probability situation
21  that you're identifying here where that might occur.
22          MR. SCHUMACHER:  Objection, nonresponsive.
23  I'm going to show you now what I have --
24          (Phone rings)

1           MR. SCHUMACHER:  I'll show you now what I
2   have marked as Exhibit Number 20.
3           (Document marked as Kytomaa
4           Exhibit 20 for identification)
5   BY MR. SCHUMACHER:
6       Q.  Have you seen this document before?
7       A.  Yes, I believe I've seen this document.
8       Q.  All right.
9           This is -- we're back to the NFPA 70 task
10  group on CSST, correct?
11          So that's -- and by "NFPA 70," that's the
12  National Electric Code task group on CSST, right?
13      A.  Yes.
14      Q.  All right.
15          I would like you to turn to Page 3 of 4.
16          I would like you to go to the last full
17  paragraph.
18      A.  To the one that's headed "Technical
19  Substantiation"?
20      Q.  Yes.
21      A.  Okay.
22      Q.  And then the -- but the next paragraph
23  starts with "concerned."
24      A.  Yeah.

1       Q.  "Concerned with a lack of technical
2   substantiation, the CSST task group
3   concluded that a research program was
4   necessary to 'identify safe methods for the
5   installation of CSST to protect against
6   lightning-induced failure with consequent
7   gas leakage.'  The CSST task group report
8   identified, among the areas that should be
9   addressed, the following:"
10          All right.  Let me start there.
11          So this is 2010, correct?  March 3rd of
12  2010 is the date of this decision?
13      A.  Yes.
14      Q.  The Torbin and Kraft white paper was 2007,
15  available in the industry for review?
16      A.  I don't remember the exact date.
17      Q.  Okay.
18      A.  But around then.
19      Q.  Okay.  But the CSST task group is still
20  indicating there is still insufficient information
21  to substantiate the efficacy of bonding and
22  grounding, and now they are requesting that a
23  protocol be created for a testing, correct?
24          MR. KURTZ:  Object to form.

1       A.  You know, I think the document speaks for
2   itself, but I -- I can't add -- add to that.
3       Q.  That's fine.  So the document does speak
4   for itself, but let's look at the first point.
5           So the first area of inquiry that testing
6   should be done to:
7               "Validate whether or not bonding of
8           CSST is an adequate solution to the
9           lightning exposure problem."
10          That's one of the first things they're
11  looking to test, do you agree with that, at least
12  from the document?
13          MR. KURTZ:  Object to form.
14      A.  So the -- the context that I'm lacking here
15  is in light of the fact that this is a document that
16  is associated with the -- the working group of the
17  National Electrical Code, whether the people that
18  are writing this document are -- let me -- let me
19  restate.
20          How are the authors of this document
21  defining "adequate solution to lightning exposure
22  problem"?  Like, for example, are they intending, or
23  are they expecting that whatever is used is used for
24  the CSST -- for example, bonding of the CSST -- is

Harri Kaarlo Kytomaa, Ph.D. - Vol. I
September 24, 2019

Video Deposition

Bonnie George, et al. vs.
Omega Flex, Inc., et al.

1  intended to protect the house from lightning insult,
2  for example, which would be a higher standard in the
3  sense that CSST is not there to protect a house from
4  lightning.  And so -- so there is context here that
5  I'm lacking that prevents me from really answering
6  your question correctly.
7      Q.  That's fine.
8          This report ultimately led to SEFTIM I, the
9  Phase I testing conducted by SEFTIM, correct?
10     A.  So, you know, I don't know whether it is
11  this report, but ultimately -- and the date of the
12  SEFTIM I report will speak for itself -- but there
13  was a Fire Protection Research Foundation project
14  that then funded -- funded the SEFTIM I project.
15     Q.  Okay.  Well, let's turn to the next page,
16  then --
17     A.  Sure.
18     Q.  -- Page 4 of 4.
19         The next point that they are looking to
20  test:
21             "If bonding is the solution, validate
22         how bonding should be done."
23         Did I read that correctly?
24     A.  You did.

1      Q.  All right.
2          The next bullet point:
3              "If bonding is the solution, validate
4          the size of the bonding jumpers."
5          Did I read that correctly?
6      A.  You did.
7      Q.  The next one:
8              "Determine if bonding should be done
9          at a location or locations other than where
10         the gas pipe enters the building."
11         Did I read that correctly?
12     A.  You did.
13     Q.  Last one:
14             "Determine if alternate methods could
15         be used for safe installation, i.e.
16         separation from other equipment."
17         Did I read that correctly?
18     A.  You did.
19     Q.  All right.
20         So how -- and this is March of 2010.  If
21  the -- the technical group on -- or the task group
22  on CSST is still asking these questions about
23  "what's the right size of a jumper," "what's the
24  separation," how can a manufacturer out there be

1  saying "bonding and grounding is safe" --
2          MR. KURTZ:  Objection.
3      Q.  -- if it hadn't been validated as of 2010?
4          MR. KURTZ:  Object to form, misstates
5  evidence, argumentative.
6      A.  I mean, one -- one way for -- for that to
7  be the case is for the work done by Torbin to have
8  actually arrived at those very answers.
9      Q.  This is 2010.  That information was
10  available.  That's 2007.
11     A.  I understand.
12     Q.  They considered it, and they said, "It's
13  still not" -- "insufficient to validate bonding and
14  grounding as being a sufficient means of protecting
15  CSST," correct?
16         MR. KURTZ:  Objection.  Let the witness
17  finish -- finish his answer to the question.
18     A.  I'm not sure what I'm answering right now.
19         MR. KURTZ:  All right.
20         MR. SCHUMACHER:  Well, then we'll move on.
21     Q.  Let's go to Page 4 of 4, the first full
22  paragraph after that.
23     A.  Yep.
24     Q.  Let's go down to the one, two, three --

1  fourth line after August 6th of 2009.  The sentence
2  starts, "Because so little..."
3      A.  Yes.
4      Q.  "Because so little information was provided
5          to the task group, it is unclear whether
6          and to what extent a problem exists.  The
7          paucity of the submissions to the task
8          group, however, confirms the council's view
9          that the concerns that have been raised
10         about CSST should be addressed and
11         resolved."
12         Did I read that correctly?
13     A.  I do (sic).
14     Q.  And, in fact, as of this group they were
15  contemplating pulling approval of CSST absent some
16  validation of bonding and grounding, correct?
17         MR. KURTZ:  Object to form and foundation.
18     A.  I don't recall -- I don't recall that
19  specific matter.
20     Q.  Well, let's go down to the end of Page 4 of
21  4, the one, two, three, four -- fifth line from the
22  bottom.  In fact, we'll go up a little bit further.
23         Do you see where it says "October 6th,"
24  2010 (sic)?

Case 6:17-cv-03114-MDH   Document 296-1   Filed 10/23/19   Page 38 of 45

Bonnie George, et al. vs.
Omega Flex, Inc., et al.

Video Deposition

Harri Kaarlo Kytomaa, Ph.D. - Vol. I
September 24, 2019

1    A.  Further down?

2    Q.  A little bit -- a little bit further up.

3    A.  Oh, yeah.  I see it, yep.

4    Q.  All right.

5            "Whether through the auspices of the

6    Research Foundation or through other means,

7    it is incumbent upon the manufacturers or

8    others promoting the use of CSST in gas

9    piping systems to provide independently

10   validated and reliable technical

11   substantiation demonstrating that CSST can

12   be" used safely.  "If substantiation is not

13   provided, the technical committee on the

14   National Fuel Gas Code must consider

15   prohibiting the use of CSST in NFPA 54,

16   National Fuel Gas Code."

17          Did I read that correctly?

18   A.  You did.

19   Q.  So there was a consideration of pulling it,

20   pulling the -- prohibiting the use of CSST absent

21   demonstrating the validity of this?  As of 2010.

22   A.  Well, that's not how I'm reading it.

23          I'm saying that if sub -- substantiation is

24   not provided, then that kicks on this process of the

1    NF -- the Fuel Gas Code then considering prohibiting

2    the use of CSST.  And so, you know, I disagree with

3    your representation.

4        MR. SCHUMACHER: That's fine.

5        I'll tell you what.  We've been going about

6    an hour again.  Why don't we go ahead and take a

7    break.

8        THE VIDEOGRAPHER: The time is now 2:30,

9    and we're off the record.

10       (Recess taken)

11       THE VIDEOGRAPHER: The time is now 2:46,

12   and we're back on the record.

13       MR. SCHUMACHER: All right.

14       Dr. Kytomaa, I am showing you what I have

15   marked as Exhibit Number 21.

16       (Document marked as Kytomaa

17       Exhibit 21 for identification)

18       MR. SCHUMACHER: And I'll tell you right

19   now, that is not the entirety of the document.

20   That's -- that's the SEFTIM I report.  It's about

21   285 pages, so I just took out some excerpts.

22   Q.  But are you basically familiar with the --

23   that document, the SEFTIM Phase I report?

24   A.  So I've reviewed the report, but not

1    recently.

2    Q.  Okay.

3    A.  And so I'm generally familiar with it, but

4    certainly have not committed it to memory.

5    Q.  Understood.

6          You had said earlier that some -- something

7    you had relied upon, or the industry had relied to

8    quantify the effectiveness of bonding and grounding

9    was the SEFTIM report, so I wanted to discuss this

10   with you a little bit.

11          I would like you to look at page -- well,

12   at the bottom it's got a Bates number TITE_GEORGE

13   23977.

14   A.  Yes.

15   Q.  All right.

16          The very bottom paragraph, "The study then

17   concentrates..."

18   A.  Yes.

19   Q.  All right.

20          "The study then concentrates on

21   indirect lightning (partial lightning

22   current) and induced lightning.  Direct

23   lightning is also addressed, even if, in"

24   this case -- "in the case of direct strike

1    to the structure, the presence of a

2    lightning protection system as required by

3    NFPA 780 needs to be considered."

4          So NF -- this was essentially limited at

5    this point to testing for indirect strikes.

6          Is that a correct statement?

7    A.  So this report, if you look at the very top

8    there, includes three things:  A literature review,

9    consultation with experts and a gap analysis.  So --

10   so this report does not address testing.

11   Q.  Okay.  Well, fair enough.

12          The review -- or the scope of this was

13   limited to indirect strikes, not direct strikes,

14   though.

15          Do you agree with that?

16   A.  I'm not sure I understand your question.

17   The -- so just ask it again, I guess.  I mean, I'm

18   struggling with your question.

19   Q.  I'll withdraw it.  Don't worry about it.

20   Let's move on to something else.

21          Let's go to page GEORGE 23980 of Exhibit

22   Number 21.  Let's go down to the bottom:

23          "The text concludes by answering the

24   initial questions raised at the origin of

Bonnie George, et al. vs.
Omega Flex, Inc., et al.

Video Deposition

Harri Kaarlo Kytomaa, Ph.D. - Vol. I
September 24, 2019

14:55:38-14:56:38                                    Page 201

1          MR. CASPER: Object to the form of the
2     question.
3          A.  The position of the -- say the bonding and
4     grounding clamp on the gas service will influence
5     the -- what that electrical circuit looks like from
6     a standpoint of how the gas system responds to the
7     influx of lightning energy.  And so if you change
8     the location of the bonding clamp, it will change
9     the current, and I think that the -- the voltages
10    will be different, as will -- as will the currents.
11    And then the question is whether that change is --
12    is substantive or not.  And that depends on exactly
13    what the change was, and you need to analyze that.
14         Q.  Understood.
15             I mean, as a practical matter, your
16    testimony is that if you bond and ground the system,
17    it's providing an additional path to ground, so
18    you're going to allow for some dissipation of energy
19    from the system, correct?
20         A.  The function that bonding typically does --
21    provides is -- is diversion of energy away from the
22    gas system.  So it's not so much a dissipation; it's
23    actually redirecting, if you will, and -- and also
24    causing the currents in the gas lines themselves to

14:57:09-14:58:06                                    Page 202

1     be lower, and therefore the voltages to be lower, to
2     reduce the likelihood of an arc to form in the first
3     place.
4          Q.  You're attempting to provide a path to
5     ground before an arc can occur between another
6     metallic system with a difference in potential?
7          MR. CASPER: Object to the form of the
8     question.
9          A.  I wouldn't put it quite in those -- in
10    those terms.
11             I mean, the only piece that I agree with is
12    that the bonding and grounding provides another path
13    to ground.
14         Q.  All right.  Let's go back to -- I think
15    it's Exhibit 21, GEORGE 23981.
16             Let's go down to the second full point,
17    "Alternatively..."
18         A.  Yes.
19         Q.  Okay.
20             "Alternatively CSST specifically
21    designed to withstand an enhanced lightning
22    surge may be considered, provided their
23    behavior is supported by tests."
24    Did I read that correctly?

14:58:21-14:59:02                                    Page 203

1          A.  Yes.
2          Q.  All right.
3             I mean, that's essentially come up with a
4     new product.
5          MR. KURTZ: Object to form.
6          Q.  Correct?
7          A.  I'm not sure I read it quite in those
8     terms.  That is -- you know, it says that the CSST
9     should be "specifically designed to withstand an
10    enhanced lightning surge," and that that "may be
11    considered," but --
12         Q.  We're back to that argument we had earlier
13    about my definition of "design" versus your
14    definition of "design"?
15         A.  Yeah.  Right.
16         Q.  When you include "design" as amending the
17    design and installation guide to effect the bonding
18    and grounding, you consider that potentially a
19    change in the design of the product?
20         A.  It's part of the design, that's correct.
21         Q.  Okay.  So -- but there's a difference
22    there.  There's a difference in a design of a
23    product versus a design of the system, correct?
24         A.  The -- the product itself that you buy --

14:59:36-15:00:14                                    Page 204

1     so, in this case CSST -- is part of a system in a
2     home.
3          Q.  All right.
4             Let's go down to the last bullet point:
5             "Bonding with Number 6" -- I'm just
6     going to call it gauge -- "needs to be
7     validated by more tests since the tests
8     published so far do not cover the complete
9     picture, even though Number 6" gauge "is
10    the normal size for equipotential bonding
11    conductors and should be enough."
12             Would you agree that as of the writing of
13    this report the -- there was more testing required
14    or requested by SEFTIM to validate that Number 6
15    gauge wire was sufficiently validated for bonding
16    purposes?
17         MR. KURTZ: Object to form.
18         A.  Yeah.  I mean, I think it's important to
19    note that this document, the entire SEFTIM document,
20    is a paper study.  So it, itself, did not attempt to
21    perform any testing.
22             And so one of the conclusions -- which is,
23    let's say, in part expected, given the scope of the
24    work that SEFTIM was given -- was that testing would

Bonnie George, et al. vs.
Omega Flex, Inc., et al.

Video Deposition

Harri Kaarlo Kytomaa, Ph.D. - Vol. I
September 24, 2019

1        **(Document marked as Kytomaa**

2        **Exhibit 26 for identification)**

3  **BY MR. SCHUMACHER:**

4  Q.  Have you seen that document before?

5  **A.**  **Yes.**

6  Q.  All right.

7      Mr. Goodson, in Exhibit 25, "A Hidden CSST

8  Electrical Danger," points to certain inaccuracies

9  in the GTI report.

10     Would you agree with that statement?

11  **MR. KURTZ:**  Object to form.

12  Q.  And you can look specifically on Page 3 of

13  Exhibit 25, the second -- or, I guess, the first

14  full paragraph:

15      "The hidden danger that arises from

16      the use of CSST starts when one realizes

17      that the above GTI numbers are incorrect."

18      Specifically, he was referring to the

19  resistance numbers; is that correct?

20  **A.**  **Yes.**

21  Q.  All right.

22      Fair to say that the inaccuracy of the

23  resistance numbers contained in the GTI report was

24  not picked up by any peer review that was conducted?

1  **A.**  **In the -- in the first issue of the report,**

2  **that's correct.**

3  Q.  All right.

4      Well, let's, then, look at Exhibit

5  Number 26, the GTI report, the revision.

6  **A.**  **Yes.**

7  Q.  And let's please go to Page 1, the

8  "Executive Summary."

9  **A.**  **Yes.**

10  Q.  All right.

11     The first line of the second paragraph:

12      "It is important to note that the

13      incorrect values were not used in any

14      critical calculations or simulations."

15     The -- the original GTI report had a

16  resistance, I want to use an example, of 22.2 ohms

17  whereas it was off by a factor of 10.  It should

18  have been 2.22 ohms.

19     Is that -- is that correct?

20  **A.**  **I would be happy if you sort of show me the**

21  **documents.  I know that you can't show me the**

22  **documents because you don't have both, but, you**

23  **know, I don't remember by heart those numbers.  So I**

24  **can't -- I can't confirm, but -- but, you know, I**

1  think that the documents will speak for themselves.

2  Q.  Okay.  That's true.  That's very true.

3      So -- all right.  I'll move on then.

4      Let's move down the executive summary.

5  Page 3 of Exhibit 26 starts:

6      "There are two areas that the testing

7      plan..."

8  **A.**  **Yes.**

9  Q.  Do you see where I am?

10  **A.**  **Yeah.**

11  Q.  "There are two areas that the testing plan

12      explicitly does not address."

13      The first bullet point:

14      "The sustained conduction of power

15      line fault current by CSST is outside of

16      the scope of this project."

17  **A.**  **Yes.**

18  Q.  Okay.  Now, that's residential household

19  current; is that correct?

20  **A.**  **Yes.**

21  Q.  All right.

22      The next line:

23      "This condition has been shown to

24      cause" perforations -- or "perforation in

1      prior studies."

2      Did I read that correctly?

3  **A.**  **Yes.**

4  Q.  All right.

5      The next bullet point:

6      "Direct lightning strikes are outside

7      the scope of this project."

8      Did I read that correctly?

9  **A.**  **Yes.**

10  Q.  "Indirect strikes and induced currents in

11      various residential structures are far more

12      numerous than direct strikes, providing

13      motivation to deal with this category of

14      event."

15      Did I read that correctly?

16  **A.**  **You did.**

17  Q.  All right.

18      So none of the calculations or testing or

19  circuit analysis contained in the Exhibit Number 26,

20  the GTI Revision A report, analyzed the

21  effectiveness of bonding and grounding of CSST with

22  regard to, number one, household residential

23  current, correct?

24  **A.**  **Although this document does state that --**

Harri Kaarlo Kytomaa, Ph.D. - Vol. I
September 24, 2019

Video Deposition

Bonnie George, et al. vs.
Omega Flex, Inc., et al.

| 15:29:49-15:30:38 | Page 221 |
|---|---|

1 you stopped short of the sentence. It says:
2 "This issue is properly addressed by
3 circuit protection devices that detect the
4 flow of fault current and disconnect it at
5 the source."
6 So the -- I mean, it's addressed
7 essentially separately by these kinds of devices, so
8 that's for the first part.
9 Q. All right.
10 But please answer my question, though.
11 There's -- nothing in Revision A provides
12 testing analysis, circuit analysis with regard to
13 the effect of household residential current on
14 yellow-jacketed CSST and its effect on bonding and
15 grounding?
16 A. The -- yeah. This -- this page, this
17 particular bullet does say that this report does not
18 look at "the sustained conduction of power line"
19 faults through CSST.
20 Q. Understood.
21 A. That's correct.
22 Q. And then the next bullet point, the testing
23 plan explicitly does not address -- direct lightning
24 strikes are also outside the scope of this project,

| 15:31:06-15:32:00 | Page 222 |
|---|---|

1 correct?
2 A. I think -- so that's what this line says,
3 but my review of the report does -- I would say that
4 this is not a -- a complete description of what the
5 GTI report does in the sense that -- that really the
6 distinction between indirect and direct strikes are
7 whether the full electrical energy associated with
8 the lightning discharged impacts the structure as
9 opposed to a partial impact. You know, that's
10 typically the division that you see in the lightning
11 literature.
12 And my review of the conditions that were
13 analyzed by the GTI report -- that are, you know
14 very quantitatively summarized -- show that they
15 actually do look at discharges that are consistent
16 with the full energy of a lightning discharge,
17 and -- and so they -- and they do so by subjecting
18 the -- let's say the fuel gas system with, let's
19 say, an injection of this -- this electrical energy
20 at the point of entry of the gas system.
21 So I would say that -- that I wouldn't
22 quite describe the -- the scope of the GTI report
23 as -- as direct lightning strikes being outside of
24 the scope, since they do include analyses within the

| 15:32:32-15:33:23 | Page 223 |
|---|---|

1 scope of the report that are consistent with direct
2 strikes.
3 Q. But there was no testing protocol directed
4 at direct strike effects on bonded and grounded
5 CSST?
6 MR. KURTZ: Object to form.
7 A. I would say that generally there was,
8 because the -- the -- the -- the reason why there
9 was, was that -- is that a lot of the testing was a
10 characterization of the electrical properties of
11 components in households associated with the fuel
12 gas system, and then many of the conclusions are
13 really based on detailed analyses in the GTI report
14 that -- that include the total energy of -- of
15 return strokes -- albeit total energy of it is --
16 that is introduced into the -- the structure at the
17 point of entry of the gas service. And so -- so,
18 you know, that is -- you know, I think that some of
19 the scope of the GTI report considers situations
20 that one might call, in part, direct lightning
21 strikes to the system.
22 Q. So to the extent that a current analysis
23 may have represented the current from a direct
24 strike, it would theoretically fall under the scope

| 15:33:54-15:36:50 | Page 224 |
|---|---|

1 of this report?
2 A. Well, no. No. It falls under the scope of
3 this report, not theoretically, because they -- they
4 do, you know, quantify and -- and present the
5 results, and the results are based upon the
6 combination of testing and analysis.
7 MR. SCHUMACHER: All right.
8 I'm going to show you what I am marking as
9 Exhibit Number 27.
10 (Document marked as Kytoma
11 Exhibit 27 for identification)
12 MR. SCHUMACHER: It's Tab 30, Counsel.
13 THE WITNESS: Thank you.
14 BY MR. SCHUMACHER:
15 Q. Have you seen any of these documents
16 before?
17 A. Yes, I've seen some of these.
18 Q. If you could please turn -- at the lower
19 left-hand corner there is the numbered pages one --
20 like Page Number 1 is 158 of 274.
21 Do you see that?
22 A. I do.
23 Q. I would like you to turn to 168 of 274 --
24 A. Okay.

Case 6:17-cv-03114-MDH  Document 296-1  Filed 10/23/19  Page 42 of 45

Harri Kaarlo Kytomaa, Ph.D. - Vol. I
September 24, 2019

Video Deposition

Bonnie George, et al. vs.
Omega Flex, Inc., et al.

1    **A.**  Yep.
2    **Q.**  "PowerCET chose to use their own measured
3    value of CSST resistance for these
4    simulations..."
5    **A.**  Yep.
6    **Q.**  Did I read that -- well:
7    "... 40 milliohms per meter" --
8    **A.**  Yep.
9    **Q.**  -- "for one-inch diameter and 66 milliohms
10    per meter for" half-inch "rather than those
11    provided by LTI."
12    **A.**  Yep.
13    **Q.**  Did I read that all correctly?
14    **A.**  Right.  You did.
15    **MR. SCHUMACHER:** I'm going to show you what
16  I am marking as Exhibit Number 28.
17    (Document marked as Kytomaa
18    Exhibit 28 for identification)
19  **BY MR. SCHUMACHER:**
20    **Q.**  Have you seen that -- I'll let you just
21  housekeep.
22    I'm showing you now what I've marked as
23  Exhibit Number 28.
24    Have you seen that document before?

1    Have you seen that document before?
2    **A.**  I may have seen this document.  I mean, I
3  certainly haven't reviewed it recently.
4    **Q.**  Okay.  Well, this is a -- the press release
5  from Jim Narva, National Association of State Fire
6  Marshals --
7    **A.**  Yes.
8    **Q.**  -- executive director, dated July 18th of
9  2012; is that correct?
10    **A.**  Uh-huh.
11    **Q.**  All right.
12    **A.**  Yes.
13    **Q.**  That the CSST manufacturers were -- or the
14  National Association of State Fire Marshals was
15  launching a nationwide yellow CSST safety campaign
16  with the CSST manufacturers.
17    **MR. KURTZ:** Object to form.
18    **A.**  I think the title of this document is,
19  "National Association of State Fire Marshals (NASFM)
20  Launches Nationwide Yellow CSST Safety Campaign."
21    **Q.**  All right.
22    Was this supported by the CSST
23  manufacturers, financially and otherwise?
24    **MR. KURTZ:** Object to form and foundation.

1    **Q.**  If you know.
2    **A.**  I -- I don't know anything about the
3  funding structure associated with this -- this
4  document.
5    **Q.**  That's fine.
6    **A.**  Yeah.
7    **Q.**  Well then, let's -- at least date-wise, you
8  would agree with me, if the original GTI report was
9  not released until 2013, that this campaign started
10  prior to the release of the GTI report?
11    **A.**  So, yes.  I mean, the...
12    **Q.**  The original -- well, let me ask this:
13    The original GTI report was issued on
14  September 5th of 2013, correct?
15    **A.**  That's my understanding, yes.
16    **Q.**  All right.
17    From Exhibit 26?
18    **A.**  Yes.  I mean, on the front page it has
19  the -- the two dates.  It's got the report issued
20  September 5th, 2013, and then the revised report
21  issued October 12th, 2015.
22    **Q.**  All right.
23    So the testing and validation that was
24  supposed to be set forth by the GTI report had not

1  come out prior to July 18th of 2012, correct?
2    **MR. KURTZ:** Object to form.
3    **A.**  The -- that's right.  The GTI report has a
4  date that is later than July 18th, 2012.
5    **MR. SCHUMACHER:** I'm showing you now what I
6  have marked as Exhibit 29.
7    (Document marked as Kytomaa
8    Exhibit 29 for identification)
9  **BY MR. SCHUMACHER:**
10    **Q.**  Have you seen that document before?
11    **MR. SCHUMACHER:** It's 36, Counsel.
12    **A.**  I may have seen this document, but I have
13  not reviewed it recently.
14    **Q.**  All right.
15    I'm just going to go to the very last
16  sentence of the second full paragraph, "These
17  tests..."
18    Do you see where I am?
19    **A.**  I do.
20    **Q.**  "These tests, however, do not evaluate CSST
21  for the threats of electrical arcing
22  associated with direct lightning or
23  household electrical system faults."
24    Did I read that correctly?

Case 6:17-cv-03114-MDH   Document 296-1   Filed 10/23/19   Page 43 of 45

Harri Kaarlo Kytomaa, Ph.D. - Vol. I
September 24, 2019

Video Deposition

Bonnie George, et al. vs.
Omega Flex, Inc., et al.

1   were not included in the GTI report?
2     A.  My understanding is that the GTI report
3   presented all of the circuit analyses that they --
4   they performed.
5     Q.  So if they ran an analysis, it's contained
6   in the report?
7     MR. KURTZ: Object to form.
8     A.  I expect there would be either as -- you
9   know, as a statement of what the input parameters
10  were and -- and what the findings were, which may
11  appear either as a -- let's say an entry in a table
12  or a data point in a graph, that sort of thing.
13    Q.  All right.
14        Let's go back to Exhibit Number 34, please.
15    A.  Yes.
16    Q.  Now, is this basically an update by Bryan
17  Haslam and Tom Eagar of the 2015 document we were
18  looking at a few moments ago?
19    MR. KURTZ: Object to form.
20    Q.  That one, Exhibit 32.
21    A.  2.
22        It is a -- this is a -- a paper --
23  Exhibit 34 is a paper entitled "Variation in
24  Lightning Simulations to Assess Grounding Safety of

1   Corrugated Stainless Steel Tubing (CSST)," and
2   Exhibit 32 is a paper, a different set of authors,
3   entitled, "Fire Safety of Grounded" Corrugated
4   "Stainless Steel Tubing in a Structure Energized by
5   Lightning."
6     Q.  All right.
7         Let's look at Page 1 of Exhibit Number 34,
8   in the first page abstract --
9     A.  Yes.
10    Q.  -- about halfway down, a little more than
11  halfway down, "Our results show..."
12    A.  Yep.
13    Q.  "Our results show that there are cases
14        where grounding may prevent perforation" --
15    A.  Yep.
16    Q.  -- "cases where grounding may reduce the
17        damage but not prevent perforation" --
18    A.  Yes.
19    Q.  -- "and cases where grounding increases the
20        chances of perforation."
21        Did I read that correctly?
22    A.  Yes, I see that.
23    Q.  And that was based on some 2,560
24  simulations they ran?

1     MR. KURTZ: Object to form.
2     A.  Yes.  I mean, it was based on 2,560
3   simulations they represent they ran, and many of
4   which would be, let's say, fictitious in the sense
5   that they don't necessarily represent parameters
6   that would be real from a standpoint of what a house
7   would actually have as parameters.
8     Q.  All right.
9         Let's go to the next line after I just
10  read:
11        "Our results further show that for
12  lightning strikes with peak current greater
13  than the median, there was never a case
14  where grounding could have prevented
15  perforation."
16        Well, the median is 50 percent?
17    A.  Yes.
18    Q.  All right.
19        So:
20        "Our results further show that for
21  lightning strikes with peak current
22  greater than" 50 percent, "there was never
23  a case where grounding could have prevented
24  perforation."

1         Is that an accurate statement --
2     A.  No.
3     Q.  -- based on their findings?
4     A.  Well, I -- I don't think it's an accurate
5   statement, but that's what the document says.
6     Q.  Okay.  Then the last line:
7         "In particular, we show grounding of
8   CSST will not prevent fires when assaulted
9   by lightning with any reasonable degree of
10  certainty."
11        Did I read that accurately?
12    A.  That's what that says.
13    Q.  All right.
14        If you could pull out Exhibit Number 3,
15  your report.  Let's go to Roman numeral xxiii.
16  Conclusion Number 1:
17        "TracPipe, WardFlex and Gastite CSST are
18  safe and effective products for
19  distributing fuel gas throughout a
20  structure when they are installed and
21  maintained in accordance with the
22  manufacturers' instructions that are
23  provided in the design guide and
24  installation instructions (D&I guides)."

Bonnie George, et al. vs.
Omega Flex, Inc., et al.

Video Deposition

Harri Kaarlo Kytomaa, Ph.D. - Vol. I
September 24, 2019

16:27:09-16:28:06                                                    Page 249

1    First of all, CSST being "effective," that
2    just essentially means they are able to run gas to
3    the appliances in a home without leaks.
4         Is that a fair statement?
5    A.  In part, yes.
6    Q.  Okay.
7         How do you define "safe"?
8    A.  Safe in the sense that it provides
9    considerable benefits in light of the -- you know,
10   the recognized risk that -- that distribution of
11   fuel gas always has risks, as exemplified, for
12   example, by -- by the -- the fact that gas piping,
13   specifically black iron piping, often leaks, and
14   so -- so you need to -- to make sure that you have
15   ways of minimizing the leaks.  And -- and CSST does
16   that.
17   Q.  How do you define "safe" with regard to the
18   ability of TracPipe, WardFlex and Gastite to
19   withstand the electrical current from a lightning
20   strike?
21   A.  These products need to be designed in such
22   a way as to be able to withstand a reasonable --
23   conditions that might occur quite often, and not
24   incur a leak.  And -- and so that is the process

16:28:46-16:29:16                                                    Page 250

1    that the manufacturers have undertaken, and -- and
2    that's culminated in certainly the product itself,
3    but also the directions and the training programs
4    that they have for proper installation.
5    Q.  I want to go down to Section 5.
6         "Grounding and direct bonding of
7         TracPipe, WardFlex and Gastite, as
8         prescribed by their D&I guides,
9         significantly reduces the likelihood of
10        arcing between the CSST and another
11        conductor, such as a metal duct, water
12        pipe, or a branch circuit wiring in the
13        event of lightning."
14   A.  Yes.
15   Q.  Quantify for me "significantly."
16        Is it five percent?  10 percent?
17   50 percent?
18   A.  I think that goes on a case by case.  And
19   I've quantified it actually -- in answer to your
20   question, I would turn your attention to my analysis
21   in this case, where the analysis is performed with
22   and without a bonding wire, and you could -- you
23   could calculate the percentages for yourself.
24   Q.  But that's based on those two specific

16:29:43-16:30:40                                                    Page 251

1    homes?
2    A.  Yes.
3    Q.  There is no way to quantify that number
4    across the board for all WardFlex CSST homeowners?
5         MR. KURTZ: Object to form.
6    A.  Yeah.  So that is not something that you
7    can, let's say, quantify with a single number,
8    because it's very case specific.  Each installation
9    is different.  Each product from each manufacturer
10   is different.  And so you would have to take into
11   consideration the very details that we quantified
12   through our inspections of the nine homes that I've
13   documented in -- in my report.
14   Q.  I would like you to turn to the next page
15   of your Exhibit Number 3, xxiv, Item 7:
16        "Assertions by the plaintiffs that
17        statements related to bonding and grounding
18        made by Omega Flex, Ward and Titeflex were
19        false'" --
20   A.  Yep.
21   Q.  -- "and 'not in accord with the facts' are
22        unsupported and inaccurate."
23        What statements specifically are you
24   referring to?

16:31:48-16:32:48                                                    Page 252

1    A.  So I will turn your attention to Page 168
2    of my report.
3    Q.  I'm there.
4    A.  And -- and so -- so under Section 7.3, I
5    have -- let's see -- one, two, three, four full
6    paragraphs.  I'll go through each of them in answer
7    to your question.
8         So here, under 7.3.1, there is a reference
9    to:
10        "... Exhibit E (Electrical Bonding of
11        CSST Systems by Cutting Edge Solutions).
12        Based on this document, the plaintiffs
13        incorrectly suggest that because grounding
14        and direct bonding were intended for
15        reducing the risk of damage of indirect
16        lightning, that grounding and direct
17        bonding are limited to that function."
18        So that's -- that's the first one.
19        Second one, under 7.3.2 --
20   Q.  Well, let me back up before, if you don't
21   mind, on 7.3.1.
22   A.  Uh-huh.
23   Q.  The last line there:
24        "Contrary to the plaintiffs'